# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 08-CR-274 (ESH) |
| | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| KEVIN A. RING, | ) | |
| | ) | |
| Defendant. | ) | |

## KEVIN A. RING'S MOTION TO DISMISS THE INDICTMENT

Pursuant to Fed. R. Crim. P. 12(b), the Defendant, Kevin A. Ring, hereby moves to dismiss indictment filed against him on September 5, 2008 by the United States. This motion is based on the accompanying memorandum of points and authorities, the First, Fifth and Sixth Amendments to the United States Constitution, and any other authorities that the Court deems relevant to this motion. Mr. Ring respectfully requests oral argument on the motion.

Respectfully submitted,

Dated: January 30, 2009

_/s/ Richard A. Hibey_____
Richard A. Hibey (D.C. Bar #74823)
Andrew T. Wise (D.C. Bar # 456865)
Matthew Reinhard (D.C. Bar # 474941)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 08-CR-274 (ESH) |
| | ) | |
| KEVIN A. RING, | ) | |
| | ) | |
| Defendant. | ) | |

## KEVIN A. RING'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT

Richard A. Hibey (D.C. Bar #74823)
Andrew T. Wise (D.C. Bar # 456865)
Matthew Reinhard (D.C. Bar #474941)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858

*Attorneys for Kevin A. Ring*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.    THE HONEST SERVICES FRAUD COUNTS (COUNTS III through VIII) MUST BE DISMISSED.................................................................2

    A.    The Honest Services Fraud Statute Applies Only To Situations In Which Public Officials Misuse Their Official Position For Private Gain And Cannot Be Applied To A Private Citizen Under the Circumstances Alleged Here.............................8

    B.    The Prior Congressional Gift, Travel and Disclosure Rules Cannot Serve as Basis For Imposing Criminal Liability Because They Provided No Warning, Much Less Fair Warning, That Their Violation Is A Crime.  In Short, They Are Not Criminal Laws As They Do Not Provide A Punishment For Their Violation. .............................................................11

    C.    The Honest Services Fraud Statute Cannot Be Applied As a "Catch-All" Theory Of Criminal Liability For Acts Involving Federal Officials Since Doing So Would Upset the Intricate Web of Federal Regulations, Both Administrative and Criminal, Governing the Acceptance of Gifts and Other Self-Enriching Actions By Federal Officials..................................................................................16

    D.    Counts VII and VIII Must Be Dismissed Because They Do Not Involve Any Alleged Behavior By Mr. Ring......................................20

II.    THE GRATUITIES COUNT (COUNT II) MUST BE DISMISSED. .......................................................................................21

III.    THE CONSPIRACY COUNT (COUNT I) MUST BE DISMISSED. .......................................................................................24

IV.    THE OBSTRUCTION OF JUSTICE COUNTS (Counts IX and X) MUST BE DISMISSED. .......................................................28

    A.    The Obstruction Charges Must Be Dismissed Because of the Failure To Meet the Nexus Requirement Established by The Supreme Court in Obstruction of Justice Cases. ................................29

    B.    Count X Must Be Dismissed Because the Statute Under Which It Is Brought Applies To Tampering With

Documents And Other Physical Evidence And Does Not
Apply To The Allegations Made Here......................................................33

CONCLUSION...........................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Arthur Andersen v. United States*, 544 U.S. 696 (2005)......................................29, 31, 32

*Beach v. United States*, 19 F.2d 739 (8th Cir. 1927) ........................................................23

*Begay v. United States*, 128 S. Ct. 1581 (2008)....................................................33, 34, 35

*Bouie v. Columbia*, 378 U.S. 347 (1964) ...........................................................................4

*Cleveland v. United States*, 531 U.S. 12 (2000) .................................................................3

*McBoyle v. United States*, 283 U.S. 25 (1931) ...................................................................4

*McNally v. United States*, 483 U.S. 350 (1987)......................................................3, 10, 25

*National Association of Manufacturers v. Taylor*, 549 F. Supp. 2d 33 (D.D.C. 2008) ...............................................................................................................................13

*Pettibone v. United States*, 148 U.S. 197 (1893) ..............................................................31

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ..................................................................36

*Rogers v. Tennessee*, 532 U.S. 451 (2001) .........................................................................7

*Sparf v. United States*, 156 U.S. 51 (1895)........................................................................7

*United States v. Aguilar*, 515 U.S.  593 (1995) ....................................................28, 30, 31

*United States v. Bass*, 404 U.S. 336 (1971) .....................................................................40

*United States v. Biaggi*, 853 F.2d 90 (2d. Cir. 1988).........................................................23

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998)...............................................5, 9, 10

*United States v. Brown*, 459 F.3d 509 (5th Cir. 2006).........................................................4

*United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997)......................................................5

*United States v. Espy*, 145 F.3d 1369 (D.C. Cir. 1998) .......................................................2

*United States v. Granderson*, 511 U.S. 39 (1994) ............................................................40

*United States v. Jimenez Recio*, 537 U.S. 270 (2003)........................................................25

*United States v. Lanier*, 520 U.S. 259 (1997)................................................................11

*United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979) .................................................23

*United  States v. Murphy*, 323 F.3d 102 (3d Cir. 2003).........................................4, 5, 9, 16

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997).........................................................2

*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002) ...................................................4

*United States v. Sawyer*, 239 F.3d 31 (1st Cir. 2001) .........................................................10

*United States v. Sun-Diamond*, 138 F.3d 961 (D.C. Cir. 1998).........................................19

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) .............................. *passim*

*United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007).....................................................4

*United States v. Warner*, 292 F. Supp. 2d 1051 (N.D. Ill. 2003)...............................5, 8, 9

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007) .....................................................17

*United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005).........................................................2

*Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007)....................................21, 22, 23

## FEDERAL STATUTES

2 U.S.C. § 1604(d)(1)(G) ........................................................................................13

2 U.S.C. § 1606(b) .........................................................................................13, 19

2 U.S.C. § 1607(a) ......................................................................................................7

2 U.S.C. § 1613..........................................................................................................13

5 U.S.C. 7353 & 5 CFR § 2635 ............................................................................19

5 U.S.C. § 7353(c) .................................................................................................28

18 U.S.C. § 1341......................................................................................................24

18 U.S.C. § 1346............................................................................................ *passim*

18 U.S.C. § 1503 ........................................................................30, 31, 36, 37

18 U.S.C. § 1512 .............................................................................................36

18 U.S.C. § 1512(b) ..................................................................................31, 38

18 U.S.C. § 1512(b)(1) .............................................................................35, 36

18 U.S.C. § 1512(b)(2)(B) ........................................................................37, 39

18 U.S.C. § 1512(b)(3) ...................................................................................28

18 U.S.C. § 1512(c) ..................................................................................33, 38, 39

18 U.S.C. § 1512(c)(2) ........................................................................28, 29, 37

18 U.S.C. § 1512(f)(1) .....................................................................................31

18 U.S.C. § 1519 .............................................................................................38

18 U.S.C. § 201(a)(3) ......................................................................................22

18 U.S.C. § 201(c) ..........................................................................................19

18 U.S.C. §201(c)(1)(A) .................................................................................24

18 U.S.C. § 371 ...............................................................................................27

18 U.S.C. § 924(e)(2) ......................................................................................33

148 Cong. Rec. S6542 ....................................................................................38

148 Cong. Rec. S6768 (daily ed. July 15, 2002) ...........................................39

*Honest Leadership and Open Government Act of 2007 (HLOGA), Pub. L. 110-
81, 121 Stat. 735 (Sept. 14, 2007) .............................................................6, 12

S. Rep. No. 107-146, at 7 (2002) ..............................................................38, 39

Sen. McCain, 153 Cong. Rec. S637-38 (Jan. 17, 2007) ................................12

Stat. of Rep. Kind, 153 Cong. Rec. E42 (Jan. 4, 2007) .................................12

Stat. of Sen. Reid, 153 Cong. Rec. S220 (Jan. 8, 2007) ................................12

U.S. Const. Amend. I .......................................................................................7

## MISCELLANEOUS

Jeffrey H. Birnbaum & Thomas B. Edsall, *Hill Gift Limits Often Exceeded,
Lobbyists' Records Show:  BellSouth Document Illustrates Gap Between the
Rules and the Realities*, WASHINGTON POST, A4 (Jan. 1, 2006)..................................15

Committee on the Judiciary, *Allegations of Selective Prosecution: The Erosion of
Public Confidence in our Federal Justice System* (Oct. 23, 2007)...............................9

Juliet Eilperin, *Gift Rules Regularly Flouted on Hill, Insiders Say; House Ethics
Chairman Acknowledges Enforcement Breakdown*, WASHINGTON POST, A27
(Oct. 14, 2002) ................................................................................14

O'Sullivan, *Symposium: Corporate, Criminality, Legal, Ethical, and Managerial
Implication: The Challenge of Cooperation: The DOJ Risks Killing The
Golden Goose Through Computer Associates/Singleton Theories of Liability*,
44 Am. Crim. L. Rev. 1447, 1450 (2007)...................................................30

Senate Judiciary Committee Report on the Public Corruption Prosecution
Improvement Act of 2007, Senate Report 110-239 (Dec. 10, 2007)...........................1

*Testimony of Richard Thornburgh before the Committee on the Judiciary,
Allocations of Selective Prosecution; The Erosion of Public Confidence in our
Federal Justice System, (Oct. 23, 2007)* ...................................................9

Transcript of March 2, 1999 Supreme Court Oral Argument in *Sun-Diamond* ...............16

*United States v. Abramoff*, 1:06-cr-0001 (ESH) .............................................18

*United States v. Heaton*, 1:07-cr-00042 (ESH) ..............................................27

*United States v. Jefferson*, 1:07-cr-209 (TSE) (E.D.Va.) ..................................18

*United States v. Ney*, 1:06-cr-00272 (ESH) .................................................27

*United States v. Volz*, 1:06-cr-1119 (ESH) .............................................18, 27

*United States v. Zachares*, 1:07-cr-106 (ESH) ..............................................6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 08-CR-274 (ESH) |
| | ) | |
| KEVIN A. RING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>INTRODUCTION</u>

The Department of Justice has repeatedly decried the reach of federal anti-corruption

laws, particularly as construed by the Supreme Court, and actively lobbied the Congress to

broaden those laws.[1]  To date, those efforts have failed.  Despite that failure, the government has

secured an indictment against Kevin Ring that reflects the law as the government wishes it were,

not as the law actually existed at the time of the charged offenses.

The government employs the existing federal statutes as a broad "meat-axe" the Supreme

Court has forbidden, rather than the narrow "scalpel" mandated in the context of public

corruption allegations involving federal officials.  *United States v. Sun-Diamond Growers,* 526

U.S. 398, 409 (1999).  This tact is particularly problematic when applied to a private lobbyist,

whose very job is to influence federal officials, and to the lobbying profession itself, where "an

intricate web" of federal anti-corruption laws already exists in part to provide clarity to the line

---

[1] The Public Corruption Prosecution Improvement Act of 2007 was proposed in August 2007, but never made it out of Committee.  *See Senate Judiciary Committee Report on the Public Corruption Prosecution Improvement Act of 2007*, Senate Report 110-239 (Dec. 10, 2007) (Attached as Exhibit 1).  The proposed bill sought to broaden existing provisions governing the corruption of federal officials, including the "honest services" fraud statute and the anti-gratuity provision.

between proper and improper influence.  *Id.*  The indictment against Mr. Ring seeks to

circumvent that web through the use of an open-ended "honest services" statute that has, to our

knowledge, never been applied to private citizens lobbying federal officials.  Indeed, it is no

coincidence that the United States Court of Appeals for the District of Columbia Circuit has

reviewed numerous cases under the federal anti-bribery and anti-gratuity laws but has never been

called on to review a public corruption conviction involving federal officials under the "honest

services" statute.  The charges against Mr. Ring cannot be reconciled with the laws under which

they are brought, and the facts, assuming *arguendo* they are true, allege no violation of federal

law.  As a result, each count in the indictment must be dismissed.

## **ARGUMENT**

Rule 12(b) of the Federal Rules of Criminal Procedure permits the filings of pre-trial

motions to dismiss the indictment.  Under Rule 12(b), this Court must dismiss an indictment (or

separate counts within it) "where [there are] material facts [that] are undisputed and only an issue

of law is presented."  *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005), citing as

examples, *United States v. Espy,* 145 F.3d 1369, 1370 (D.C. Cir. 1998); *United States v. Oakar,*

111 F.3d 146, 147-50 (D.C. Cir. 1997).

That is the situation here.  The material facts set forth in the indictment fail to allege a

criminal offense as a matter of law.  The Court should accordingly dismiss the indictment in its

entirety with prejudice.

## I.     THE HONEST SERVICES FRAUD COUNTS (COUNTS III through VIII) MUST BE DISMISSED.

Six of the indictment's ten counts allege that Mr. Ring violated the wire fraud statutes.

The indictment does not allege, however, that Mr. Ring committed "fraud" in any classic sense

of the term, *i.e.*, by depriving anyone of tangible property interests.  Rather, it proceeds entirely

under the nebulous theory that Mr. Ring, a private lobbyist whose fiduciary duty was to represent his clients zealously, committed "honest services fraud" by sending or receiving five email messages[2] that purportedly were part of a "scheme and artifice to defraud and deprive the United States and its citizens of their right to honest services of certain public officials within the legislative and executive branches, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment and self dealing . . . ."  Indictment, DE 2, p. 39.

The charges rest on 18 U.S.C. § 1346, a twenty-eight word law providing merely that a fraudulent mail or wire fraud scheme includes one designed "to deprive another of the intangible right of honest services."[3]   The statute was passed after the Supreme Court, in *McNally v. United States*, 483 U.S. 350, 360 (1987), flatly rejected the theory of "honest services fraud" and refused to expand the mail fraud statutes beyond a traditional fraud involving tangible monetary or property interests.  The statute thus leaves it entirely to the federal courts to sort out the definition of an "intangible right of honest services" and to determine the contours of that right. In light of the statute's vague terms and lack of any guidance from Congress, the Supreme Court has continued to tread lightly in this area, *Cleveland v. United States*, 531 U.S. 12, 27 (2000), going so far to as state that its reading of the wire fraud statute as set forth in *McNally* remains the law.  *Id.* at 26 ("we reaffirm our reading of § 1341 in *McNally.*").

The dangers of broadly interpreting a criminal law like this one are obvious:  No two people would likely agree about the nature and scope of the "intangible right of honest services"

---

[2] The six counts include one based upon an email sent by a Congressional staffer to Mr. Ring (count 7) and one based upon the cashing of a check by a Congressman's wife (count 8).  The infirmity of those puzzling counts is addressed in section I(D), *infra*.

[3] In its entirety, 18 U.S.C. § 1346 provides:  "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services.

and Congress has failed to provide any additional guidance on what conduct is criminal and what is not.  Section 1346, in other words, fails on its face to provide what Justice Holmes spoke of as "fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed."  *McBoyle v. United States*, 283 U.S. 25, 27 (1931).  Such "fair warning" emphasizes clear lines between legal and illegal conduct, *id.*, in order to ensure "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  *Bouie v. Columbia*, 378 U.S. 347, 351 (1964).

On its face, the statutory phrase -- the "intangible right of honest services" -- lacks precisely the sort of clarity the fair warning doctrine compels.  As a result, both before and after *McNally*, the courts of appeals have criticized the vague and amorphous statute, noted the dangers of such a *criminal* prohibition, and relied on the rule of lenity in giving the statute a narrow scope.  As the Third Circuit has explained,

> Deprivation of honest services is perforce an imprecise standard, and rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecutions may chill constitutionally protected political activity. Moreover, decisions of our own Court stating that "fraud is a broad concept that 'is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community,'" . . . do little to allay fears that the federal fraud statutes give inadequate notice of criminality and delegate to the judiciary impermissibly broad authority to delineate the contours of criminal liability.

*United States v. Panarella*, 277 F.3d 678, 698 (3d Cir. 2002); *accord United States v. Brown*, 459 F.3d 509, 523 (5th Cir. 2006) ("we resist the incremental expansion of a statute that is vague and amorphous on its face and depends for its constitutionality on the clarity divined from a jumble of disparate cases."); *United States v. Thompson*, 484 F.3d 877, 883 (7th Cir. 2007) (noting that "honest services" is a "slippery . . . phrase" and noting that "[o]ne of these days we may need to gloss the phrase to reduce the risk that uncertainty poses to public servants"); *United*

*States v. Murphy*, 323 F.3d 102, 116 (3d Cir. 2003)(the "plain language of § 1346 provides little guidance as to the conduct it prohibits").

Courts have accordingly adopted narrowing constructions.  First, in public corruption cases, the government must prove the defendant violated a duty to provide honest services to the public.  *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998) ("Misuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime."); *United States v. Warner*, 292 F. Supp. 2d 1051, 1062-63 (N.D. Ill. 2003) (dismissing indictment of private individual on grounds that he could not, as a matter of law, be properly charged with "honest services fraud").  Second, the fiduciary duty to provide honest services must itself have arisen from a discrete legal provision whose breach provides a defendant with fair warning that criminal liability will result.  *United States v. Brumley*, 116 F.3d 728, 735 (5th Cir. 1997) (en banc) (noting that the invocation of a broad right to honest services has " no purchase independent of rights and duties locatable in state law."); *accord United States v. Murphy*, 323 F.3d at 118 (noting absence of any "logical rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates 'a catch-all political crime which has no use but misuse.'").  Third, in the context of federal officials, application of the honest services statute must not upset the intricate web of federal regulations governing the acceptance of gifts and other self-enriching actions by federal officials.  *United States v. Sun-Diamond Growers,* 526 U.S. at 409.

The indictment against Mr. Ring ignores these limitations.

First, during the time of the allegations contained in the indictment, Mr. Ring was not a government official -- he was a lobbyist who owed no fiduciary duty of "honest services" to the

public of any kind.   To the extent the indictment relies on a theory that Mr. Ring himself owed a

duty of "honest services" to the public, there is no legitimate basis for imposing criminal liability

against Mr. Ring under § 1346 for depriving the public of his "honest services."

Second, the legal "hook" on which the government seeks to rest criminal liability -- the

prior Senate and House Rules for gifts, travel and financial disclosure -- applied only to members

of Congress and their staffs at the time of the indictment; they did not apply at all to lobbyists

like Mr. Ring.  Moreover, these provisions were not enforceable under the *criminal* law -- either

against governmental officials or against lobbyists.  Mr. Ring nonetheless stands accused of a

federal criminal offense based on his failure to prevent Congressional members and their staff

from violating these administrative provisions.[4]  Indictment, DE 2 at 6, ¶ 18.  Although Mr.

Ring's alleged acts might rise to the level of criminal conduct if performed now (or within the

past sixteen months), they cannot support valid criminal charges if performed as alleged in

indictment.  This is because, after the alleged acts in the indictment occurred (and, indeed in

response to reports of some of the acts alleged in the indictment) Congress changed the law by

passing the Honest Leadership and Open Government Act of 2007 (HLOGA), Public Law 110-

81, 121 Stat. 735 (Sept. 14, 2007) (Attached as Exhibit 2). As described in detail in section I.B,

*infra*, however, the HLOGA was not the law at the times relevant to this case.  The pre-HLOGA

administrative provisions provided Mr. Ring with *no* warning that criminal liability could result

against him for the breach of these internal rules, much less the fair warning required by the

---

[4] Interestingly, the indictment does not identify any specific act Mr. Ring supposedly took to help federal officials avoid their obligations under the rules; it alleges only that he supposedly knew such violations were occurring and did nothing to stop them.  This stands in stark contrast to the government's allegations against others.  *See, e.g. United States v. Zachares*, 1:07-cr-106 (ESH), DE 5 (Factual proffer) at ¶ 16(a)(3) (describing Congressional staffer's coordination with Mr. Abramoff to arrive at a fictitious figure for transportation, lodging, and meal costs during Scotland trip to ensure his financial report would reflect figures substantially identical to those reported by others, including a member of Congress.)

United States Constitution.  *Sparf v. United States*, 156 U.S. 51, 88 (1895) (describing important principle of 'nullum crimen, nulla poena, sine lege.'  Unless there be a violation of law preannounced, and this by a constant and responsible tribunal, there is no crime, and can be no punishment. 1 Crim. Law Mag. 56); *Rogers v. Tennessee*, 532 U.S. 451, 467-68 (2001) (Scalia, J. dissenting) ("the maxim *nulla poena sine lege* . . . dates from the ancient Greeks and has been described as one of the most 'widely held value-judgments in the entire history of human thought.'")

Third, it would undoubtedly upset Congress' careful scheme of federal regulations and criminal prohibitions involving gifts and other self-enriching acts of federal officials to allow the honest services statute to be utilized as the government proposed in this indictment.   As Congress has expressly recognized, 2 U.S.C. § 1607(a), lobbying implicates important First Amendment rights of association and speech, as well as the right "to petition the Government for redress of grievances."  U.S. Const. Amend. I.  The very job of a lobbyist is to petition the Government for the purpose of influencing federal officials, and a substantial amount of grey area exists between *properly* influencing federal officials (through ideological and public policy arguments, often made to governmental officials in social settings) and *improperly* influencing federal officials (through gratuities, bribes, and other conduct now criminalized following passage of the HLOGA).  Congress has carefully marked the lines criminalizing such conduct, mindful of the Supreme Court's guidance in *Sun Diamond*, and respecting the constitutional interests at stake.   The indictment seeks to circumvent the balance Congress has adopted through an open-ended use of the "honest services" statute.

A. *The Honest Services Fraud Statute Applies Only To Situations In Which Public Officials Misuse Their Official Position For Private Gain And Cannot Be Applied To A Private Citizen Under the Circumstances Alleged Here.*

One infirmity with the honest services charges leveled against Mr. Ring is that he was, at all times alleged in the indictment, a private citizen lobbyist. As a result, he owed no fiduciary duty of honest services to the public; he cannot be found to have defrauded anyone of such services. To the extent the indictment relies on such a theory, it must be dismissed because no criminal charge of honest services fraud can be properly maintained against him.

This is precisely what happened in *United States v. Warner*, 292 F. Supp. 2d 1051 (N.D. Ill. 2003). There, the government charged Lawrence Warner with scheming to defraud the people of Illinois, the State of Illinois and Office of the Illinois Secretary of State (SOS) of the honest services of its government officials. *Id.* at 1056-57. In essence, it alleged that Mr. Warner worked closely with the SOS to solicit improper payments from contractors hoping to do business with SOS Office, and also performed a number of other corrupt acts, working in conjunction with SOS Office. *Id.* at 1053-55.

Mr. Warner moved to dismiss the "honest services fraud" counts on the ground that "as a private citizen, he did not owe a duty of honest services to the people of Illinois or to the SOS Office." *Warner*, 292 F. Supp. 2d at 1056. The district court agreed, despite the fact that the indictment alleged a host of facts arguably creating an agency relationship between Mr. Warner and the SOS office. *Id.* at 1059. The district court in *Warner* was troubled by the constitutional implications of expanding the "honest services fraud" statute into the private realm, noting that "Congress has never defined the term "honest services" and with the exception of the Second Circuit's 1982 *Margiotta* [688 F.2d 108 (2d Cir. 1982)] decision, which has been roundly criticized and arguably is no longer good law, no case has found that a private individual who

does not hold public office or employment and whose private company does not receive any public funds can have a fiduciary duty to provide honest services to the public." *Warner*, 292 F. Supp. 2d at 1062.  It concluded that "Warner cannot be charged with defrauding the public of his own honest services because he was a private citizen who did not owe such a fiduciary duty to the citizens of Illinois or to the SOS office." *Id* at 1063.

In *United States v. Murphy*, 323 F.3d 102, 116 (3d Cir. 2003), the Third Circuit reached the same result, rejecting the government's attempt to convict a private individual of honest services fraud.  In *Murphy*, the head of the Passaic County (N.J.) Republican Party was accused of using his influence over county officials to convince them to award contracts to a favored contractor, who then sent some of the government money to a group of individuals connected to the defendant. *Id.* at 104.  The Third Circuit rejected the government's contention that such conduct was punishable under the "honest services fraud" provision of 18 U.S.C. § 1346, concluding that no logical rationale existed for "treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates 'a catch-all political crime which has no use but misuse.'" *Id.* at 117-18.[5]

Similarly, in *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998), the Seventh Circuit refused to apply the honest services fraud provisions to private actors.  As the appellate court explained in that case:

---

[5] This fear of misuse is not hypothetical.  A former United States Attorney General, Richard Thornburgh, recently testified before the House Judiciary Committee about the manner in which the United States Attorney in Pittsburgh has misused the "honest services" provision of the mail fraud statute for political purposes in order to attack a prominent Democrat in Pittsburgh.  *See* Testimony of Richard Thornburgh before the Committee on the Judiciary, *Allegations of Selective Prosecution:  The Erosion of Public Confidence in our Federal Justice System*, (Oct. 23, 2007) (Attached As Exhibit 3).  One central tenet of the indictment in that case, reflected in 23 of the counts, is that each use of the office fax machine  for personal business created a separate instance of "honest services fraud."

> In *McNally*, the Supreme Court described the intangible rights theory this way: "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud." 483 U.S. at 355. This is the theory that *McNally* disapproved as unsupported by § 1341, and that by enacting § 1346 Congress reinstated. We do not think that § 1346, with its unelaborated reference to "a scheme or artifice to deprive another of the intangible right of honest services", creates criminal liability for events that would not have been crimes before *McNally*. But if *McNally*'s description of the intangible rights doctrine is accurate, then it is clear that Count I does not charge Bloom with an intangible rights fraud. For it does not charge that he misused his office for private gain. It does not charge that he used his office in any way, let alone that he misused it.

*Bloom*, 149 F.3d at 655. The Seventh Circuit accordingly went on to reject the government's theory that a Chicago alderman engaged in "honest services fraud" for conduct in his private capacity that did not involve misuse of his office for private gain.[6]

      *Warner*, *Murphy* and *Bloom* demonstrate that any "honest services fraud" case against Mr. Ring that relies on any purported duty owed by him to the public is insufficient as a matter of law. Whatever else that statutory phrase prohibits, it cannot be read so broadly as to criminalize the conduct of a private citizen accused of interacting with federal officials, as

---

[6] The government may rely on the First Circuit's opinion in *United States v. Sawyer*, 239 F.3d 31 (1st Cir. 2001), in which the court refused to vacate the conviction of a lobbyist who had pleaded guilty to honest services fraud in connection with his interactions with state officials. Such reliance would be misplaced. The lobbyist in that case sought to vacate his guilty plea after the Supreme Court's decision in *United States v. Sun-Diamond Growers,* 526 U.S. 398 (1999), on the ground that the lack of specific nexus between the entertainment expenses he admitted providing to state officials and any official act, which *Sun Diamond* required under the federal gratuity statute, also applied under the honest services fraud statute. According to Mr. Sawyer, the failure of the indictment of his case to meet *Sun Diamond*'s nexus requirement rendered his plea invalid. The First Circuit upheld the guilty plea, but was clearly troubled by the potentially broader implications of its decision and noted approvingly that prosecutions on facts like these have not often been brought. The Court also emphasized the narrow scope of its holding ("we hold only, for the purpose of determining whether there was a fundamental error in his conviction, that there was an adequate basis for Sawyer's plea."). Most importantly, *Sawyer* did not squarely address the problems with the honest services charges relied on by Mr. Ring here -- namely, the lack of a duty to the public owed by a private citizen lobbyist, the existence of new Congressional enactments criminalizing the same conduct after Mr. Ring's alleged acts occurred, and whether § 1346 can be applied to such conduct involving federal officials, where there are already a host of federal administrative regulations and statutes that apply to such officials. The substantial distinctions between the arguments raised here and the narrow question decided in *Sawyer* should deprive it of any persuasive value.

alleged in this indictment.  Just as in *Warner*, to stretch the phrase "honest services" to include

the conduct by a private citizen alleged here would present grave vagueness and fair notice

problems under the Supreme Court's decision in *United States v. Lanier*, 520 U.S. 259, 265

(1997), and would go well beyond anything that § 1346 would permit.  If this Court were to

construe the statute to include the alleged conduct here, the statute would be unconstitutional as

applied to these facts.  The Court would then be required to dismiss the honest services fraud

counts because Mr. Ring did not have the fair warning required by the Constitution that the

honest services fraud statute could be applied in the manner in which the government seeks to

apply it here.

There is no need to go so far, however.  This case presents a far easier case than *Warner*,

*Murphy* or *Bloom*, where the private/public relationship had been blurred by a private citizen

whose conduct was so enmeshed with the government officials as to create an agency-type

relationship.  Here, the indictment does not proceed under such a theory, nor can it, since there is

no suggestion that Mr. Ring was acting in a way as would make him *a de facto* government

official.  The government, in crafting the indictment, simply ignored the requirement that it

establish a fiduciary duty owed by the individual that it charged with "honest services" fraud.

As a result, the honest services fraud charges are unsustainable as a matter of law and should be

dismissed.

        B.        *The Prior Congressional Gift, Travel and Disclosure Rules Cannot Serve as Basis*
                        *For Imposing Criminal Liability Because They Provided No Warning, Much Less*
                        *Fair Warning, That Their Violation Is A Crime.  In Short, They Are Not Criminal*
                        *Laws As They Do Not Provide A Punishment For Their Violation.*

The government's "honest services fraud" allegations are also insufficient because they

rest on the premise that Mr. Ring can be held criminally responsible for the failure to prevent a

breach of the prior gift, travel and financial disclosure rules that applied to members of Congress

and their staffs.  But those now-superseded rules provided no warning at all, much less the fair warning required by the Constitution, that criminal liability could result when a private lobbyist did not act affirmatively to prevent their breach by a Congressional member or staff.

Prior to September 2007, the gift, travel and financial disclosure provisions were administrative rules that applied to members of Congress and their staffs.  Rules violations could result only in internal discipline in the House, (House Rule XXV), Senate (Senate Rule XXXV) or Executive Branch, respectively.  It was inconceivable that such provisions could give rise to criminal liability.  This has admittedly changed, as Congress has passed criminal laws that post-date all of the alleged conduct in this case.  Specifically, in September 2007, the President signed into law the Honest Leadership and Open Government Act of 2007 (HLOGA), Pub. L. 110-81, 121 Stat. 735 (Sept. 14, 2007), largely in response to the public attention created by the Abramoff scandal.  The legislative history of the HLOGA makes abundantly clear its origins and motivation. Stat. of Sen. Reid, 153 Cong. Rec. S220 (Jan. 8, 2007) ("The reforms in S. 1 are very real, very strong. To begin, it prohibits gifts and travel paid for by lobbyists, such as Jack Abramoff's infamous trips around the world."); Stat. of Rep. Kind, 153 Cong. Rec. E42 (Jan. 4, 2007) ("It has become clear to all Americans that the ethical safeguards here in our Nation's Capital are broken. Rogue lobbyists such as Jack Abramoff were allowed to run amok for years, leaving behind a vast web of corruption in their wake . . . Today we will prevent lobbyists from buying access and favor from lawmakers. While they will retain their constitutional right to petition government and share valuable information, they will no longer be allowed to buy meals, give gifts, or provide lavish trips."); Sen. McCain, 153 Cong. Rec. S637-38 (Jan. 17, 2007); ("For 2 years, the Committee on Indian Affairs which I chaired at the time, investigated the actions of Jack Abramoff and Michael Scanlon, and brought to light their efforts to

manipulate the political process. If there is a silver lining to the Abramoff affair, it is that it helped to compel Congress to reassess the rules that govern our dealings with lobbyists and others who seek to influence us . . .  );  *and see Nat'l Ass'n of Mfrs v. Taylor*, 549 F. Supp. 2d 33, 38-45 (D.D.C. 2008) (describing general history of lobbying restrictions in the United States through passage of the HLOGA).

In the HLOGA, Congress addressed a number of issues directly relevant to the indictment in this case.  Section 543 modified the Senate Standing Rule XXXV by adopting, for the first time, specific rules regarding the provision of tickets to entertainment and sporting events.  Also for the first time, Congress applied the gift, travel and disclosure rules to lobbyists themselves, rather than just preventing Congressional officials and their employees from accepting those gifts.  HLOGA, Section 206, codified at 2 U.S.C. § 1613.   That provision expressly prohibits private citizen lobbyists from "mak[ing] a gift or provid[ing] travel to a covered legislative branch official if the person has knowledge that the gift or travel may not by accepted by that covered legislative branch official under the Rules of the House of Representatives or the Standing Rules of the Senate (as the case may be)."  *Id.*  The HLOGA also added a provision requiring lobbyists to certify on a semi-annual basis that they are familiar with the House and Senate Rules on gifts and travel, and have not provided or offered such gifts or travel in violation of those rules.  HLOGA, Section 203(a), now codified as 2 U.S.C. § 1604(d)(1)(G).

Most importantly, Section 211(b) of the Act added a new criminal provision imposing up to a 5 year sentence for the knowing and corrupt failure to comply with the act.  That criminal provision is now codified at 2 U.S.C. § 1606(b).  Prior to the adoption of this provision, no criminal penalties existed for the violation of the gift, travel and financial disclosure rules.  The

criminal provisions took effect on the date of enactment, September 14, 2007, and apply to conduct that occurs on or after that date.  HLOGA, Section 211(b).

It cannot be that the HLOGA -- billed as a measure to *create* criminal penalties for conduct resembling the allegations here -- instead *weakened* a scheme in which 20-year penalties already existed for any violation of the gift, travel and disclosure.  That, however, is the necessary predicate of the government's theory in this indictment.  Congress cannot have been so fundamentally incorrect about the state of laws it passed, a fact that eviscerates the government's attempt to apply that statute to Mr. Ring.

There can be no doubt that the government's reading of § 1346 would also criminalize a vast array of conduct that, while perhaps unseemly post-*Abramoff*, was typical, customary, and not considered to violate the federal criminal laws prior to the enactment of the HLOGA.  In a 2002 article describing the wide-spread violations of the prior gift, travel and disclosure rules, the *Washington Post*'s congressional correspondent expressed the common understanding the prior gift, travel and disclosure provisions did not apply to lobbyists and did not carry criminal penalties, explaining:

> Even lobbyists seeking to comply with the rules learn quickly they are under no obligation to disclose their activities. Ronald L. Platt, senior director of government affairs at Greenberg Traurig LLP, said his law firm discovered after consulting with outside counsel that lobbyists face "no enforcement mechanism" connected to the gift rule.
>
>  "The Lobbying Disclosure Act does not require any kind of affirmative action by lobbyists or law firms," Platt said. "You're not required to report any expenses" in detail. [7]

---

[7] Mr. Platt was, it should be noted, a senior shareholder at one of Mr. Ring's former law firms and signed off on Mr. Ring's expense reports during times relevant to the indictment.

*See* Juliet Eilperin, *Gift Rules Regularly Flouted on Hill, Insiders Say; House Ethics Chairman Acknowledges Enforcement Breakdown*, WASHINGTON POST, A27 (Oct. 14, 2002) (Attached as Exhibit 4).

A few years later, the *Washington Post* reported that more than 80 apparent violations of the Congressional gift, travel and disclosure rules were committed by a single company.  *See* Jeffrey H. Birnbaum & Thomas B. Edsall, *Hill Gift Limits Often Exceeded, Lobbyists' Records Show:  BellSouth Document Illustrates Gap Between the Rules and the Realities*, WASHINGTON POST, A4 (Jan. 1, 2006) (Attached as Exhibit 5).  As the story explains:

> BellSouth records show that the firm's lobbyists were regularly out on the town hosting people they are paid to influence with drinks and dinner at Washington's priciest restaurants -- from Charlie Palmer Steak to the Capital Grille. Some of the guests feasted so often and so well that they apparently toted up bills several times as large as they are allowed to accept.
>
> The experience is not isolated. "The gift rules have been broken steadily for a long time despite strong efforts by corporations to stay within the limits," said Douglas G. Pinkham, president of the Public Affairs Council, an education group for lobbyists. Paul A. Miller, president of the American League of Lobbyists, agreed: "If you call that an abuse, it probably is the biggest one."

*Id.*  To our knowledge, despite the widely-known nature of these violations, criminal charges were never brought or even pursued against BellSouth, reinforcing the common perception that violations of the gift rules did not trigger criminal penalties.

The indictment's contravention of common understanding and practice is yet another problem with the government's interpretation of § 1346.  As the Supreme Court explained in *Sun Diamond*, courts should avoid, when possible, interpreting a statute in a way that would criminalize customary and accepted practices that were not commonly understood as violative of the criminal law.  *Sun Diamond*, 526 U.S. at 407 (providing common examples of gift-giving conduct and rejecting broad interpretation of the anti-gratuity statute in part because it would criminalize such conduct).  Transcript of March 2, 1999 Supreme Court Oral Argument in *Sun-*

*Diamond* (Attached as Exhibit 6) (Kennedy, J. to Special Prosecutor: "Do you think any public officials in Washington will be surprised by [the special prosecutor's] interpretation [of the gratuity statute]? . . . I'm serious about that.  There's a huge gap between the general understanding and your interpretation.  And if -- and if the statute is open to two plausible interpretations, it seems to me that we shouldn't adopt yours.")  Criminal liability cannot rest on these sorts of violations, as the prior gift, travel and disclosure rules provided no warning that their violation could carry a potential 20 year criminal penalty for private citizen lobbyists.

> C.     *The Honest Services Fraud Statute Cannot Be Applied As a "Catch-All" Theory Of Criminal Liability For Acts Involving Federal Officials Since Doing So Would Upset the Intricate Web of Federal Regulations, Both Administrative and Criminal, Governing the Acceptance of Gifts and Other Self-Enriching Actions By Federal Officials.*

Third, and relatedly, the government's theory of liability fails because to permit the government to utilize the honest services statute as a sweeping theory for conduct involving federal officials would upset the already-existing intricate web of federal regulations, both civil and criminal, that govern precisely this sort of conduct.   Indeed, to permit the government to distort the statute to include such conduct would result in precisely the sort of "catch all" political crime that the Third Circuit disparaged.  *See United States v. Murphy*, 323 F.3d at 117-118.

At the outset, Mr. Ring emphasizes that his argument applies only in the context of *federal* officials.  For federal officials, Congress has created a clearly-articulated set of federal rules and regulations governing gifts and other self-enriching acts.  Those rules are constantly evolving, as the discussion in the previous section about the HLOGA demonstrates.  They do not apply to state and local officials.  Setting aside the vagueness issues that have been noted by courts even in the context of honest services prosecutions of state and local officials, Congress

may well have intended federal prosecutors to apply that statute to acts of state and local corruption amounting to gratuities or bribes, otherwise not reachable by federal law, to fill the vacuum.  Thus, for example, the Seventh Circuit has upheld the use of the honest services statute when applied to acts of public corruption involving private individuals and *state* government officials that would otherwise have amounted to gratuities or bribes under federal law.  *United States v. Warner*, 498 F.3d 666, 698 (7th Cir. 2007) (upholding honest services fraud conviction from constitutional attack only because jury instructions required government to  "prove[ ] beyond a reasonable doubt that the public official accepted the personal financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return.").[8]

Mr. Ring has no quarrel with the manner in which these provisions have been applied to state and local officials, given the absence of other federal laws directed at the same conduct. When it comes to conduct involving federal officials, however, federal prosecutors have a direct and narrowly-tailored way of reaching such conduct -- the specific statutes, regulations and rules governing gifts and other self-enriching conduct by federal officials.  This indictment alleges, at least as to Mr. Ring, only traditional and foreseeable lobbying conduct; there are no extraordinary events outside the reasonable contemplation of Congress when it drafted the array

---

[8] *Warner* is the same prosecution discussed in Section I(A) supra, and the two decisions provide a good illustration of what is permissible and what is not, even in "honest services" prosecutions involving state and local officials.  The district court decision discussed above, which does not appear to have been challenged by the government, illustrates that no private citizen can be convicted on the basis of an independent duty to the public to provide "honest services."  By contrast, the Seventh Circuit's decision in *Warner* finds that an "honest services" violation can occur when a private citizen engages in conduct that, if it were conducted with a *federal* official, would rise to the level of a gratuity or bribe.  As noted in the text, however, if such conduct involved a federal official, Congress has created a whole range of more specific provisions directed toward such conduct, which have essentially occupied the field with respect to federal actors.

of regulations and statutes that already govern this sort of conduct.[9]  See, *United States v. Abramoff*, 1:06-cr-0001 (ESH), DE 33 (Government's Sentencing Memorandum) (citing golf trips to Scotland and London aboard private jet among other travel); *United States v. Volz*, 1:06-cr-1119 (ESH), DE 5 (Factual Proffer) (same); *United States v. Jefferson*, 1:07-cr-209 (TSE)(E.D.Va.), DE 1 (Indictment).    The pertinent question, therefore, is whether Congress intended for 18 U.S.C. § 1346 to serve as a sweeping, catch-all source of criminal liability for both federal officials and the private citizens who lobby them and to attach criminal penalties to gifts and self-enriching conduct that do not violate any other criminal provision but *are* contemplated and addressed by the prior administrative gift, travel and financial disclosure rules (and are now addressed by the HLOGA).

The Supreme Court's decision in *United States v. Sun-Diamond Growers,* 526 U.S. 398, 409 (1999), provides substantial guidance on this question.  As the Supreme Court explained in *Sun-Diamond*, the many statutes and regulations in this area

> demonstrate that this is an area where precisely targeted prohibitions are commonplace and where more general prohibitions have been qualified by numerous exceptions. Given that reality, a statute in this field that can linguistically be interpreted to be either a meataxe or a scalpel should reasonably be taken to be the latter.  Absent a text that clearly requires it, we ought not expand this one piece of the regulatory puzzle so dramatically as to make many other pieces misfits.

*Id.*

The government's theory of criminal responsibility in this case -- that the prior gift, travel and disclosure rules are enforceable under the criminal law through the use of 18 U.S.C. § 1346 -- would relieve the government of the obligation to meet the requirements of the gratuity statute,

---

[9] This case accordingly does not require the Court to decide whether there might be some types of extraordinary acts involving corruption by federal officials that do fall within the "honest services" fraud provision.

the bribery statute or any of the other "precisely targeted" provisions of the federal anti-corruption laws.  It would, in the words of the Court, "expand this one piece of the regulatory puzzle so dramatically as to make the other pieces misfits" by exposing violators to a 20-year period of incarceration, vastly exceeding the administrative discipline imposed by the gifts statute, 5 U.S.C. 7353 & 5 C.F.R. § 2635, the two-year maximum penalty of the gratuity statute, 18 U.S.C. § 201(c), and even the bribery statute, which "may be punished by up to 15 years' imprisonment, a fine of $250,000 or triple the value of the bribe, whichever is greater, and disqualification from holding government office." *Sun-Diamond*, 526 U.S. at 405.  As noted, it also vastly exceeds the 5 year penalty for violation of the House and Senate Ethics rules created by the HLOGA, which is now codified in 2 U.S.C. § 1606(b) and applies to offenses committed after September 14, 2007.

In this context, it is no coincidence that the United States Court of Appeals for the District of Columbia Circuit, which would generally hear cases of this sort involving federal officials, has never reviewed a conviction for "honest services fraud" of any federal official, much less a private citizen lobbyist, notwithstanding the long-standing controversy surrounding the relationship between lobbyists and federal officials.[10]  Indeed, to our knowledge, no federal appeals court has permitted the "honest services fraud" statute to be used against federal officials accused only of violations of the administrative gift, travel and disclosure rules, and certainly no federal appeals court has permitted criminal punishment for lobbyists who supposedly worked

---

[10] Our research suggests that the closest the D.C. Circuit has come to reviewing such a conviction occurred in *United States v. Sun-Diamond*, 138 F.3d 961 (D.C. Cir. 1998).  There, a corporation had been prosecuted for wire fraud based on a scheme set up by two of its employees to defraud another corporation of money.  *Id.* at 972-73.  One aspect of this scheme was allegedly to deprive the defrauded company of the honest services of its employee.  *Id.*  The case raised no issues about the use of the honest services statute in the public corruption context, but the court did note, as we have here, that the statute had been used in that context in connection with public corruption of state and local officials.  *Id.*

with them to avoid these rules.  The absence of any relevant authority should heighten this

Court's skepticism of the manner in which the government seeks to expand the statute here.

Congress has already created a detailed criminal and administrative scheme governing precisely

this sort of conduct, which only recently added a criminal provision (not applicable to this case)

addressing violations of the gift, travel and disclosure rules.  The existence of such a scheme

renders invalid the government's attempted use of § 1346 as a catch-all offense that would sweep

in the same conduct and leave the other statutory provisions superfluous.

In short, the application of 18 U.S.C. § 1346 to the facts as alleged in the indictment is

deeply inconsistent with the entirety of the federal scheme that already regulates precisely this

form of conduct.  Congress can criminalize this conduct if it wants to, and it has now chosen to

do so when it passed the HLOGA in September 2007.  The new criminal provision, as well as the

entirety of the detailed federal scheme in this area, make clear that the "honest services" fraud

provision of 18 U.S.C. § 1346 cannot do the work the government seeks to have it perform in

this case.  Whatever else that statute prohibits, it cannot be applied to conduct criminalized after

its commission and outside of the established web of then-existing administrative and criminal

regulations. The Court should dismiss all of the "honest services fraud" counts from the

indictment.

> D.    *Counts VII and VIII Must Be Dismissed Because They Do Not Involve Any*
>       *Alleged Behavior By Mr. Ring.*

Counts VII and VIII involve, respectively, an email from a Congressional staffer to Mr.

Ring, and the cashing of check by a Congressman's wife.  The indictment fails to allege any

involvement by Mr. Ring in these activities.  Although it would be incorrect to interpret 18

U.S.C. § 1346 as covering charged conduct of this sort at all, as we have shown above, no

conceivable interpretation of § 1346 can go so far as to impose criminal liability for acts in

20

which Mr. Ring played no role.  Thus, assuming arguendo the truth of the facts as alleged in the

indictment, no criminal charge is sufficiently stated as to Mr. Ring, and those counts must be

dismissed for that reason as well.

## II.   THE GRATUITIES COUNT (COUNT II) MUST BE DISMISSED.

The indictment does include a single count charged under the federal anti-corruption

laws.  Count II alleges Mr. Ring provided eight Washington Wizards tickets to his friend Robert

Coughlin, then an official at the Department of Justice, "for and because of an official act

performed and to be performed by such public official (to wit, contacting an employee of the

Immigration and Naturalization Service and requesting an expedited review and approval of the

application to admit nonimmigrant students, relating to Eshkol Academy."  Indictment at 38, ¶ 2.

That count of the Indictment incorporates paragraph 196 of the indictment, which provides

further context to the allegation and reads:

> On or about February 7. 2003. Coughlin forward defendant RING's email request
> to two DOJ employees, including an employee of the INS, to whom Coughlin
> wrote, "Thank you for looking into this.  I do not know if anything can be done
> but I said I would look into it.  If, for any reason, nothing can be done, please
> email me so I can pass that along.  Thank you very much for you[r] assistance."

Indictment at 37, ¶ 196.  As a matter of law, this count must be dismissed because it fails to

allege an "official act" within the meaning of the gratuities laws.[11]

The controlling case on this Count is *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir.

2007) (en banc), in which the full Court of Appeals recently outlined the boundaries of the

"official act" element of the gratuities statute.  In *Valdes*, a police officer had been convicted of

---

[11] Although it is Mr. Coughlin's, not Mr. Ring's, conduct that is critical when determining whether Mr.
Coughlin engaged in an "official act," it is worth noting that the government does not allege that Mr. Ring
asked Mr. Coughlin to take any discretionary action or to influence the outcome of the decision in any
way.

violating the federal gratuities laws when an undercover FBI informant paid him for searching police databases and providing information, including whether a warrant existed for an individual's arrest.  *Id.* at 1320-22.  In overturning the conviction on the ground that no "official act" had been performed, the en banc court began with the definition of "official act" contained in the United States Code:

> [A]ny decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity.

*Id.* at 1322, quoting 18 U.S.C. § 201(a)(3).

The government asserted that Mr. Valdes had taken "action" (searched databases and reported his findings) on clear "questions" (including, "does this man have an outstanding arrest warrant?") and thus performed an "official act" under the statute.  *Id.*  In rejecting this argument, *Valdes* relied heavily on the Supreme Court's guidance in *Sun-Diamond*, where the Court noted that "[w]hile numerous activities -- hosting a ceremony, visiting a school, or delivering a speech, for example – 'are assuredly "official acts" in some sense … it would be "absurd[]" …to consider them within the scope of § 201.'" *Valdes*, 475 F.3d at 1323.  It expressly quoted the Supreme Court's admonition:

> [T]he numerous … regulations and statutes littering this field[] demonstrate that this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions.  Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.

*Id*. quoting *Sun-Diamond*, 526 U.S. at 412.  As the Court explained, the only "questions" that fit within the definition of "official act" are those "whose answer or disposition is determined by government."  *Id.* at 1324.  It went on to note that "it would be linguistically odd, at a minimum, to treat an answer to a question as a 'decision or action on' a question unless the answer were one that the government had authority to decide."  *Id.*  The Court observed such a construction fit

22

well within its earlier decisions, citing *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979),
for the proposition that "it is the corruption of official decisions through the misuse of influence
in governmental decision-making which the bribery statute makes criminal." *Valdes*, 475 F.3d at
1324.

The *Valdes* decision reflects the Court's conviction that an "official act" for purposes of
the gratuities statute must be one that presents the potential for misuse of influence in
governmental decision-making. Indeed, the Court's citation of other cases where actions
satisfied § 201 further this conclusion. *Id*. at 1325, *citing United States v. Parker*, 133 F. 3d 322
(5th Cir. 1998) (clerk's manufacture of official government approval of a Supplemental Security
Income benefit); *United States v. Biaggi*, 853 F.2d 90 (2d. Cir. 1988) (Congressman's use of his
office to secure Navy contracts); *Beach v. United States*, 19 F.2d 739 (8th Cir. 1927) (Veterans'
Bureau official's activity securing a favorable outcome on a disability claim).

*Valdes* controls disposition of the question here and compels dismissal of Count II.  The
gratuities statute cannot properly reach instances where a government official simply directs a
query to the proper office within the federal bureaucracy and takes no part in discussion or
resolution of the query.  The indictment makes clear that Mr. Coughlin did not participate in the
resolution of the question and expressly stated he had no interest in a particular outcome.
Indictment at 37, ¶196 ("If, for any reason, nothing can be done, please email me so I can pass
that along.")  Such conduct, even assuming arguendo that it is true, is not the sort of conduct that
presents the potential for "the corruption of official decisions through misuse of influence in
governmental decision-making" that *Valdes* holds forms the crux of an "official act."  Indeed,
Mr. Coughlin's "act" here is far less official and far less discretionary than searching police data
bases and making inquiries about a warrant -- the very acts that were still deemed not to be

"official acts" in *Valdes*.  To permit the anti-gratuity law to apply to these sorts of allegations would create precisely the sort of absurdities that both *Sun-Diamond* and *Valdes* cautioned to avoid in construing the meaning of an "official act."  Count II fails as a matter of law, and the Court should dismiss it from the indictment.

## III.    THE CONSPIRACY COUNT (COUNT I) MUST BE DISMISSED.

Count I of the indictment is a wide-ranging, often indecipherable conspiracy charge which contains nearly 200 factual allegations, many of which seem irrelevant, confusing, or intentionally scandalous.  It rests heavily, if not exclusively, on the invalid theories of honest services fraud and gratuities discussed above.  To the extent that it reaches outside of those theories, it fails to provide meaningful notice about the alleged agreement, which is the essence of any conspiracy charge.  And to the extent it alleges a conspiracy to violate the gift, travel and disclosure laws, it fails as a matter of law under the plain language of § 371.  Count I must be dismissed.

Count I of the indictment relies on the same invalid allegations regarding the gratuities and "honest services" statutes discussed above.  The allegations in counts II through VIII of the indictment (except, inexplicably, count VI) are all recycled in count I.  The count, on its face, alleges a conspiracy to violate the gratuity provision of 18 U.S.C. §201(c)(1)(A) and the "honest services fraud" provision of 18 U.S.C. § 1341 and 1346.  As noted, those allegations fail as a matter of law.  Those same infirmities in the purported object of the conspiracy permeate the conspiracy charges and serve as an independent basis for dismissal.  Simply put, if underlying conduct was not criminal (as it was not), it was not a crime for Mr. Ring to conspire to commit this conduct.  The government, in fact, conceded precisely this point in the *McNally* case.  There, the government conceded that, if the "honest services fraud" charges failed, as they ultimately

did, then a conviction for conspiring to violate those same provisions must be dismissed as well. *McNally*, 483 U.S. at 361 ("The Government concedes that if petitioners' substantive mail fraud convictions are reversed their conspiracy convictions should also be reversed."). Count I should be dismissed on this ground alone.

To the extent that the conspiracy count attempts to reach beyond the flawed legal theories underlying the gratuities and honest services counts, it fails to sufficiently articulate an offense. The Supreme Court "has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). Yet Count I of the indictment fails to provide essential information about the agreement alleged. First, it fails to identify any of the purported co-conspirators other than Mr. Abramoff, leaving it impossible to determine whether the government is alleging (a) a private agreement among lobbyists to violate the prior gift, travel and disclosure rules, (b) an agreement between lobbyists and Congressional staffers, (c) an agreement among lobbyists, staffers and Congressional members, (d) an agreement among lobbyists and a Congressional "office," or (e) some other combination. Identification of the alleged co-conspirators is especially important in a case such as this, where the alleged criminal violations turn on proof of "official acts" and relevant duties as set forth in the preceding sections of this motion.

Second, the indictment recites boilerplate language referencing an agreement to violate the gratuities and honest services statutes. But the "manner and means" section of the indictment is devoid of any facts setting forth the specifics of the agreement. Instead, it cobbles together a list of alleged acts by Mr. Ring, many of which are clearly legal, with a list of acts of others with no arguable connection to Mr. Ring aside from the allegation that the actor and Mr. Ring were members of the same law and lobbying office. As a result, Mr. Ring is left to guess: is the

government alleging an agreement between knowing participants to *improperly* influence public officials or is the government alleging a conspiracy to lobby where independent contractors were left to pursue a common goal by individual means and some acted illegally?  If it is the former, the indictment fails to provide sufficient notice.  If it is the latter, which it appears to be, Count I must fail on the grounds that it fails to allege an offense.

For example, in the middle of Count I, the government has inserted a six paragraph section titled "Honest Services Fraud Relating to [Republican Representative Robert] Ney's Office."  The paragraphs set forth no criminal act by Mr. Ring nor do they establish his involvement in, or knowledge of, acts by others in a conspiracy to corrupt Ney or members of his staff.  One paragraph describes unexceptional lobbying by Mr. Ring and another lobbyist.  Indictment at 27, ¶ 146.  The next alleges that Ring suggested another representative (unidentified) be allowed to use a box at a baseball stadium, with no allegation of any tie between Ring and that representative, Ring and Ney, or Ney and that representative beyond the allegation that both representatives intended to co-sponsor a bill.  Id. at 28, ¶ 147.  The third and fourth paragraphs of the section reference emails between Ring and an unidentified congressional staffer (with no identified connections to Ney) regarding contents of an appropriations bill.  Id., ¶ 148-49.  The communications between Mr. Ring and the unidentified staffer evidence no illegal conduct.  The fourth and fifth paragraphs reference communications between Mr. Ring and Ney's executive assistant, William Heaton, regarding an issue in the same appropriations bill.  Id., ¶ 149-150.  The exchange between Mr. Ring and the Mr. Heaton contain no references to gift or other improper inducements.  Finally, the sixth paragraph of the section alleges that Neil Volz, Ney's former communications director and a lobbyist at Mr. Ring's firm, expenses $2,200 worth of food and drinks at Signatures for Ney, his staff, and others during a

birthday party for the executive assistant. Id., ¶ 151. There is no allegation that Mr. Ring was involved in, or even aware of Mr. Volz's actions detailed in the final paragraph. There is no allegation that Mr. Ring intended to corrupt Mr. Ney. And there is no allegation that Mr. Ring agreed with anyone else to do so.

These six paragraphs do not make out an agreement to commit any offense, never mind a violation of the gratuities or honest services statute. They weave allegations that Mr. Ring engaged in lawful lobbying practices into allegations relating to others in an attempt to taint Mr. Ring through association. It is certainly no coincidence that Mr. Ney, Mr. Volz, and Mr. Heaton have entered guilty pleas relating largely to conduct that occurred in their various jobs on Capitol Hill. *United States v. Ney*, 1:06-cr-00272 (ESH), DE 4 (Plea Agreement); *United States v. Volz*, 1:06-00119 (ESH), DE 4 (Plea Agreement); *United States v. Heaton*, 1:07-cr-00042 (ESH), DE 5 (Plea Agreement). But it cannot sufficiently allege a criminal offense to state a number of instances in which a defendant came into contact with someone who pleaded guilty to a crime. Without sufficient specificity regarding the core elements of a conspiracy and tying those elements to Mr. Ring, a conspiracy charge against Mr. Ring cannot stand.

Finally, Count I should be dismissed because, at most, it alleges a conspiracy to violate the administrative provisions of the prior gift, travel and disclosure rules that applied to Congressional members and their staffs. Conspiring to commit an administrative violation is not a violation of § 371. The conspiracy statute, 18 U.S.C. § 371, provides in full that

> If two or more persons conspire either to commit *any offense against the United States, or to defraud the United States*, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is *a misdemeanor only*, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. (*emphasis added*)

The language of the conspiracy statute is accordingly clear:  If the object of the alleged conspiracy is to commit a felony, the charge is a felony; if the object is a misdemeanor, the conspiracy to commit it is a misdemeanor.  Here, the government has in essence charged Mr. Ring with conspiring to violate the gift, travel and disclosure provisions as they existed prior to 2007.  The alleged object of the conspiracy was accordingly not a felony, or even a misdemeanor, but a potential violation of Congressional Rules.  Pursuant to 5 U.S.C. § 7353(c), the primary sanction for such a violation was internal discipline in the House, (House Rule XXV), Senate (Senate Rule XXXV) or Executive Branch, respectively.  The concept of criminal penalties for the violation of these rules was introduced by the HLOGA.  See Section I.B, supra. The government has, accordingly, charged Mr. Ring with conspiring to commit an administrative violation of Congressional Rules.  Under the plain language of § 371, one cannot conspire to commit an administrative rules violation.  Count I should be dismissed for this reason as well.

## IV. THE OBSTRUCTION OF JUSTICE COUNTS (Counts IX and X) MUST BE DISMISSED.

Count IX of the indictment alleges that Mr. Ring obstructed justice in violation of 18 U.S.C. § 1512(b)(3), by making false statements to a lawyer conducting an internal investigation of Mr. Abramoff, on behalf of their mutual employer, Greenburg Traurig, knowing those statements "might be communicated to entities investigating Abramoff's lobbying activities, including the DOJ and the U.S. Senate Committee on Indian Affairs."  Indictment at 43, ¶ 12. Count X alleges that Mr. Ring obstructed justice in violation 18 U.S.C. § 1512(c)(2) for essentially the same conduct.

Both obstruction of justice counts must be dismissed because they fail to allege the "nexus" between the statements to private counsel and their known, obstructive effect on a federal proceeding that is required under the Supreme Court's *United States v. Aguilar*, 515 U.S.

28

593 (1995) and *Arthur Andersen v. United States*, 544 U.S. 696 (2005).  In addition, Count X must also be dismissed for the separate and independent reason that the statute under which it is brought, 18 U.S.C. § 1512(c)(2), applies only to acts involving the destruction of documents or other records, and cannot be properly applied to the purportedly false statements to private individuals alleged here.

A.      *The Obstruction Charges Must Be Dismissed Because of the Failure To Meet the Nexus Requirement Established by The Supreme Court in Obstruction of Justice Cases.*

Both obstruction of justice counts must be dismissed because they fail to allege the requisite nexus between Mr. Ring's statements to the lawyers hired by his employer and an official proceeding.  Each charge relies on Mr. Ring allegedly having been informed during interviews with the lawyers that anything he said "might" be communicated to federal officials investigating the activities of Mr. Abramoff, and having knowledge such investigations were pending.  *See* Indictment at 43, ¶ 12.  As a matter of law, knowledge that a statement "might" be communicated to officials conducting a federal investigation cannot suffice to support an obstruction charge.  If this conduct supports an obstruction charge, then every false statement made in every internal investigation does so as well, because virtually all such interviews involve a boilerplate warning that the statements "may" be communicated to the federal authorities if the Company decides to self-disclose.  That is not, and cannot be the law.

Commentators have noted the troubling implications of such a theory, which would inevitably chill private investigations, thus depriving the government of the fruits of those investigations.  O'Sullivan, *Symposium:  Corporate, Criminality, Legal, Ethical, and Managerial Implication:  The Challenge of Cooperation:  The DOJ Risks Killing The Golden Goose Through Computer Associates/Singleton Theories of Liability,* 44 Am. Crim. L. Rev. 1447, 1450 (2007)

(Exhibit 7).  In part to prevent such a result, the Supreme Court has required evidence of a discrete nexus between the statement and its effect on an official proceeding, making clear that "the key legal issue in these cases . . . . is whether false statements made to counsel bear the requisite causal connection or, in the Supreme Court's terminology, nexus, to an official proceeding because, after all, these are *obstruction* cases, not simple false statements cases."

Thus, without a non-speculative link between any purportedly false statements and their effect on an official proceeding, the Supreme Court has held that the obstruction statute cannot apply.  In *United States v. Aguilar*, 515 U.S. 593 (1995), for example, the Supreme Court construed the "omnibus clause" of the general obstruction of justice statute, 18 U.S.C. § 1503 and invalidated an obstruction conviction because of the government's failure to meet the nexus requirement.[12]  *Aguilar* involved a federal judge who had been convicted of obstructing justice by lying to an FBI agent about whether the judge had disclosed to a friend that he was the subject of federal wiretap.  *Aguilar*, 515 U.S. at 596-97.  During the conversation, the judge asked if he was the target of a grand jury investigation and the FBI agent responded that an investigation was in progress.  *Id.* at 600.  The government successfully argued at trial that this knowledge,

---

[12] At the time of *Aguilar*, 18 U.S.C. §  1503 provided:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or  on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice,* shall be fined not more than $ 5,000 or imprisoned not more than five years, or both." (emphasis added).

combined with the judge's false statements to the agent, sufficed to make out an obstruction of justice charge. *Id.* at 597.

The Supreme Court reversed, explaining "[w]e do not believe that uttering false statements to an investigating agent -- and that seems to be all that was proved here -- who might or might not testify before a grand jury is sufficient to make out a violation of the catch-all provision of § 1503." *Aguilar*, 515 U.S. at 600.  In response to the government's arguments that Judge Aguilar knew that the grand jury investigation was pending when he spoke with the FBI agent, the Supreme Court responded that "what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is . . . speculative.  We think it cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* at 601.

Although *Aguilar* arose under 18 U.S.C. § 1503, its analysis was expressly grounded in basic concerns of notice and the rule of lenity which, the Court noted, have applied in the obstruction of justice context for over 100 years. *Aguilar*, 515 U.S. at 599-600 (discussing establishment of basic nexus requirement in *Pettibone v. United States*, 148 U.S. 197 (1893) and observing that such a requirement has constitutional grounding).  This analysis was reaffirmed in *Arthur Andersen v. United States*, 544 U.S. 696 (2005), in which the Court unanimously applied *Aguilar* to obstruction charges brought under 18 U.S.C. § 1512(b).  There, the government asserted that, because 18 U.S.C. § 1512(f)(1) states that an official proceeding "need not be pending or about to be instituted at the time of the offense," there was no need to show any nexus between the document destruction allegedly instigated by the defendants in the *Arthur Andersen* case and their intended effect on an official proceeding.  *Arthur Andersen*, 544 U.S. at 707-08.

31

The Supreme Court rejected the argument.  As the Court explained, it had "faced a similar situation in *Aguilar*, [where Judge] Aguilar had lied to an [FBI] agent in the course of a federal investigation . . . ."  *Arthur Andersen*, 544 U.S. at 708.  The Court rejected such an obstruction theory, it explained, because "[a]ll the government had shown was that Aguilar had uttered false statements to an investigating agent 'who might or might not testify before a grand jury.'"  *Id.*  Similarly in *Arthur Andersen*, the Court concluded, the government had failed to demonstrate the requisite "nexus between the obstructive act and the proceeding," because it had not shown that *Arthur Andersen* knew that its conduct involving the documents was "likely" to affect any proceeding.  *Id.*

The indictment in Mr. Ring's case suffers from the same flaws identified by the Supreme Court in both *Aguilar* and *Arthur Andersen.*  Indeed, the indictment here alleges substantially less than was proven in *Aguilar*, since the indictment here involves statements made to a private lawyer, not an investigating FBI agent.  Like *Aguilar* and *Arthur Andersen*, moreover, the alleged link between any statements and an official proceeding is insufficient.  Indeed, Mr. Ring's indictment uses precisely the same formulation -- anything Mr. Ring said "might" be communicated to federal officials investigating the activities of Mr. Abramoff -- the Supreme Court condemned in *Aguilar* and *Arthur Andersen* as overly speculative.  Both obstruction of justice counts suffer from this flaw, and must be dismissed.

It is also immaterial that the statutory obstruction of justice provisions under which these charges were brought are different than those in *Aguilar* and *Arthur Andersen*.  Not only are the "nexus" principles discussed in those cases of constitutional magnitude, but they also stem from statutes that operate in a functionally identical fashion.  Each statute forbids a particular type of obstructive conduct, when accomplished with the intent that it corruptly affect a federal

proceeding.  The nexus requirement -- which compels a non-speculative relationship between the obstructive act and the proceeding -- serves to ensure in all of these situations that the statutory proscriptions are restricted to those actually intended to affect a federal proceeding, rather than merely punishing persons for making a false statement that "might or might not" have an effect on the proceeding.   Thus, although the language of these statutes differs in some respects, those differences are immaterial, and all are governed by the nexus requirement set forth by the Supreme Court in *Aguilar* and *Arthur Andersen*.

> B.     *Count X Must Be Dismissed Because the Statute Under Which It Is Brought Applies To Tampering With Documents And Other Physical Evidence And Does Not Apply To The Allegations Made Here*

Count X of the indictment must also be dismissed because Section 1512(c), the statute on which it rests, prohibits tampering with physical evidence, not uttering false statements.  This provision reads, in its entirety:

> Whoever corruptly (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c). The government has invoked the "catch-all" subsection (2) of this statutory provision in the indictment.  But the government's theory of obstruction involves activity not covered by any part of Section 1512(c) which, when read as a whole, is limited to acts involving tampering with documents and other physical evidence. Because there is not a single allegation that Mr. Ring tampered with documents or physical evidence, Count X should be dismissed.

The Supreme Court's decision in *Begay v. United States*, 128 S.Ct. 1581 (2008), addressed a very similar issue of statutory construction less than a year ago.  In *Begay*, the Court

construed 18 U.S.C. § 924(e)(2), which defines a "violent felony" under the Armed Career

Criminal Act as "any crime punishable by imprisonment for a term exceeding one year" that

> (i) has as an element the use, attempted use, or threatened use of physical force
> against the person of another; or (ii) is burglary, arson, or extortion, involves use
> of explosives, or otherwise involves conduct that presents a serious potential risk
> of physical injury to another.

The question in *Begay* was whether driving under the influence of alcohol fell within the

catch-all phrase of § 924(e)(2)(B)(ii) as one that otherwise "involve[d] conduct that presents a

serious potential risk of physical injury to another." The Supreme Court began its analysis by

acknowledging that a violation of a drunk driving law does, in fact, involve conduct that presents

a serious potential risk of physical injury to another because it is "an extremely dangerous

crime." *Id.* at 1584. Nonetheless, the Court found that drunk driving did not fit the statutory

definition of "violent felony," explaining that the statutory reference to burglary, arson, extortion

or crimes involving the use of explosives:

> indicates that the statute covers only similar crimes, rather than every crime that
> 'presents a serious risk of physical injury to another . . . If Congress meant …the
> statute to be all-encompassing, it is hard to see why it would have needed to
> include the statutory examples at all. Without them, clause (ii) would cover all
> crimes that present a 'serious potential risk of physical injury. Additionally, if
> Congress meant clause (ii) to include all risky crimes, why would it have included
> clause (i)? A crime which has an element, the 'use, attempted use, or threatened
> use of physical force' against the person (as clause (i) specifies) is likely to create
> a 'serious potential risk of physical injury' and would seem to fall within the
> scope of clause (ii).

*Begay*, 128 S.Ct. at 1585 (emphasis omitted) (internal citations omitted).

The Court then concluded that "these considerations taken together convince us that, 'to

give effect … to every clause and word' of this statute, we should read the examples as limiting

the crimes that clause (ii) covers to crimes that are roughly similar, in kind as well as in degree of

risk posed, to the examples themselves." In doing so, the Court also relied on support for its

position in the Legislative History of the Armed Career Criminal Act, and rejected the

government's contention that the term "otherwise" placed after the examples unambiguously meant to include offenses that were unlike the enumerated ones. *Id.* at 1585-86. As the Court explained, "we cannot agree with the Government that the word "otherwise" is sufficient to demonstrate that the examples do not limit the scope of the clause. That is because the word "otherwise" can . . .refer to a crime that is similar to the listed examples in some respects but different in others -- similar say in respect to the degree of risk it produces, but different in respect to the 'way or manner' in which it produces that risk . . . ." *Id.* at 1586.

*Begay* compels reading § 1512(c)(2) as being limited to conduct that is roughly similar to the type of conduct proscribed by § 1512(c)(1). Just as in *Begay*, the presence of the discrete examples in (c)(1) indicate that (c)(2) was intended to cover *similar* crimes involving tampering with documents and other physical evidence rather than *every* crime involving obstruction of justice. Indeed, the effects of applying the statute as broadly as the government urges here are even starker than they were in *Begay*. Here, just as in *Begay*, the government's construction of § 1512(c)(2) would render superfluous an earlier subsection. Specifically, under the government's interpretation of § 1512(c)(2), § 1512(c)(1)'s enumerated prohibitions involving tampering with documents and physical evidence are completely unnecessary. If Congress meant the subsection (c)(2) to be all encompassing, as the government argues, it is hard to see why it bothered to describe specific types of conduct in subsection (c)(1). What is more, if the theory adopted by the government in the indictment is correct, subsection (c)(2) also renders superfluous most, if not all, other provisions of Section 1512 — not to mention other obstruction statutes found elsewhere in the Criminal Code.

By way of example, a person who "knowingly. . . corruptly persuades another person. . . with intent to influence, delay, or prevent the testimony of any person in an official proceeding"

has committed conduct that violates 18 U.S.C. § 1512(b)(1).   However, if Section 1512(c)(2) were construed without limitation, the government could charge conduct specifically proscribed by § 1512(b)(1) under § 1512(c)(2). In this way, the government could avoid its burden of proving all of §1512(b)(1)'s requisite elements and circumvent that provision's shorter statutory maximum sentence.   Indeed, it is arguable that that is precisely what has occurred in this case since, if the conduct alleged against Mr. Ring in Count X is chargeable at all as obstruction of justice (which we think it is not for the reasons discussed in the "nexus" section), it is most logically chargeable under § 1512 as an attempt to "influence" an "official proceeding" -- that is, the Senate Committee proceedings and the grand jury proceedings.   The fact that the government has instead chosen to charge such conduct under §  1512(c)(2) -- which carries twice the penalty -- perfectly illustrates the manner in which its construction of the statute renders § 1512(b)(2) superfluous.

Other provisions of 18 U.S.C. § 1512 and other obstruction statutes would similarly be rendered redundant and unnecessary under the government's interpretation of subsection (c)(2). Indeed, sections 1512(a), 1512(b) and 1512(d) all proscribe conduct that could instead be prosecuted under a liberally construed § l512(c)(2), as could conduct falling within the scope of the other obstruction of justice statutes, 18 U.S.C. §1503 and 1505. The government's apparent reading of § 1512(c)(2) thus results in a wholesale transformation of numerous statutory provisions into surplusage, a situation which would be unacceptable for any statute, but particularly a criminal one. *See generally Ratzlaf v. United States*, 510 U.S. 135, 140-41 (1994) (courts should avoid treating any statutory terms as surplusage, and resistance to such a result "should be heightened when the words describe an element of a criminal offense.") (citations omitted). Moreover, this replacement, in effect, of a number of obstruction of justice statutes

with a broadly-interpreted § 1512(c)(2) would substitute that section's 20-year maximum sentence for the substantially lesser penalties that Congress had previously deemed appropriate for the specifically proscribed conduct of l8 U.S.C. § 1503, 1505, 1512(a), 1512(b) and 1512(d).

A more limited reading of Section 1512(c)(2), on the other hand, would complement, rather than eradicate, these other statutory provisions. If the catch-all language of § 1512(c)(2) is read, as we suggest it must be, to refer solely to an individual's obstructive activity directed at physical evidence, then that provision would close any loophole in § 1512(c)(l) with regard to evidence tampering, without interfering with the functions of the other provisions of Section 1512, which focus on witness tampering.  Such a construction would also preserve the importance of the other obstruction of justice statutes, ensuring that each statute fulfills its unique role in the statutory scheme.

Construing the provisions of 18 U.S.C. § 1512(c)(2) as limited to situations involving tampering with documents or physical evidence would also fulfill the legislative history, which makes clear the statute was enacted in the aftermath of the related Arthur Andersen and Enron affairs in 2001 to correct perceived shortcomings in the criminal laws governing document destruction.  Specifically, in early January 2002, after Arthur Andersen disclosed that it had destroyed "a 'significant but undetermined number" of documents relating to its auditing work for Enron, Congress held hearings on the issue.  *See* Michael Schroeder & Tom Hamburger, Congressional Panel Investigates Andersen's Enron Audit — Memo Telling Accountants to Destroy Documents Is at Center of Inquiry, Wall St. J., Jan. 14, 2002, at A3.  The hearings -- and the later criminal charges against Arthur Andersen -- highlighted the absence of any statutory provision prohibiting the direct destruction of evidence by an individual prior to the issuance of a subpoena. Thus, in that case, the government was forced to charge Arthur Anderson with

violating 18 U.S.C. § 1512(b)(2)(B), which prohibits corrupt persuasion of another person to destroy documents, and necessarily proceeded "under the legal fiction that the defendants are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves." S. Rep. No. 107-146, at 7 (2002).

The evolution of these events, culminating in Andersen's indictment under 18 U.S.C. § 1512(b), thus exposed the inadequacy of the criminal obstruction of justice laws pertaining to document destruction, leading Congress to conclude, among other things, that "current federal obstruction of justice statutes relating to document destruction is riddled with loopholes and burdensome proof requirements." See S. Rep. No. 107-146, at 6.  In response, Congress enacted the Sarbanes-Oxley Act of 2002, which included the Corporate Fraud Accountability Act of 2002, of which 18 U.S.C. § 1512(c) is a part. See S. Rep. No. 107-146, at 2-5. There is no question that the focus of the obstruction of justice provisions in the Corporate Fraud Accountability Act was on document destruction, even in the early stages of the law's promulgation. The Senate Report submitted on May 6, 2002 with the proposed bill (S. 2010), stated that the Corporate Fraud Accountability Act contained two provisions, 18 U.S.C. § 1519 and 1520, making document destruction a felony, because "the current laws regarding destruction of evidence are full of ambiguities and limitations that must be corrected." S. Rep. No. 107-146, at 7.  Indeed, the Corporate Fraud Accountability Act was expressly designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15. Section 1512(c) did not exist as part of the original proposal. S. 2010, 107th Cong. (2002).

Instead, it was later introduced as an amendment by Senator Trent Lott in July 2002. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). Senator Lott explained that the proposed

amendment, which added, among other provisions, 18 U.S.C. § 1512(c), would enact stronger laws against document shredding: "Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . . [T]his section would allow the Government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year." *Id.* at S6545 (statement of Sen. Lott) (emphasis supplied). Senator Orrin Hatch, in support of Senator Lott's amendment, explained that it would "close[] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents. Id. at S6550 (statement of Sen. Hatch). In fact, Congress focused on preventing document destruction throughout debates about the Corporate Fraud Accountability Act. *See, e.g.*, 148 Cong. Rec. S6768 (daily ed. July 15, 2002) (statement of Sen. Leahy) ("This bill is going to send wrongdoers to jail and save documents from the shredder[.]").

   The legislative history is clear that the express purpose of § 1512(c) was to criminalize the type of document destruction that had occurred as part of the Enron affair. *See e.g.*, S. Rep. No. 107-146, at 2-5. Congress's stated goal was to close a loophole then extant in obstruction of justice laws, which criminalized an individual's persuasion of another person to destroy a document with intent to impair its availability in an official proceeding, but did not necessarily criminalize that individual's own destruction of a document. *See* 18 U.S.C. § 1512(b)(2)(B); S. Rep. No. 107-146, at 7. The government's apparent position in this case that any non-document related obstructive activity can be prosecuted under § 15 l2(c)(2) — is rebutted by the reasons that Congress stated for enacting that particular statutory provision, and should be rejected.  This

Court should accordingly construe § 1512(c)(2) as limited to the conduct Congress intended it to reach.

Even if the canons of statutory construction and the relevant legislative history did not dictate the conclusion that Section 1512(c)(2) cannot reach the conduct alleged here, the rule of lenity would apply to resolve any remaining ambiguity in the defendant's favor. See *United States v. Granderson*, 511 U.S. 39, 54 (1994) ("In these circumstances — where text, structure, and history fail to establish that the Government's position is unambiguously correct — we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."); *United States v. Bass*, 404 U.S. 336, 347 (1971). The principles behind the rule of lenity were explained by the Supreme Court in Bass:

> First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed . . . . Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.' Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

404 U.S. at 348 (quotations and citations omitted). Those principles suggest that if there is any doubt about the proper construction of this statute -- and we suggest there is none -- this Court must resolve those doubts in favor of the narrower construction urged by Mr. Ring here.

*****

In short, § 1512(c)(2) applies only to actions that consist of or relate to tampering with documents and other physical evidence.   Because the indictment against Mr. Ring alleges no such conduct, it is insufficient to state a charge under § 1512(c)(2) as a matter of law.

## **CONCLUSION**

For the reasons stated above, the Court should dismiss the indictment in its entirety.  Any dismissal should be with prejudice.


Respectfully submitted,


Dated:  January 30, 2009

  /s/ Richard A. Hibey
Richard A. Hibey (D.C. Bar #74823)
Andrew T. Wise (D.C. Bar # 456865)
Matthew Reinhard (D.C. Bar #474941)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that, on this 30th day of January, 2009, a true and genuine copy of the

foregoing was filed in the Court's ECF system and thereby automatically sent to the following:

> Michael J. Leotta
> Assistant United States Attorney, Maryland
> 36 South Charles Street
> Fourth Floor
> Baltimore, MD  21201
> Michael.leotta@usdoj.gov
>
> William M. Welch, II
> Criminal Division
> U.S. Department of Justice
> 1400 New York Avenue, NW
> Washington, DC  20005
> william.welch3@usdoj.gov
>
>
> Nathaniel B. Edmonds
> Senior Trial Attorney, Fraud Section
> Criminal Division
> U.S. Department of Justice
> 1400 New York Avenue, NW
> Washington, DC  20005
> Nathaniel.edmonds@usdoj.gov
>
>
> Michael Ferrara
> Public Integrity Section
> Criminal Division
> U.S. Department of Justice
> 1400 New York Avenue, NW
> Washington, DC  20005
> Michael.ferrara@usdoj.gov
> *Attorneys for Plaintiff*

/s/ Richard A. Hibey