**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

JUN 2 5 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>)<br>v.                                   )<br>)<br>KEVIN A. RING,                )<br>)<br>             Defendant.      )<br>_____ ) | No. 08-CR-274 (ESH) |

## MEMORANDUM OPINION AND ORDER

Defendant Kevin A. Ring faces a ten-count indictment for paying illegal gratuities in violation of 18 U.S.C. § 201(c)(1)(A); honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; conspiracy to pay illegal gratuities and commit honest services wire fraud in violation of 18 U.S.C. § 371; and obstruction of justice in violation of 18 U.S.C. §§ 1512(b)(3) and 1512(c)(2). Ring has filed a motion to dismiss the indictment, and on April 9, 2009, the Court heard arguments on this motion. For the reasons explained below, the Court will deny defendant's motion.

## BACKGROUND

### I.   THE ALLEGATIONS

On September 5, 2008, a federal grand jury indicted Ring for acts relating to his work with lobbyist Jack Abramoff. The indictment alleges that from 1993 through 1999, Ring worked on the staff of a member of the U.S. House of Representatives, on the staff of a U.S. Senate subcommittee, and as the executive director of a Republican Party caucus in the House. (Indictment ["Ind."] at 2-3 ¶ 7.) Around December 1999, Ring joined a law/lobbying firm in Washington, D.C. ("Firm A"), working as a lawyer and lobbyist under the direction of Jack

Abramoff. (*Id.* at 3 ¶ 9.) Around January 2001, Ring followed Abramoff to another firm in Washington ("Firm B"), where Ring was employed until October 2004. (*Id.*) Ring and Abramoff lobbied government officials, their staff, and other federal employees on behalf of their clients, which included Native American tribal governments that operated, or were interested in operating, gambling casinos. (*Id.* at 3 ¶ 11.)

In March 2002, a Native American tribe based in New Mexico ("the New Mexico tribe") hired Firm B at $50,000 per month for lobbying services, and Ring subsequently persuaded the tribe to enter a $2.75 million contract with Capitol Campaign Strategies, LLC ("CCS"), a public relations firm run by former Firm B employee Michael Scanlon. (*Id.* at 2 ¶ 6, 9 ¶ 27, 41 ¶¶ 4-5.) Abramoff and Scanlon had a pre-existing profit-sharing relationship whereby Scanlon made payments to Abramoff; a similar arrangement later extended to Ring as well, who would receive five percent of Scanlon's total revenues from the tribe. (*Id.* at 9 ¶ 28, 41-42 ¶¶ 4-7.)

Abramoff used funds from his lobbying practice and from Scanlon to provide gifts and other things of value to government officials or their staff. (*Id.* at 9 ¶ 29.) From 2000 through 2004, Ring and Abramoff provided things of value (*e.g.*, tickets to music and sporting events, meals and drinks, golf outings, travel, and un-reimbursed sponsorship of political fundraisers) to three U.S. congressmen (identified as "Representative 4," "Representative 5," and Robert Ney), their staffers, and officials in the executive branch. (*See generally id.* at 10-28.) Abramoff and Ring also sought to find a job for the wife of Representative 5 (*see, e.g., id.* at 17 ¶ 78, 18 ¶ 84, 22 ¶ 117), with Abramoff ultimately putting her on his payroll for approximately 19 months at $5000 per month drawn from Firm B's funds. (*Id.* at 23 ¶ 123, 25 ¶ 131, 27 ¶ 145.)

During this time period, the three congressmen took (or agreed to take) actions that were favorable to Ring and Abramoff's various clients, such as

- inserting, or resisting the removal of, multimillion-dollar earmarks into appropriations bills (*id.* at 11-13, 21-22, 24);

- contacting the Immigration and Naturalization Service ("INS") to seek an investigation of a woman advocating labor reform that would adversely affect Abramoff's clients in the Commonwealth of the Northern Mariana Islands (CNMI) (*id.* at 15);

- contacting executive branch officials in support of appropriations requests (*id.* at 15-16, 32-33);

- opposing legislation regarding Internet gambling (*id.* at 17);

- contacting the DOI regarding tribal governance issues and a petition for tribal recognition (*id.* at 25-27);

- signing a letter opposing a proposed commission to study Indian gaming (*id.* at 28); and

- meeting with the New Mexico tribe (*id.* at 29).

Also during this time, executive branch officials took (or agreed to take) actions that were favorable to Ring and Abramoff's various clients or, in some cases, favorable to Abramoff personally, such as

- calling the DOI and a U.S. senator to gain support for a settlement agreement benefiting the New Mexico tribe *(id.* at 29);

- placing the New Mexico tribe on a list of people with whom the federal government could work (*id.* at 30);

- awarding a $16.3 million DOJ grant for the construction of a tribal jail and waiving the DOJ's requirement that the contract to construct the jail be competitively bid (*see generally id.* at 31-36); and

- seeking expedited review and approval by INS of pending applications from an Abramoff-owned religious school, Eshkol Academy, seeking to admit foreign students (*id.* at 37).

In late 2002, the New Mexico tribe complained to Ring and Abramoff about Scanlon's performance on his contract.  *(Id.* at 42 ¶ 7.)  From 2003 through February 2004, news stories began to appear regarding the fees charged by Abramoff and Scanlon for lobbying and public relations services to four tribal clients. (*Id.* at 42 ¶¶ 8-9.)  In February 2004, Firm B retained outside legal counsel to conduct an internal investigation into Abramoff's lobbying activities,

and this investigation later extended to the activities and practices of Ring and other members of Abramoff's lobbying team.  (*Id.* at 42-43 ¶ 11.)

From March through August 2004, Firm B's outside counsel interviewed Ring.  (*See generally id.* at 43-45 ¶¶ 12-19.)  During these interviews, the outside counsel informed Ring that anything he said might be communicated to entities investigating Abramoff's lobbying activities, including the DOJ and the U.S. Senate Committee on Indian Affairs ("the Indian Affairs Committee"), and that there were pending congressional and DOJ investigations into Abramoff's employment of Representative 5's wife.  (*Id.* at 43 ¶ 12.)  Subsequently, Ring stated that he indeed believed that outside counsel, or other lawyers for Firm B, were providing information to the DOJ or the Indian Affairs Committee, and that he was aware that Firm B and Representative 5's wife had received federal grand jury subpoenas.  (*Id.* at 44 ¶ 16.)  Ring also falsely told Firm B's outside counsel, among other things, that he did not recall conversations about getting a job for Representative 5's wife, and that there was no agreement to give Ring a monetary stake in Scanlon's contract with the New Mexico tribe.  (*Id.* at 44 ¶ 17-18.)

## II.   THE COUNTS

Count I of the indictment charges Ring with conspiring, in violation of 18 U.S.C. § 371, to pay illegal gratuities in violation of 18 U.S.C. § 201(c)(1)(A) and to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.  (Ind. at 6-7 ¶ 20.)  Count II, which incorporates many of the conspiracy allegations, charges Ring with paying illegal gratuities to DOJ official Robert Coughlin by giving him eight tickets to basketball games "for or because of" Coughlin's contacting an INS employee to request "expedited review and approval" of Eshkol Academy's application to admit foreign students.  (*Id.* at 38 ¶ 2.)  Counts III through VIII, which incorporate all of the conspiracy count's factual allegations, charge Ring with committing honest

services wire fraud by devising a scheme to defraud "the United and its citizens of their right to the honest services" of certain legislative and executive branch officials, "performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing . . . ." (*Id.* at 39 ¶ 2.) The six counts are premised upon six separate interstate wires: one email exchange between Ring and Coughlin, four email exchanges between Ring and John Albaugh, Representative 4's chief of staff, and one bank wire involving a $5000 check drawn from Firm B's bank account and deposited into an account controlled by Representative 5's wife. (*Id.* at 39-40 ¶ 3.) Count IX charges Ring with obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), for making false statements to Firm B's outside counsel and thereby preventing "the communication of information" to the Federal Bureau of Investigation ("FBI") relating to the commission of the possible offenses of conspiracy, mail fraud, wire fraud, and payment of illegal gratuities. (*Id.* at 45 ¶ 19.) Count X similarly charges Ring with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), for making false statements to outside counsel so that counsel would provide misleading information to the grand jury and the Indian Affairs Committee. (*Id.* at 45-46 ¶ 2.)

## ANALYSIS

## I.     STANDARD OF REVIEW

An indictment need only contain a "plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c). However, "an indictment is not required to set forth all the evidence the Government plans to present." *United States v. Palfrey*, 499 F. Supp. 2d 34, 45 (D.D.C. 2007) (citing *United States v. Haldeman*, 559 F.2d 31, 123-25 (D.C. Cir. 1976)). Rather, it is "sufficiently specific where it (1) contains the elements of the offense charged and fairly informs the defendant of those charges so that he may

defend against them, and (2) enables him 'to plead acquittal or conviction in bar of future prosecutions for the same offense,'" *United States v. Safavian*, 429 F. Supp. 2d 156, 158 (D.D.C. 2006) (quoting *Hamling v. United States*, 418 U.S. 87, 117-18 (1974)), thus protecting him "'against future jeopardy for the same offense,'" *id.* (quoting *Haldeman*, 559 F.2d at 123).

A defendant may move to dismiss the indictment on the grounds that it "fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). "In considering a motion to dismiss under Rule 12, the Court is bound to accept the facts stated in the indictment as true." *United States v. Syring*, 522 F. Supp. 2d 125, 128 (D.D.C. 2007); *United States v. Sampson,* 371 U.S. 75, 78-79 (1962) ("[A]t this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense."). Accordingly, the Court "cannot consider facts beyond the four corners of the indictment." *United States v. Harris*, No. 06-CR-124, 2006 WL 2882711, at *3 (D.D.C. Oct. 5, 2006).

## II.   PAYMENT OF ILLEGAL GRATUITIES (COUNT II)[1]

Ring contends that Count II fails to allege that Coughlin performed any "official act," as required by statute. The Court disagrees.

To prove that Ring paid an illegal gratuity, the government must show that he conferred a thing of value upon a present, past, or future public official "for or because of" a specific "official act" that the official performed or would perform. *See* 18 U.S.C. § 201(c)(1)(A); *United States v. Smith*, 267 F.3d 1154, 1163 (D.C. Cir. 2001) ("[T]he Government 'must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given.'" (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999)). The statute defines "official act" as "any decision or action on any

---

[1] The Court will first discuss the sufficiency of Counts II through VIII, because their gratuities and wire fraud charges underlie Count I's conspiracy charge.

question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or

which may by law be brought before any public official, in such official's official capacity, or in

such official's place of trust or profit." 18 U.S.C. § 201(a)(3). Unlike statutory bribery, which

requires a *quid pro quo* (*i.e.*, "a specific intent to give or receive something of value *in exchange*

for an official act"), an illegal gratuity may simply be "a reward" for a past or future act. *Sun-*

*Diamond*, 526 U.S. at 404-05 (emphasis in original). The gratuities statute thus aims to

criminalize "the corruption of official decisions through the misuse of influence in governmental

decision-making." *Valdes v. United States*, 475 F.3d 1319, 1324-25 (D.C. Cir. 2007) (en banc)

(quoting *United States v. Muntain*, 610 F.2d 964, 968 (D.C. Cir. 1979), and reviewing cases).

Given this concern for "inappropriate influence on decisions that the government actually

makes," *id.* at 1325, the statutory phrase "any question, matter, cause, suit, proceeding or

controversy" refers to "a class of questions or matters whose answer or disposition is determined

by the government." *Id.* at 1324.

  The indictment alleges that Robert Coughlin was Deputy Director of DOJ's Office of

Intergovernmental and Public Liaison (Ind. at 5 ¶ 17), a job that required him "to interact with

the INS and other DOJ components on behalf of members of the public, and vice-versa." (Opp'n

[Dkt. No. 41] at 25.) On or about February 7, 2003, Ring emailed Coughlin seeking "an

expedited review and approval" of the pending applications, submitted by Abramoff's Eshkol

Academy, to admit foreign students. (Ind. at 37 ¶ 195 (quoting Ring's email).) Coughlin then

forwarded Ring's email to two DOJ employees (including an INS employee) with a cover email

stating, "Thank you for looking into this. I do not know if anything can be done but I said I

would look into it. If, for any reason, nothing can be done, please email me so I can pass that

along. Thank you very much for you[r] assistance." (*Id.* at 37 ¶ 196 (quoting Coughlin's

email).) After Coughlin notified Ring that INS agreed to expedite the review, Ring emailed Coughlin on February 10 to thank him and to offer an invitation to drinks, which Coughlin accepted. (*Id.* at 37 ¶ 197.) The next day, Coughlin requested eight tickets to two Washington Wizards basketball games, and Ring sought and received approval to give Coughlin the tickets by writing Abramoff an email stating, "Bob Coughlin (DOJ). . . . Helped on the school and is now looking for tickets to the Wizards . . . ." (*Id.* at 38 ¶ 198 (quoting Ring's email).)

Relying on the D.C. Circuit's recent opinion in *Valdes*, Ring points to Coughlin's cover email to the DOJ officials and suggests that because Coughlin used disinterested language when forwarding Ring's request, the email is not evidence of an "official act," but of "a government official simply direct[ing] a query to the proper office within the federal bureaucracy and tak[ing] no part in discussion or resolution of the query." (Ring's Mem. of P. & A. in Supp. of His Mot. to Dismiss ["Mem."] at 23 (discussing Ind. at 37 ¶ 196).) This argument misreads *Valdes*, as well as the indictment, which charges that Coughlin "request[ed] an expedited review and approval of the application . . . ."[2] (Ind. at 38 ¶ 2.). First, Coughlin allegedly took action on specific questions whose "disposition[s]" would be *solely* "determined by the government," *Valdes*, 475 F.3d at 1324, namely, whether the ongoing INS review should be expedited, and whether the pending applications should be approved. Second, the indictment alleges that Ring asked Coughlin, and Coughlin asked the DOJ officials, to accelerate that governmental decision-making process. *Valdes* found similar conduct to be "unquestionably" prohibited by the

---

[2] As the government notes, "[s]ome but not all of the details of Coughlin's official acts are included in the overt acts section supporting the conspiracy charge in Count I, and are incorporated into Count II. Of course, the fact that not every single detail was included in the conspiracy's overt acts does not limit the government's proof at trial. For example, the government will prove at trial that in addition to sending an email, Coughlin placed a telephone call to the same INS official seeking the expedited review and approval of the application." (Opp'n at 26 n.7.)

gratuities statute, *id.* at 1325, offering examples such as "the acceleration . . . of [a FOIA request's] grant or denial, or any skewing of the terms of its grant or denial," *id.* at 1329, "a congressman's use of his office to secure Navy contracts for a ship repair firm," *id.* at 1325 (citing *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988)), and "decisions to initiate, accelerate, retard, conclude, or skew" a police investigation. *Id.* at 1326. Third, Ring's request directly implicated Coughlin's job as a liaison between lobbyists and DOJ components regarding DOJ matters, because the request "involved a matter or issue that could properly, by law, be brought before" Coughlin in that capacity. *Muntain*, 610 F.2d at 969.[3]

In short, because Coughlin's alleged request for expedited review and approval fits comfortably within the meaning of an "official act," Count II is sufficient to state an "official act" within the meaning of § 201(a)(3) and *Valdes*.

## III.   HONEST SERVICES WIRE FRAUD (COUNTS III - VIII)

Ring contends that the honest services wire fraud charges are invalid as a matter of law because the statute cannot be used to prosecute a private lobbyist who did not prevent a federal lawmaker's breach of congressional ethics rules. (*See generally* Mem. at 2-20; Reply [Dkt. No. 45] at 1-19.)  Ring's arguments are based on a misreading of both the indictment and the relevant case law.

### A.   Applicable Law

It is unlawful to "transmit[] or cause[] to be transmitted" a wire communication in interstate commerce "for the purpose of executing" an existing or intended "scheme or artifice to

---

[3] By sending an email to the DOJ officials in his official capacity, Coughlin's alleged conduct was akin to that of the congressman in *Biaggi* whose "official acts" included seeking assistance for a Navy contractor by writing letters on official stationery to city officials. Those letters fell within "the scope of a congressman's job" because, not unlike Coughlin's responsibilities, "the duties of senators and representatives routinely include interceding with various agencies on behalf of their constituents . . . ." 853 F.2d at 98.

defraud." 18 U.S.C. § 1343. "To prove wire fraud, the Government must show: (1) the defendant 'knowingly and willingly entered [or intended to enter] into a scheme to defraud'; and (2) 'an interstate wire communication was used to further the scheme.'" *United States v. Tann*, 532 F.3d 868, 872 (D.C. Cir. 2008) (quoting *United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006)). A scheme to defraud includes a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Congress enacted § 1346 in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), which held that the mail fraud statute (18 U.S.C. § 1341) was limited to the deprivation of property.[4] *United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 973 (D.C. Cir. 1998), *aff'd on other grounds*, 526 U.S. at 414. Although the "honest services" theory has been used in certain private sector contexts, it has "typically been used . . . as a tool for prosecuting corrupt public officials who have deprived citizens of their right to honest representation." *Id.* (citations omitted). Public sector honest services fraud "is premised upon an underlying theory that a public official acts as 'trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, *e.g.*, honesty and loyalty' to them." *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir. 1987) (quoting *United States v. Mandel*, 591 F.2d 1347, 1363 (4th Cir.), *aff'd in relevant part*, 602 F.2d 653 (4th Cir. 1979) (en banc)).[5]

Courts have long recognized at least two ways in which "a public official can steal his honest services from his public employer: (1) the official can be influenced or otherwise

---

[4] "The requisite elements of 'scheme to defraud' under the wire fraud statute, 18 U.S.C. § 1343[,] and the mail fraud statute, 18 U.S.C. § 1341, are identical. Thus, cases construing mail fraud apply to the wire fraud statute as well." *United States v. Lemire*, 720 F.2d 1327, 1334 n.6 (D.C. Cir. 1983) (citing cases).

[5] Although *Silvano* predated *McNally* and the enactment of § 1346, "Congress's evident intent in enacting [§ 1346] was to revive pre-*McNally* caselaw, at least with respect to the deprivation of honest services." *Sun-Diamond*, 138 F.3d at 973 n.13.

improperly affected in the performance of his duties, or (2) the official can fail to disclose a

conflict of interest, resulting in personal gain." *United States v. Woodward*, 149 F.3d 46, 57 (1st

Cir. 1998) (citations omitted); *see also United States v. Safavian*, 435 F. Supp. 2d 36, 47 (D.D.C.

2006) ("As applied to a public official, the two most common theories of honest services fraud

typically are (1) that the official accepted a bribe or (2) that he or she failed to disclose a conflict

of interest that resulted in personal gain." (citing *Woodward*)). The exercise of improper

influence (often through bribery-like conduct) and efforts to reap personal gain through

undisclosed conflicts of interest both "undermine transparency in the legislative process and

other governmental functions." *United States v. Weyhrauch*, 548 F.3d 1237, 1247 (9th Cir.

2008). "[W]ithout transparency the public cannot evaluate the motivations of public officials

who are purporting to act for the common good to determine whether they are in fact acting for

their own benefit." *Id.*

   Honest services fraud by means of bribery requires "a *quid pro quo* – a specific intent to

give or receive something of value *in exchange* for an official act." *Sun-Diamond*, 526 U.S. at

404-05 (emphasis in original) (distinguishing bribery and gratuities under 18 U.S.C. § 201). As

the D.C. Circuit has explained, "[b]ribery is entirely future-oriented" and "can be seen as having

a two-way nexus. That is, bribery typically involves an intent to affect the future actions of a

public official through giving something of value, and receipt of that thing of value then

motivates the official act." *United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999), *vac'd

as moot due to pardon*, 240 F.3d 35 (D.C. Cir. 2001) (per curiam). This two-way nexus can take

various forms. A single instance of bribery might involve an individual giving a gift to a public

official in exchange for a specific official act. However, it is also the case that "bribery can be

accomplished through an ongoing course of conduct . . . ." *United States v. Ganim*, 510 F.3d

11

134, 149 (2d Cir. 2007); *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ("[A] *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct."). In such ongoing bribery schemes, donors and recipients "do not always spell out in advance the specific match between gift and act." *Ganim*, 510 F.3d at 148. Honest services fraud is therefore also possible where "'a person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services.'" *Woodward*, 149 F.3d at 55 (quoting *United States v. Sawyer*, 85 F.3d 713, 730 (1st Cir. 1996)). For example, even if a lobbyist "'may not have provided legislators with direct kickbacks or commissions arising out of the specific official action [sought by the lobbyist], he may have intended the legislators generally to treat preferentially [the lobbyist's client's] interests, knowing that the free meals, entertainment, and golf would continue so long as favorable official acts were, at some point, taken.'" *Id.* This type of scheme, first articulated most clearly by the First Circuit in *Sawyer*, 85 F.3d at 730, has come to be known as the "stream of benefits" or "retainer" theory of honest services bribery, and it has been recognized by several other circuits. *See United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) ("stream of benefits"); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 n.15 (9th Cir. 2009) (describing "retainer" theory and citing *Kemp* and *Sawyer*); *see also Ganim*, 510 F.3d at 147-50 (2d Cir.).

The stream-of-benefits theory describes the "payment to a public official of a stream of things of value over time in exchange for favorable official action if and when the need or opportunity ar[i]se[s] . . . ." (Opp'n at 15.) *See Sawyer*, 85 F.3d at 730 (describing how pattern of gratuity offenses in exchange for "ongoing favorable official action" could constitute honest

services fraud); *Ganim*, 510 F.3d at 142 (affirming honest services fraud conviction under

bribery theory and holding that "the requisite *quid pro quo* . . . may be satisfied upon a showing

that a government official received a benefit in exchange for his promise to perform official acts

or to perform such acts as the opportunities arise"). To prove stream-of-benefits honest services

fraud, "the government need not prove that each gift was provided with the intent to prompt a

specific official act." *Kemp*, 500 F.3d at 282; *see also Kincaid-Chauncey*, 556 F.3d at

943 ("[T]he implicit *quid pro quo* [need not] concern a specific official act."). Rather,

> [t]he *quid pro quo* requirement is satisfied so long as the evidence shows a
> "course of conduct of favors and gifts flowing to a public official *in exchange for*
> a pattern of official actions favorable to the donor." Thus, "payments may be
> made with the intent to retain the official's services on an 'as needed' basis, so
> that *whenever* the opportunity presents itself the official will take specific action
> on the payor's behalf." While *the form and number of gifts may vary*, the gifts
> still constitute a bribe as long as the essential intent – a specific intent to give or
> receive something of value *in exchange* for an official act – exists.

*Kemp*, 500 F.3d at 282 (quoting *Jennings*, 160 F.3d at 1014) (emphases added, citations

omitted); *Kincaid-Chauncey*, 556 F.3d at 943 n.15 ("It is sufficient, for example, if the evidence

establishes . . . that the government official has received payments or other items of value with

the understanding that when the payor comes calling, the government official will do whatever is

asked."). In other words, the requisite intent need not take the form of a one-to-one *quid pro quo*

where each thing of value can be linked to a particular official act; it may also be proven by

evidence of a broader symbiotic relationship taking the form of "these for those." *See Ganim*,

510 F.3d at 148 ("'[E]ach payment need not be correlated with a specific official act. . . . [T]he

intended exchange in bribery can be "this for these" or "these for these," not just "this for

that."'" (quoting *Jennings*, 160 F.3d at 1014)).

Honest services fraud by means of undisclosed conflicts of interest is premised upon a

public official's "affirmative duty to disclose material information to the public employer."

*Woodward*, 149 F.3d at 54-55 (internal quotation marks omitted); *cf. United States v. Diggs*, 613

F.2d 988, 998 (D.C. Cir. 1979) ("'The mail fraud statute is violated when some or all of the

following factors are present: a duty to disclose an interest with a concomitant failure to do so;

[a]n attempt to cover-up through false pretenses . . . .'" (quoting *United States v. Bush*, 522 F.2d

641, 646 (7th Cir. 1975) (edits omitted)). An official's failure "to disclose a personal interest in

a matter over which she has decision-making power" deprives the public "of its right either to

disinterested decision making itself or, as the case may be, to full disclosure as to the official's

potential motivation." *Woodward*, 149 F.3d at 55 (internal quotation marks and citations

omitted). For example, material conflicts of interest can arise where a public official "solicit[s]

gifts from entities over which he [holds] decision-making discretion," *United States v. Espy*, 23

F. Supp. 2d 1, 6 (D.D.C. 1998); accepts extensive "business loans" from companies owned by an

individual to whom the official helped award a government contract, *see United States v.

Harvey*, 532 F.3d 326, 332 (4th Cir. 2008); negotiates for future employment with a private

entity that has an interest in matters pending before the official, *see Weyhrauch*, 548 F.3d at

1239; accepts illegal campaign contributions, *see United States v. Vila*, No. 08-CR-297, 2009

WL 79189, at *4  (D.P.R. Jan. 9, 2009); or engages in a romantic relationship with a private

lobbyist who represents clients in matters that come before the official. *See United States v.

Lopez-Lukis*, 102 F.3d 1164, 1166 (11th Cir. 1997) (noting that indictment charged county

commissioner and lobbyist with honest services mail fraud and alleged that they "concealed their

'monetary and intimate relationship' from the public"). And, of course, a scheme to commit

honest services fraud can exhibit elements of both non-disclosure and bribery-like conduct, such

as where a public official conceals the conflict of interest that results from his acceptance of

benefits from a private entity in exchange for taking official action favorable to that entity. *See,*

*e.g.*, *Weyhrauch*, 548 F.3d at 1247 (noting that legislator defendant "allegedly voted and took other official actions on legislation" at private company's direction "while engaged in undisclosed negotiations for future legal work" from that company, and that those allegations "describe an undisclosed conflict of interest and could also support an inference of a *quid pro quo* arrangement to vote for the oil tax legislation in exchange for future remuneration in the form of legal work").

### B.    Ring's Challenges to the Honest Services Fraud Counts

Ring's challenges to the legal sufficiency of the indictment are based on a series of incorrect premises.  As an initial matter, he makes much of the fact that he is a private citizen who owes no duty to the public, and therefore cannot be prosecuted for depriving the public of their right to his honest services.  (Mem. at 8-11.)  Ring misreads the indictment.  The government has not alleged that Ring deprived the public of his *own* honest services, but rather that he devised a scheme to deprive the public of its right to "the honest services *of certain public officials*," and that he aided and abetted such a scheme.  (Ind. at 39-40 ¶¶ 2-3 (emphasis added).)  The mail and wire fraud statutes have long been used to prosecute private participants in schemes to deprive the public of an official's honest services.  *See, e.g.*, *Silvano*, 812 F.2d at 755 (affirming honest services fraud convictions, under pre-*McNally* interpretation of mail fraud statute, of local insurance agent as well as city budget director); *Lopez-Lukis*, 102 F.3d at 1165 (reinstating indictment's honest services fraud allegations involving lobbyist and county commissioner); *Harvey*, 532 F.3d at 331 (affirming convictions of private businessman and U.S. Army employee).[6]  In fact, "[n]either the language nor the policy of the wire-fraud statute"

---

[6]  Private parties who scheme with a public official can even be convicted of honest services fraud despite the public official's acquittal.  *See United States v. Blumeyer*, 114 F.3d 758, 765 (8th Cir. 1997).

requires that one of the parties to the scheme be a public official. *United States v. Potter*, 463 F.3d 9, 16 (1st Cir. 2006). Private citizens may therefore be prosecuted for public sector honest services fraud even where none of the defendants is a public official. *See, e.g., id.* at 13 (affirming honest services fraud convictions of two private individuals who devised scheme "to bribe the then-speaker of the Rhode Island House of Representatives," where indictment did not charge the public official); *Sawyer*, 85 F.3d at 722-34 (examining honest services fraud conviction of lobbyist who was sole defendant). Accordingly, Ring's status as a private individual does not present an obstacle to indictment.[7]

Ring also challenges the indictment on the grounds that it charges him with "fail[ing] to

_____

[7] The three cases cited by Ring do not undermine the uncontroversial principle that private citizens can scheme to deprive the public of a *public official's* honest services. In *United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003), the Third Circuit reversed an honest services mail fraud conviction of a private individual who served as a Republican Party county chairman. The court of appeals noted that the jury had been *correctly* instructed that the party chairman could be convicted under the "legally sufficient" theory that he deprived the public of the County Administrator's honest services; however, the jury was also *incorrectly* instructed that it could convict the party chairman under the theory that he "violat[ed] his duty to provide the County with his own honest services." *Id.* at 109. "Because . . . the jury did not specify which theory of mail fraud it believed Murphy violated," the court of appeals reversed the conviction and remanded for a new trial absent the latter "legally invalid theory." *Id.* at 118.

Similarly, in *United States v. Warner*, 292 F. Supp. 2d 1051 (N.D. Ill. 2003), the district court dismissed an honest services charge against a private individual because, despite his unofficial working relationship with the Illinois Secretary of State's ("SOS") Office and allegations that he influenced the office's decisions for his own personal gain, he could not be charged with "defrauding the public of *his own honest services* because he was a private citizen who did not owe such a fiduciary duty to the citizens of Illinois or to the SOS Office." *Id.* at 1063 (emphasis added). Notably, however, the same defendant was later convicted of depriving the public of *the former governor's* honest services. *See United States v. Warner*, No. 02-CR-506, 2006 WL 2583722, at *1 (N.D. Ill. Sept. 7, 2006) (denying motion for acquittal on seven of nine honest services fraud counts), *aff'd*, 498 F.3d 666 (7th Cir.), *reh'g denied*, 506 F.3d 517 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2500 (2008).

Finally, in *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998), the Seventh Circuit affirmed the dismissal of an honest services charge against a part-time city alderman where the charge was premised not upon the defendant's misuse of his alderman's office but upon his conduct in his *private capacity* as a lawyer counseling a client. *See id.* at 655-57.

prevent a breach of the prior gift, travel, and financial disclosure rules that applied to members of Congress and their staffs." (Mem. at 11-12.)  As he describes it, the government is using § 1346 to enforce the administrative ethics rules and "criminalize a vast array of conduct that . . . was typical, customary, and not considered to violate the federal criminal laws" prior to the enactment of the Honest Leadership and Open Government Act of 2007 ("HLOGA"), Pub. L. 110-81, 121 Stat. 735 (Sept. 14, 2007).  (*Id.* at 14.)  Such use of § 1346, in defendant's view, has deprived him of "fair warning[,] required by the Constitution, that criminal liability could result when a private lobbyist did not act affirmatively" to prevent a breach of the ethics rules.  (*Id.* at 12.)  He also argues that the Supreme Court's decision in *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999), precludes the government's attempt to apply § 1346 to corruption schemes relating to federal officials because this would render superfluous the more narrowly written "statutes, regulations[,] and rules governing gifts and other self-enriching conduct by federal officials." (*See* Mem. at 18-20.)

These arguments fundamentally mischaracterize the government's use of § 1346.  The government does not seek to criminalize "traditional" lobbying activities such as constitutionally protected petitioning[8] or even the provision of meals and drinks in order to cultivate goodwill. Nor does the government seek to criminalize Ring's supposed failure to prevent public officials from violating ethics rules by accepting his gifts.  What the indictment *does* charge is that Ring devised and assisted a scheme, furthered by six interstate wire communications, to deprive the public of the honest services of certain identified public officials.  The allegations support this charge in a manner consistent with a long line of cases, both before and after *Sun-Diamond*, that

---

[8] "Of course, it is well settled that the First Amendment does not protect fraud." *United States v. Philip Morris USA Inc.*, Nos. 06-5267 & 06-5268, 2009 WL 1423964, at *20 (D.C. Cir. May 22, 2009).

establish the validity of using § 1346 to target honest services fraud relating to both state *and federal* officials. *See United States v. Diggs*, 613 F.2d 988 (D.C. Cir. 1979) (congressman); *United States v. Wingate*, 128 F.3d 1157 (7th Cir. 1997) (INS agent); *United States v. Espy*, 23 F. Supp. 2d 1 (D.D.C. 1998) (Cabinet secretary); *United States v. Harvey*, 532 F.3d 326 (4th Cir. 2008) (U.S. Army civilian administrator); *United States v. Selby*, 557 F.3d 968 (9th Cir. 2009) (federal agency administrator); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1307, 1312 (D.C. Cir. 1995) (affirming validity of honest services charges against congressman to the extent they were based on unambiguous House rules).

There is no merit to – nor legal authority for – Ring's suggestion that *Sun-Diamond* requires the Court to construe § 1346 so as to immunize him from criminal prosecution for honest services fraud involving federal officials. (*See* Hr'g Tr. at 64:15-22.) As discussed (*see supra* Section II), *Sun-Diamond* interpreted the gratuities statute, 18 U.S.C. § 201(c)(1)(A), as criminalizing things of value given to public officials "for or because of" a specific official act. 526 U.S. at 414. The Court rejected an alternate interpretation of the statute that would have criminalized a gratuity given to a public official merely because of that official's *position* in order to, for example, "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *Id.* at 405. That alternate interpretation would have ignored the express statutory language requiring a link between the illegal gratuity and an "official act," and would have had the absurd consequence of criminalizing "token gifts to the President based on his official position and not linked to any identifiable act," "a high school principal's gift of a school baseball cap to the Secretary of Education, by reason of his office, on the occasion of the latter's visit to the school," or "a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA

policy – so long as the Secretary had before him, or had in prospect, matters affecting the farmers." *Id.* at 406-07.  The wisdom of the Court's narrower interpretation was reinforced by the broader backdrop of federal corruption laws and regulations

> where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions.  Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.  Absent a text that clearly requires it, we ought not expand this one piece of the regulatory puzzle so dramatically as to make many other pieces misfits.

*Id.* at 412.  The rejected interpretation, by requiring only a link between a gift and an official's *position*, would have made redundant various more specific prohibitions on gift-giving without regard to the gift's purpose, *see id.*, and also would have made illegal what other statutes and regulations specifically carved out as *lawful* activity, *see id.* at 411-12.

No such concerns are applicable to the honest services fraud statutes.  The words of §§ 1343 and 1346 are clear: it is unlawful to use an interstate wire to further a scheme "to deprive another of the intangible right of honest services."  These statutes differ materially from the gratuities statute, in that honest services fraud requires no link between gift-giving and a specific official act; rather, under a stream-of-benefits theory of honest services fraud, gifts are given as part of an ongoing course of conduct to induce favorable official action as needed over time.  *See, e.g., Kemp,* 500 F.3d at 282.  Nonetheless, the stream-of-benefits theory imports a significant limiting principle in the form of a bribery-like fraudulent intent requirement – which is even stricter than the intent required for a conviction for paying illegal gratuities.  For stream-of-benefits fraud, there must be "a specific intent to give or receive something of value *in exchange* for an official act . . . ." *Id.*; *see also Sun-Diamond,* 526 U.S. at 404-05.  This requirement constrains the type of conduct criminalized by § 1346 and clearly distinguishes stream-of-benefits fraud from what Ring calls "traditional and foreseeable lobbying conduct"

(Mem. at 17), including the acts of gift-giving which were recently criminalized by HLOGA. "The traditional business practice of promoting a favorable business climate by entertaining and doing favors for potential customers" does not become bribery "merely because the potential customer is the government." *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976). "Such expenditures, although inspired by the hope of greater government business, are not intended as a *quid pro quo* for that business: they are in no way *conditioned upon the performance* of an official act or pattern of acts or upon the recipient's express or implied agreement to act favorably to the donor when necessary." *Id.* (emphasis added). It is the intent to enter into a *quid pro quo* that brings gift-giving into the realm of honest services fraud, and "[o]nly individuals who can be shown to have had the specific intent to trade official actions for items of value are subject to criminal punishment on this theory of honest services fraud." *Kincaid-Chauncey*, 556 F.3d at 944 n.15. This "essential idea of give-and-take" – and the government's need to prove it at trial – "eliminates the possibility that an innocent lobbyist or politician will be convicted for depriving the public of honest services" simply because the lobbyist possessed "the 'mere intent to curry favor.'" *Id.* at 943 (quoting *Kemp*, 500 F.3d at 281), 944 n.15.

Through this *quid pro quo* requirement, the theory of stream-of-benefits honest services fraud heeds *Sun-Diamond*'s admonition against interpreting § 1346 so broadly as to erase any distinction "between an elected official responding to legitimate lobbying and a corrupt politician selling his votes to the highest bidder." *Kincaid-Chauncey*, 556 F.3d at 943; *see also Ganim*, 510 F.3d at 146-47 (finding no "principled reason to extend *Sun-Diamond*'s holding beyond the illegal gratuity context"). "Thus, now, as before *Sun-Diamond*, so long as the [indictment alleges] that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not [allege] that the specific act to be performed was identified at the time of the

promise, nor need it link each specific benefit to a single official act. . . .Once the *quid pro quo*

has been established, . . . the specific transactions comprising the illegal scheme need not match

up this for that." *Ganim*, 510 F.3d at 147.

Here, the indictment alleges that Ring was a party to an agreement whose purpose was to

give things of value to public officials "in exchange for" favorable official action; that he gave

things to certain officials "as a means of influencing and securing their official actions, and

rewarding those official actions;" that he was aware of the administrative gift, travel, and

financial disclosure rules, that these officials were violating those rules by accepting his gifts and

by failing to report them on mandatory financial disclosure forms; and that these officials, in

exchange, took numerous actions favorable to Ring's clients. (*See* Ind. at 7 ¶¶ 21-22, 9-10 ¶¶ 30-

31; *see also generally id.* at 10-38.) These allegations suffice for purposes of charging an honest

services scheme to defraud, and Ring's alleged awareness of congressional rules and his

agreement to give gifts "in exchange for" official action would demonstrate that he had the

knowledge and corrupt intent necessary to violate the wire fraud statute. *See Tann*, 532 F.3d at

872.[9]

In addition, the allegations regarding the congressional rules support an honest services

fraud charge under a theory of material non-disclosure. Although congressional rules "impose a

duty of honesty" upon legislators, *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir.

1995) (discussing Senate rules), the mere breach of that fiduciary duty would not, "in and of

---

[9] There is no merit to Ring's argument that honest services fraud under a bribery theory
should be limited to the exchange of money for official actions. (*See* Reply at 5-7.) The bribery
statute itself rejects such a limitation, speaking instead in terms of "anything of value." 18
U.S.C. § 201(b)(1) & (2). Honest services bribery can thus involve the exchange of official
actions for more speculative economic benefits such as future legal employment, *see Weyhrauch*,
548 F.3d at 1239, or even wholly non-monetary benefits such as assistance in adopting children.
*See Wingate*, 128 F.3d at 1158.

itself," support a conviction under the fraud statutes. *United States v. DeFries*, 129 F.3d 1293,

1305-06 (D.C. Cir. 1997) (discussing private sector honest services mail fraud). "To constitute a

deprivation of 'honest services,' the breach of fiduciary duty must have some element of

dishonesty." *Id.* at 1306. "[I]nherently dishonest acts," such as "misrepresentation or intentional

non-disclosure," can thus convert a simple fiduciary breach into a deprivation of honest services.

*Id.*

In this case, it is alleged that the congressmen concealed their receipt of Ring's gifts by

"filling out materially false financial disclosure forms" in an effort to avoid truthfully revealing

"that they had accepted gifts in violation of the applicable ethical rules." (Ind. at 9-10 ¶ 30.)

Such concealment would "exhibit[] elements of dishonesty" sufficient to convert their breach of

House rules into a scheme to deprive the United States and its citizens of their duty of honest

services. *Espy*, 23 F. Supp. 2d at 6; *see Rostenkowski*, 59 F.3d at 1307, 1312 (concluding that

"House Rule[s] may be used to prove" honest services fraud counts, except for those found to be

too ambiguous and therefore not subject to judicial interpretation under separation of powers

doctrine and Constitution's Rulemaking Clause); *Diggs*, 613 F.2d at 998 (finding that *absence* of

House rules authorizing congressman's appropriation of staff funds for his own expenses,

coupled with his non-disclosure of that appropriation, established scheme to "defraud[] the

public . . . of his faithful and honest services"); *see also Harvey*, 532 F.3d at 334 ("Failure to

report income, including gifts, on a required financial disclosure form, and failure to report the

conflict of interest associated with it, constitute significant evidence of concealment of material

facts."). Furthermore, the indictment alleges that Ring was familiar with the House rules, that he

knew the congressmen were violating those rules by failing to disclose his gifts, and that he

helped to conceal their violations when filling out his own client expense reports. (*See* Ind. at 6

¶¶ 18-19, 7 ¶¶ 21-22, 9-10 ¶¶ 30-31.)  Accordingly, the indictment is sufficient insofar as it

alleges that Ring had the requisite knowledge and intent to assist the scheme to conceal the

officials' conflicts of interest.  *See, e.g.*, *United States v. Chartock*, 283 F. App'x 948, 954 (3d

Cir. 2008) (affirming private citizen's conviction for scheme relating to public official's

undisclosed conflict of interest and finding that indictment "sufficiently pleaded the necessary

element that Chartock knew of [the public official]'s disclosure requirement and knowingly

assisted in [the official]'s evasion of the requirement"); *cf. United States v. Walker*, 490 F.3d

1282, 1299 (11th Cir. 2007) (affirming public official's conviction for honest services fraud via

material non-disclosure where jury instructions cautioned jurors to consider non-criminal state

ethics rules "only to the extent that the evidence indicated an intent to commit fraud on [his]

part").

Ring counters that breaches of congressional rules cannot support the honest services

charges, because a failure to disclose material conflicts must also constitute a criminal offense

under state law.  (*See* Reply at 5-6.)  That is not the law in this circuit, nor should it be.  It makes

no sense to define a *federal* official's duty to disclose material conflicts of interest in terms of

state law.  *Cf. Selby*, 557 F.3d at 978 (affirming honest services conviction of federal agency

administrator where she failed to disclose conflict of interest to her employer as required by 18

U.S.C. § 208(a), regarding conflicts for executive branch officials); *Harvey*, 532 F.3d at 334

(affirming conviction of Army employee for defrauding United States and Army where he

concealed material facts, such as failure to report "gifts" from co-defendant "despite a

requirement that he do so on an annual financial disclosure form").  Unsurprisingly, this Court's

prior discussions of a federal official's duty of honest services impose no requirement of a state

law violation.  *See Espy*, 23 F. Supp. 2d at 6-7; *see also Safavian*, 435 F. Supp. 2d at 47.  And,

the D.C. Circuit has held that the government may look to House rules – or even their *absence* –

when proving honest services fraud. *See Rostenkowski*, 59 F.3d at 1307, 1312; *Diggs*, 613 F.2d

at 998. The Third and Fifth Circuits are the only circuit courts to have imposed a requirement

that there be an underlying state law violation, and even then, they did so to address the

"federalism concerns about the appropriateness of the federal government's interference with the

operation of *state and local governments*" that are raised by "the prosecution of *state public*

*officials* for honest services fraud . . . ." *United States v. Panarella*, 277 F.3d 678, 694 (3d Cir.

2002) (emphasis added); *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (en

banc).[10] But even if these federalism concerns have merit,[11] they remain wholly inapposite to

_____

[10] In fact, only the Third Circuit has embraced *Ring's* specific argument that the official's breach of a duty must constitute a *criminal* offense, *see Kemp*, 500 F.3d at 283, while the Fifth Circuit has expressly declined to reach that question. *Brumley*, 116 F.3d at 734.

[11] Notably, the Third and Fifth Circuits' "state law limiting principle" for public honest services fraud has been rejected by the First, Fourth, Seventh, Ninth, and Eleventh Circuits, because "the meaning of 'honest services' is governed by a uniform federal standard inherent in § 1346 . . . ." *Weyhrauch*, 548 F.3d at 1244; *see also United States v. Sorich*, 523 F.3d 702, 712 (7th Cir. 2008); *United States v. Sawyer* (*"Sawyer II"*), 239 F.3d 31, 41-42 (1st Cir. 2001); *Walker*, 490 F.3d at 1298-99 (11th Cir.); *United States v. Bryan*, 58 F.3d 933, 941 (4th Cir. 1995), *abrogated in part on other grounds*, *United States v. O'Hagan*, 521 U.S. 642 (1997); *see also United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 444, 461-62 (D. Conn. 2002) (denying motion to dismiss public sector honest services counts, rejecting need for any underlying state law violation, and noting absence of relevant Second Circuit precedent); *cf. United States v. Rybicki*, 354 F.3d 124, 143 (2d Cir. 2003) (holding that § 1346 is not unconstitutionally vague as applied to *private* sector honest services fraud).

A public official's fiduciary duty to disclose material facts can thus arise from, or be clarified by, sources as varied as federal statutes, *see Selby*, 557 F.3d at 978, federal consent decrees, *see Sorich*, 523 F.3d at 711-12, non-criminal state disclosure laws, *Woodward*, 149 F.3d at 62, non-criminal state ethics rules, *Walker*, 490 F.3d at 1299, and local police regulations. *See United States v. Woodward*, 459 F.3d 1078, 1087 n.8 (11th Cir. 2006). And, at least two circuits have gone so far as to conclude that because "the duty of honest services owed by government officials derives from fiduciary duties *at common law* as well as from statute," an honest services conviction for material non-disclosure need not be based on an underlying statute or regulation. *Sawyer II*, 239 F.3d at 40 (1st Cir.); *United States v. deVegter*, 198 F.3d 1324, 1328 (11th Cir. 1999) ("Public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest."); *see also Sorich*, 523 F.3d at 712 ("It may well be that merely by virtue of being public officials the defendants inherently owed the public a fiduciary

federal prosecutions of schemes to deprive the public the honest services of *federal* officials.

The Court therefore rejects Ring's suggestion that either the Supreme Court's decision in *Sun-Diamond* or the passage of HLOGA has reshaped federal corruption law to preclude the interpretation of § 1346 to encompass a scheme to exert improper influence upon a federal official or to conceal a federal official's conflict of interest.  Contrary to Ring's contention, the fact that honest services fraud can be charged under a theory that relies upon bribery- or gratuity-style conduct does not mean that such interpretations of § 1346 impermissibly "expand honest services to subsume clearly [] define[d] statutory prohibitions" on bribery or gratuities.  (Hr'g Tr. at 15:1-3.)  Regardless of whether bribery, for example, constitutes a deprivation of honest services, the *actus reus* of wire fraud is distinct from that of bribery.[12]  The mail and wire fraud statutes do not criminalize fraudulent schemes in themselves, but rather prohibit the U.S. Postal Service or other interstate communication networks "from being used to carry out fraudulent schemes, regardless of what is the exact nature of the scheme and regardless of whether it happens to be forbidden by state law."  *United States v. States*, 488 F.2d 761, 767 (8th Cir. 1973) (discussing mail fraud statute) (citing *Badders v. United States*, 240 U.S. 391, 393 (1916)); *see also United States v. Karamanos*, 38 F. App'x. 727, 729 (3d Cir. 2002) ("The United States Supreme Court has consistently maintained that Congress may constitutionally regulate the 'channels' and 'instrumentalities' of interstate commerce.  The wire fraud statute, as applied in this case, is in harmony with these Commerce Clause principles." (quoting *United States v.*

---

duty to discharge their offices in the public's best interest."); *United States v. Bush*, 522 F.2d 641, 651-52 (7th Cir. 1975) (affirming honest services mail fraud conviction and concluding that defendant's "duty to disclose need not be based upon the existence of some statute prescribing such a duty").

[12] In addition, as discussed, it would not be enough to prove that a lobbyist gave a public official a series of gratuities; under the stream-of-benefits theory, that flow of gratuities would have to be accompanied by a bribery-like specific intent to effect a *quid pro quo* involving favorable official action.

*Morrison*, 529 U.S. 598, 609 (2000)) (citation omitted).  By contrast, the bribery and gratuity

statutes criminalize the act of giving, offering, or promising a thing of value, for various reasons,

to a federal or District of Columbia official.  *See* 18 U.S.C. §§ 201(a) & 201(b)(1).

The fact that a *scheme* to commit honest services fraud may have as its *object* conduct

that is forbidden by the bribery statute, for example, does not render the bribery statute

"superfluous."  (Hr'g Tr. at 13:23.)  The honest services statute is concerned with those who

"devise" a scheme to commit honest services fraud, but does not require that a public official be

among the schemers, *Potter*, 463 F.3d at 17, and therefore, a scheme need not reach the point of

actually "giv[ing], offer[ing,] or promis[ing]" something of value to a public official, as would

be necessary to commit bribery.[13]  18 U.S.C. § 201(b)(1).

Similarly, the enactment of HLOGA's penalties for violations of ethics rules does

nothing to undermine the validity of § 1346, even where the proof of the requisite criminal intent

to commit honest services fraud may rely upon evidence as to violations of those rules.  HLOGA

does not eliminate § 1346 from the U.S. Code, and the fact that HLOGA criminalizes certain

conduct says nothing about the long-established reach of § 1346.  It is clear that HLOGA and

§ 1346 do not address government corruption in the same way.  Ring emphasizes how HLOGA

prohibits lobbyists from "mak[ing] a gift or provid[ing] travel" to a legislator if the lobbyist

knows that House or Senate rules prohibit the legislator's acceptance of the gifts.  2 U.S.C.

---

[13] Ring repeatedly insists that *Sun-Diamond* requires the Court to consider the 20-year maximum sentence for wire fraud under § 1343 when interpreting the scope of § 1346's honest services provision, because that penalty exceeds the maximum sentences of 15 years and two years for bribery and illegal gratuities, respectively.  (*See* Mem. at 18-19; Hr'g Tr. at 14:19-15:3, 64:15-22.)  *Compare* 18 U.S.C. § 1343 *with id.* §§ 201(b) & (c).  The Court fails to see how Congress's sentencing determinations compel a particular understanding of "honest services fraud," particularly where the Sarbanes-Oxley Act of 2002 expanded the maximum sentence for wire fraud from five to 20 years only *after* the Supreme Court's decision in *Sun-Diamond*.  *See* Pub. L. 107-204, Title IX, § 903(b), 116 Stat. 745, 805 (July 30, 2002).

§ 1613(a).  (*See* Reply at 17.)  By contrast, as discussed, §§ 1343 and 1346 do not criminalize

such activity; they criminalize the use of interstate wires to execute gift-giving schemes that seek

to corruptly induce favorable official action in exchange for the gifts, *see, e.g., Kemp*, 500 F.3d

at 282, or that conceal an official's material conflict of interest created by the receipt of those

gifts.  *Harvey*, 532 F.3d at 334; *cf. DeFries*, 129 F.3d at 1305-06.[14]

Finally, Ring argues that Counts VII and VIII should be dismissed because they do not

allege that he initiated the underlying wire communications in question.  (Mem. at 20-21.)  Such

an allegation is unnecessary.  A conviction under § 1343 requires that the person who has

devised a fraudulent scheme must also have "transmit[ted]  or cause[d] to be transmitted" by

means of interstate wire communication "any writings, signs, [or] signals . . . for the purpose of

executing such scheme . . . ."  18 U.S.C. § 1343.  "[A] defendant 'causes' the use of [a wire]

where he 'does an act with knowledge that the use of [a wire] will follow in the ordinary course

of business, or where such use can reasonably be foreseen, even though not actually intended.'"

*Diggs*, 613 F.2d at 998 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)).  Thus, "[i]t is

sufficient for the [wire] to be 'incident to an essential part of the scheme' . . . or 'a step in [the]

plot,'" *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989), even where the wire is merely "a

'routine or innocent'" communication but is nonetheless "part of the execution of the scheme."

*United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008) (quoting *Schmuck*, 489 U.S. at 714-

---

[14] It appears possible to violate HLOGA without ever committing honest services fraud, such as by giving a gift in violation of House rules but expecting nothing in return or doing nothing to conceal the violation.  It may similarly be possible to commit honest services wire fraud without violating HLOGA, such as by executing steps of a contemplated scheme through email or fax without ever giving anything to a federal official.  *Cf. Potter*, 463 F.3d at 16-17 ("[U]nder the statute anyone could concoct a scheme to deprive . . . citizens of [a legislator's] honest services and could send a fax for the purpose of executing such a scheme. . . . That [the legislator] might prove unwilling or unable to perform, or that the scheme never achieved its intended end, would not preclude conviction for [] the substantive offense (sending the fax) . . . .").

15). Here, the indictment alleges that Ring and others communicated via interstate email and that "[p]ayments were often made by interstate wire transfer or checks that foreseeably caused interstate funds transfers between banks." (Ind. at 4 ¶ 11.) Count VII is based on an email from John Albaugh to Ring entitled "RE: hope you had a nice break," and Count VIII is based upon a bank transfer of $5000 from Firm B's account into an account controlled by Representative 5's wife. (*See id.* at 39-40 ¶ 3.) Because Albaugh was "responding to an email Ring sent him" (Opp'n at 20), and because it is certainly reasonably foreseeable that the recipient of an email would also respond with an email, the indictment sufficiently alleges that Ring "caused" the email giving rise to Count VII. Similarly, the indictment alleges that Ring "caused" Count VIII's transfer of funds, because Ring and his co-conspirators allegedly paid money to Representative 5's wife as part of their fraudulent scheme, and it was reasonably foreseeable that a payment by check would require a wire transfer of funds between banks.[15] Therefore, Counts VII and VIII properly state an offense under § 1343.

In sum, Ring's challenge to the honest services counts fails.

## V.   CONSPIRACY (COUNT I)

Ring challenges Count I's conspiracy charge on the grounds that, *inter alia*, "[i]t rests heavily, if not exclusively, on the invalid theories of honest services fraud and gratuities" alleged in Counts II through VIII. (Mem. at 24.) However, as discussed, the indictment properly states

---

[15] Alternatively, it is well established in other circuits that "[l]ike co-conspirators, 'knowing participants in the scheme are legally liable' for their co-schemers' use of the mails or wires." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (quoting *United States v. Lothian*, 976 F.2d 1257, 1263 (9th Cir. 1992)); *accord United States v. Siegelman*, 561 F.3d 1215, 1230 (11th Cir. 2009); *United States v. Stull*, 743 F.2d 439, 442 (6th Cir. 1984); *United States v. Sedovic*, 679 F.2d 1233, 1238-39 (8th Cir. 1982); *United States v. Read*, 658 F.2d 1225, 1239 (7th Cir. 1981); *United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir. 1979); *see also United States v. Leahy*, 445 F.3d 634, 656 (3d Cir. 2006) (assuming *arguendo* that Ninth Circuit's approach was correct). Thus, even if Ring had not "caused" the wires in question, he would be liable for them to the extent that they were caused by one of his alleged co-schemers.

offenses under the gratuities and wire fraud statutes. Because the indictment also alleges the other requisite elements of a conspiracy charge, Ring's challenge fails.

"To prove a conspiracy charge, the government must show that the defendant agreed to engage in criminal activity and 'knowingly participated in the conspiracy' with the intent to commit the offense, as well as that at least one overt act took place in furtherance of the conspiracy." *United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C. Cir. 2008) (quoting *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996)); *see also Safavian*, 435 F. Supp. 2d at 47 (discussing elements of conspiracy to commit honest services fraud). The indictment alleges that Ring knowingly agreed with Abramoff and others to pay illegal gratuities and to commit honest services fraud (Ind. at 6-7 ¶ 20), that the purpose of the agreement was to reward public officials for past or future official acts and to conceal these rewards from the public (*id.* at 7 ¶¶ 21-22), and that numerous overt acts took place in furtherance of that agreement. (*See id.* at 10-38.)[16]

Ring also contends that the conspiracy count is invalid because the government has not specified which public officials are co-conspirators, and yet certain of the alleged criminal violations "turn on proof of 'official acts' and relevant duties." (Mem. at 25.) Such an argument is meritless. First, the co-conspirators need not be identified in the indictment. Second, the government's bill of particulars does identify them. Finally, as a matter of law, public officials do not need to be co-conspirators. Private parties alone can *conspire* to pay illegal gratuities to a

---

[16] Just as Ring mischaracterizes the government's claim of honest services fraud, he also mischaracterizes Count I as alleging, "at most, . . . a conspiracy to violate the administrative provisions of the prior gift, travel and disclosure rules that applied to Congressional members and their staffs." (Mem. at 27.) The indictment clearly states that the conspiracy's purpose was not to violate the ethics rules or to engage in ordinary lobbying, but to obtain benefits for Ring and his clients "through corrupt means, including by offering and providing things of value to certain public officials to influence, to induce, to reward, and in exchange for official actions by those public officials," and "to attempt to conceal from the public . . . their offering and providing things of value to certain public officials to influence, to induce, to reward, and in exchange for official actions . . . ." (Ind. at 7 ¶¶ 21-22.)

public official or to deprive the public of that official's honest services without ever committing the actual offense, and thus without ever interacting with that official. The gratuities provision at issue here, 18 U.S.C. § 201(c)(1)(A), pertains only to those *giving* gratuities; it is subsection (c)(1)(B), not charged here, that applies to public officials who *accept* gratuities. A conspiracy to *give* a gratuity therefore does not require that a public official be part of the conspiracy. Similarly, the honest services statute does not require that a public official be among the schemers, and so a conspiracy to devise such a scheme requires no public official's participation. *Potter*, 463 F.3d at 16-17.

Finally, Ring's concern for potential variance between the indictment's allegations of conspiracy and the government's evidence of conspiracy is premature. (*See* Reply at 22.) "Whether the prosecution has proven a single conspiracy or multiple conspiracies is a question for the jury." *United States v. Carson*, 455 F.3d 336, 375 (D.C. Cir. 2006) (citing *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988)); *see, e.g.*, *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000) ("In order to reverse their [conspiracy] convictions, . . . the appellants must show that the variance substantially prejudiced them through spillover prejudice. Substantial prejudice occurs when multiple defendants are charged with a large and complex conspiracy and spillover prejudice confuses the jurors." (internal quotation marks and citation omitted)); *United States v. Thomas*, 525 F. Supp. 2d 17, 26 (D.D.C. 2007) ("Even if the evidence had demonstrated that multiple independent conspiracies existed instead of a single overarching conspiracy, defendant Thomas's 'fatal variance' argument still fails because he cannot demonstrate that his rights were substantially prejudiced.")

Count I is therefore sufficient on its face.

## VI.     OBSTRUCTION OF JUSTICE RE: COMMUNICATIONS (COUNT IX)

Ring argues that Counts IX fails to allege a "nexus" between his statements to Firm B's

outside counsel and his knowledge of those statements' obstructive effect on a federal

proceeding.  (Mem. 28-29.)  However, the case law interpreting 18 U.S.C. § 1512(b)(3) is clear

that there need not have been any such nexus between Ring's alleged statements and any official

proceeding.  Rather, the government need only show that "the misleading information" was

"*likely* to be transferred to a federal agent."  *United States v. Veal*, 153 F.3d 1233, 1251 (11th

Cir. 1998) (emphasis in original).

Section 1512(b)(3) provides, in relevant part:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another
> person, or attempts to do so, or engages in misleading conduct toward another
> person, with intent to . . . hinder, delay, or prevent the communication to a law
> enforcement officer or judge of the United States of information relating to the
> commission or possible commission of a Federal offense . . . shall be fined under
> this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(b)(3).  The statute thus "'criminalizes the *transfer* of misleading information

which actually relates to a *potential* federal offense . . . .'"  *United States v. Ronda*, 455 F.3d

1273, 1288 (11th Cir. 2006) (quoting *Veal*, 153 F.3d at 1252 (emphasis in original)) (citations

omitted).  There need only be "'the *possible* existence of a federal crime and a defendant's

intention to thwart an inquiry into that crime.'"  *Id.* (quoting *Veal*, 153 F.3d at 1250 (emphasis in

original)); *see also United States v. Guadalupe*, 402 F.3d 409, 415-16 (3d Cir. 2005) (affirming

conviction under § 1512(b)(3) where defendant "intended to influence an investigation that later

turned out to be federal" by "attempting to corruptly persuade" an individual whom defendant

"knew or should have known . . . *might* communicate with federal officials" simply by virtue of

defendant's "knowledge of the federal nature of the crime imputed to him" (emphasis added));

*United States v. Baldyga*, 233 F.3d 674, 680 (1st Cir. 2000) (noting that defendant's conduct

violated § 1512(b)(3) where he hindered government cooperator's "communication with authorities" and where "the *possibility* existed that such communication would eventually occur with federal officials" (emphasis added)). "It is irrelevant . . . whether the person who provides false or misleading information that ultimately becomes relevant to a federal investigation *intended* that a federal investigator or judge receive that information; it is relevant only that a federal investigator or judge *received* it." *Veal*, 153 F.3d at 1252 (emphasis in original).

Ring contends that the Supreme Court's decisions in *United States v. Aguilar*, 515 U.S. 593 (1995), and *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), establish a general "nexus" requirement for obstruction of justice cases, and that the government has failed to allege such a nexus between Ring's statements to private counsel and a federal proceeding. (Mem. at 28-29.) Ring's argument is unpersuasive. As many circuit courts have recognized, the text of § 1512(b)(3) is materially different from the statutory provisions at issue in *Aguilar* and *Arthur Andersen*.

In *Aguilar*, the Supreme Court reversed a federal judge's conviction for making false statements to an FBI agent during a grand jury investigation, where the conviction had been obtained under the "omnibus" provision of 18 U.S.C. § 1503. *See* 515 U.S. at 598-99. At the time, § 1503's omnibus provision made it unlawful to "corruptly or by threats or force, or by any threatening letter or communication, influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice . . . ." 18 U.S.C. § 1503 (1994) (amended 1996). The Court adopted

> a "nexus" requirement – that the act must have a relationship in time, causation, or logic with the judicial proceedings. *In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice.* This is not to say that the defendant's actions need be successful; an endeavor suffices. But . . . *if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.*

*Aguilar*, 515 U.S. at 599 (emphases added; quotation marks and citations omitted).  Because the

Supreme Court found that there was insufficient evidence that the defendant "knew that his false

statement would be provided to the grand jury," his conduct merely constituted "uttering false

statements to an investigating agent . . . who might or might not testify before a grand jury."  *Id.*

at 600.  Accordingly, any use to be made "of false testimony given to an investigating agent who

has not been subpoenaed or otherwise directed to appear before the grand jury" was too

"speculative" to have "the 'natural and probable effect' of interfering with the due administration

of justice."  *Id.* at 601.

In *Arthur Andersen*, the Court reversed the defendant's convictions under

§§ 1512(b)(2)(A) and (B) for "'corruptly persuad[ing]'" its employees to withhold testimony and

records from "'official proceedings.'"  544 U.S. at 698 (quoting 18 U.S.C. §§ 1512(b)(2)).  The

Court found that the jury instructions were flawed because, among other things, "[t]hey led the

jury to believe that it did not have to find *any* nexus between the 'persua[sion]' to destroy

documents and any particular proceeding."  544 U.S. at 707.  Noting that *Aguilar* had presented a

"similar situation," the Court explained that "[a] 'knowingly . . . corrup[t] persuade[r]' cannot be

someone who persuades others to shred documents . . . when he does not have in contemplation

any *particular official proceeding* in which those documents might be material."  *Id.* at 708

(quoting § 1512(b)(2)) (emphasis added).

The Eleventh Circuit has extensively considered and persuasively rejected the application

of the *Aguilar-Arthur Andersen* nexus requirement to § 1512(b)(3).  In *Veal*, the court explained

that that while § 1503's omnibus provision spoke only in terms of "the due administration of

justice," *Aguilar* placed that phrase "in the context of a legitimate federal interest that was

consistent with the amorphous language used by Congress" by interpreting it as "connot[ing] the

federal government's interest in preserving the integrity of a judicial proceeding." 153 F.3d at

1250.  By contrast, "[o]ther obstruction statutes, such as § 1512(b)(3) . . . , implicate different

federal interests, which specifically do not identify as the federal interest a federal judicial

proceeding, pending or contemplated." *Id.*  Similarly, in *Ronda*, the Eleventh Circuit concluded

that unlike § 1512(b)(2), which was at issue in *Arthur Andersen*, "§ 1512(b)(3) makes no

mention of 'an official proceeding' and does not require that a defendant's misleading conduct

relate in any way either to an 'official proceeding' or even to a particular ongoing investigation."

455 F.3d at 1288.  There is therefore "no reason to believe that the Supreme Court's holding in

*Arthur Andersen* requires that [this Court] graft onto § 1512(b)(3) 'an official proceeding'

requirement based on statutory language in § 1512(b)(2) that does not appear in § 1512(b)(3)."

*Id.*  The First, Second, Third, Sixth, and Tenth Circuits have reached similar conclusions about

the reach of § 1512(b)(3).  *See Baldyga*, 233 F.3d at 679-81 (1st Cir.) (discussing *Veal* when

affirming drug dealer's conviction for preventing customer-turned-informant from

communicating with police by removing his wire); *United States v. Byrne*, 435 F.3d 16, 25 (1st

Cir. 2006) (expressing doubt about defendant's argument "that *Arthur Andersen* requires a

heightened showing of a nexus in a § 1512(b)(3) prosecution, between the intent to hinder

communication and a particular law enforcement agency"); *United States v. Kaplan*, 490 F.3d

110, 126 (2d Cir. 2007) ("With respect to § 1512(b)(3), it is unclear whether *Arthur Andersen*'s

nexus requirement is applicable because § 1512(b)(3) does not explicitly refer to an 'official

proceeding.'"); *Guadalupe*, 402 F.3d at 413 (3d Cir.) (discussing *Veal* when affirming

conviction); *United States v. Carson*, 560 F.3d 566, 580-82 (6th Cir. 2009) (discussing *Veal* and

*Ronda* when affirming conviction, noting that § 1512(b)(3) "requires only that a defendant

intended to hinder, delay, or prevent communication to any 'law enforcement officer or judge of

34

the United States,'" and concluding that *Arthur Andersen* is inapposite); *United States v. Serrata*, 425 F.3d 886, 897-99 (10th Cir. 2005) (affirming conviction, rejecting argument "that the government needed to prove that [defendant] believed the information would be transmitted to federal authorities," and affirming validity of jury instruction that required government to prove only that defendant "believed that the witness – toward whom the defendant engaged in misleading conduct – *might* communicate with federal authorities" (emphasis added)).

Finally, Ring contends that the charge is invalid because the attorneys with whom Ring communicated were private counsel and not federal investigators with DOJ or another agency. (Reply at 23.) This argument is not compelling. A violation of § 1512(b)(3) requires only "the *possibility* or *likelihood* that [a defendant's] false and misleading information would be transferred to federal authorities, irrespective of the governmental authority represented by the initial investigators." *Veal*, 153 F.3d at 1251-52 (emphasis in original). This interpretation of the statute is confirmed by the legislative history. As the Eleventh Circuit has noted, Congress expressly intended that the provision, which was originally enacted as § 1512 (a)(3), would apply to "activities designed to create witnesses as part of a cover-up and to *use unwitting third parties or entities* to deflect the efforts of law enforcement agents in discovering the truth." *Id.* at 1247 & n.17 (emphasis added); *see* Victim & Witness Protection Act of 1982, S. Rep. No. 97-352, at 18 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2515, 2524 ("[A] person who induces another . . . to give misleading information to a federal law enforcement officer would be guilty under subsection [(b)](3)."). It is therefore irrelevant to whom a defendant made false statements, so long as the statements were made with the intent to thwart an inquiry into a possible federal crime by officials who happen to be federal. *See, e.g., Baldyga*, 233 F.3d at 680; *Serrata*, 425 F.3d at 897-99 (affirming conviction for tampering with government witness); *Guadalupe*, 402

F.3d at 415-16 (affirming conviction of former state corrections official for trying to persuade subordinate officer to lie in her report relating to the beating of a prisoner). As a result, the statute can also be violated even where, as alleged here, the defendant directly misleads a private attorney. *See, e.g., United States v. Siegelman*, 561 F.3d 1215, 1235 (11th Cir. 2009) (affirming conviction where jury found that defendant intended to mislead private lawyer into believing that defendant's financial transaction was legitimate, and where defendant "clearly knew that there was a 'possibility' that the federal investigators would come asking").

In short, the allegations in the indictment that defendant intentionally provided misleading information about a possible federal crime and that he knew the information might be communicated to federal officials are sufficient to state a violation of § 1512(b)(3). (*See* Ind. at 43 ¶¶ 12-13, 45 ¶ 19.)

## VII.   OBSTRUCTION OF JUSTICE RE: OFFICIAL PROCEEDINGS (COUNT X)

As with Count IX, Ring argues that Count X is invalid because it fails to allege the requisite "nexus" between the statements to private counsel and their known, obstructive effect on a federal proceeding, as required by 18 U.S.C. § 1512(c)(2). Ring also argues that § 1512(c)(2) can only apply " to acts involving the destruction of documents or other records, and cannot be properly applied to the purportedly false statements to private individuals alleged here." (Mem. at 29.) Neither argument is convincing.

Section 1512(c) provides that

[w]hoever corruptly--

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c). The term "official proceeding" includes proceedings before federal judges, grand juries, and Congress. *Id.* §§ 1515(a)(1)(A) & (B). Like § 1503, which was at issue in *Aguilar*, § 1512(c)(2) penalizes one who "corruptly" obstructs, influences, or impedes. And like § 1512(b)(2), which was at issue in *Arthur Andersen*, § 1512(c)(2) makes an "official proceeding" the forbidden target of the penalized activity. Thus, in order to secure a conviction under § 1512(c)(2), the government must prove at trial that Ring's allegedly obstructive conduct had "'a relationship in time, causation, or logic with the [official] proceedings'; in other words, 'the endeavor must have [had] the natural and probable effect of interfering with'" the official proceeding. *United States v. Reich*, 479 F.3d 179, 185 (2d Cir. 2007) (applying *Aguilar*'s nexus requirement to § 1512(c)(2)) (quoting *Aguilar*, 515 U.S. at 599); *accord United States v. Johnson*, 553 F. Supp. 2d 582, 626 (E.D. Va. 2008); *United States v. Plaskett*, No. 07-CR-060, 2008 WL 3833838, at *4 (D.V.I. Aug. 13, 2008).

The problem with Ring's argument at this stage "is that it conflates pleading with proof." *United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 470, 475 (D. Conn. 2003) (denying motion to dismiss count under omnibus provision of § 1503, where defendants argued that indictment failed to allege that they knew their obstructive actions would likely affect grand jury investigation). Neither *Aguilar* nor *Arthur Andersen* "involved the sufficiency of the indictment – the issue in both cases was the sufficiency of the evidence" following a conviction. *Id.* Nor did they hold that "the nexus requirement, *i.e.*, a relationship in time, causation or logic between the conduct and the judicial proceeding, is an element . . . that must be alleged in the indictment." *Id.* Ring is "essentially ask[ing] the Court to make a factual determination that the government cannot prove a nexus between the allegedly obstructive act" and the various federal investigations. *United States v. Black*, 469 F. Supp. 2d 513, 543 (N.D. Ill. 2006) (denying

motion to dismiss count based on § 1512(c)(1) where defendant argued that indictment failed to allege that he knew of or contemplated the indictment or grand jury investigation when he committed the obstructive act at issue). "Such a determination is for the jury, not the Court." *Id.*

It is enough that the indictment alleges the elements of obstructing justice as set out under § 1512(c)(2): that Ring (1) corruptly (2) did or attempted to obstruct, influence, or impede an official proceeding by providing false statements to Firm B's outside counsel "to cause and in an attempt to cause" those misrepresentations to be provided to the grand jury and Indian Affairs Committee. (Ind. at 45-46 ¶ 2.) *See United States v. Kumar*, No. 04-CR-846, 2006 U.S. Dist. LEXIS 96142, at *13-*15 (E.D.N.Y. Feb. 21, 2006) (rejecting motion to dismiss § 1512(c)(2) count for failure to allege nexus). Such allegations "plainly charge[] the defendant[] with conduct that bears a 'relationship in time, causation or logic' to an 'official proceeding' as that term is used in § 1512(c)(2) and defined in § 1515(a)(1)(C)." *Id.* at *14 (quoting *United States v. Schwarz*, 283 F.3d 76, 108 (2d Cir. 2002)) (citation omitted). "Whether the government can prove that [Ring] knew his actions were likely to affect the grand jury [or the Indian Affairs Committee] will depend on the evidence at trial." *Triumph Capital*, 260 F. Supp. 2d at 475.

As a separate and independent basis for Count X's dismissal, Ring argues that 18 U.S.C. § 1512(c)(2) applies only to acts involving "tampering with documents or physical evidence," and cannot be properly applied to allegedly false statements to private individuals. (Mem. at 37.) Ring contends that § 1512(c)(2)'s reference to conduct that "otherwise obstructs, influences, or impedes any official proceeding" is limited to conduct that is similar to the type of conduct proscribed by subsection (c)(1) – namely, conduct that impairs the integrity or availability of "record[s], document[s], or other object[s]" for use in an official proceeding. 18 U.S.C. § 1512(c)(1). (*See* Mem. at 33-34.) However, the meaning of § 1512(c)(2) is plain on its face,

and courts have recognized the validity of convictions under the provision based upon false statements.[17]

In *United States v. Kumar*, the district court rejected the argument that § 1512(c)(2) should be construed as limited to tampering with physical evidence and concluded instead that an indictment properly charged the defendants with violating the provision for making false statements. *See* 2006 U.S. Dist. LEXIS 96142, at *4-*15. The court found that § 1512(c)(2) gives defendants "fair warning[,] in language that is commonly understood, that the law will be offended in a different way (*i.e.* 'otherwise') if they obstruct, influence or impede the justice that is pursued in an official proceeding." *Id.* at *6-*7. Although "the clear, succinct and unambiguous language of the statute" rendered the "legislative history . . . superfluous," the *Kumar* court found that its interpretation of § 1512(c)(2) was nonetheless consistent with its reading of that history, which "compels the conclusion that what [Congress] plainly sought to eliminate was corporate criminality in all of its guises which, in the final analysis, had the effect of obstructing, influencing or, impeding justice being pursued in an 'official proceeding' as that

---

[17] Ring's argument mistakenly relies upon *Begay v. United States*, 128 S. Ct. 1581 (2008). (*See* Mem. at 33-35.) At issue in *Begay* was whether driving under the influence of alcohol ("DUI") met the definition of "violent felony" set forth in the "otherwise" clause of 18 U.S.C. § 924(e)(2)(B)(ii). That provision defined "violent felony" to include a crime punishable by at least one year's imprisonment and which "is burglary, arson, or extortion, involves use of explosives, *or otherwise* involves conduct that presents a serious potential risk of physical injury to another . . . ." 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). *Begay* interpreted the "otherwise" clause as limited to crimes similar in kind and degree to the two other specified categories (*i.e.*, "burglary, arson, or extortion" and crimes that "involve[] the use of explosives") and held that the clause did not apply to DUI crimes because, despite the danger they pose to others, they were not similar enough to the offenses specified in subsection (e)(2)(B)(ii). *See* 128 S. Ct. at 1584-86. Here, by contrast, the "otherwise" phrase in § 1512(c)(2) stands alone, unaccompanied by any limiting examples. Moreover, subsection (c)(2) is plainly separate and independent of subsection (c)(1). Thus, just as *Begay* did not define the "otherwise" clause of subsection (e)(2)(B)(ii) in terms of the independent and preceding subsection (e)(2)(B)(i), this Court need not read § 1512(c)(2)'s use of "otherwise" as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering.

term is defined in 18 U.S.C. § 1515(a)(1)(A)-(D)." *Id.* at *12.

Moreover, circuit courts have regularly affirmed convictions under § 1512(c)(2) where a defendant attempted to present false information to a grand jury, whether personally or via intermediaries. *See, e.g., Carson*, 560 F.3d at 584 (affirming conviction arising from defendant's false statements to the grand jury); *United States v. Crandle*, 274 F. App'x 324, 327 (4th Cir. 2008) (affirming conviction based on defendant's attempt to influence a third party to provide false grand jury testimony); *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007) (affirming conviction where, *inter alia*, defendant "attempted to orchestrate" grand jury witness's testimony by sending notes to an attorney who in turn "coached" the witness); *see also United States v. Long*, 06-CR-028, 2007 WL 218592, at *6 (W.D. Va. Jan. 29, 2007) (finding sufficient evidence to support defendant's conviction under § 1512(c)(2) for false statements to grand jury).[18]

---

[18] Two unpublished decisions have applied § 1512(c)(2) to false statements while construing the provision "to require some nexus to tangible evidence, though not necessarily tangible evidence already in existence." *United States v. Singleton*, No. 06-CR-080, 2006 WL 1984467, at *5-*6 (S.D. Tex. July 14, 2006) (denying motion to dismiss count under § 1512(c)(2)); *see also United States v. Hutcherson*, 05-CR-039, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (denying motion to dismiss count under § 1512(c)(2) and noting that "[i]f an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object, such person violates this subsection"). In one case, the statements were made to a third party for eventual inclusion in the third party's "written report for a government investigation," *Singleton*, 2006 WL 1984467, at *4 ("[T]he statute proscribes a witness's intentional lies to individuals that the witness expects will report his statements to the government in connection with an official proceeding."), and in the other, the statements were made to an FBI agent *about* certain documents, *Hutcherson*, 2006 WL 270019, at *2 (quoting indictment); *United States v. Hutcherson*, 05-CR-039, 2006 WL 1875955, at *4 (W.D. Va. July 5, 2006) (explaining that defendant was convicted under § 1512(c)(2) "for lying to an FBI agent and leading the agent on a meritless search for documents"). Thus, even if § 1512(c)(2) required some nexus to documents, which it does not, Count X would still be sufficient. The indictment alleges that Firm B's outside counsel might communicate to DOJ or the Indian Affairs Committee anything that Ring said. It is common sense that such communications would be through writing, at least in part, and that Ring, a lawyer himself, would have understood this. Indeed, as the government confirmed during argument, Firm B's outside counsel did in fact prepare a written report of his interviews with Ring. (*See* Hr'g Tr. at 33:10-15.)

Because § 1512(c)(2)'s application is not limited to the destruction of documents but also extends to false statements, Count X will not be dismissed.

**CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss [Dkt. No. 31] is **DENIED.**

**SO ORDERED.**

*Ellen S. Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

DATE:   June 24, 2009