## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                           |     |                              |
|---------------------------|-----|------------------------------|
| UNITED STATES OF AMERICA, | )   |                              |
|                           | )   |                              |
|                           | )   |                              |
| v.                        | )   | No. 08-CR-274 (ESH)          |
|                           | )   |                              |
|                           | )   | **ORAL ARGUMENT REQUESTED**  |
| KEVIN A. RING,            | )   |                              |
|                           | )   |                              |
| Defendant.                | )   |                              |
|                           | )   |                              |

### KEVIN A. RING'S REVISED MOTION FOR JUDGMENT OF ACQUITTAL

Pursuant to Federal Rule of Criminal Procedure 29(a), and pursuant to this Court's order of July 6, 2010, Kevin Ring respectfully revises his motion for this Honorable Court to enter a judgment of acquittal as to each count of the indictment. This motion incorporates all grounds for acquittal previously raised in Docket Entries 108 & 143, and formally tenders those matters to this Court for disposition.  However, in light of the Court's directive at the July 6, 2010 hearing, Mr. Ring's revised motion and points and authorities, which supersedes those earlier filings, will focus briefing solely on those issues that retain the most urgency in light the Supreme Court's recent decision in *Skilling v. United States*, No. 08-1394, 2010 U.S. LEXIS 5259 (June 24, 2010).  This motion is based on the accompanying memorandum of points and authorities, the First, Fifth and Sixth Amendments to the United States Constitution, and any other authorities that the Court deems relevant to this motion. Mr. Ring intends to present

argument on this motion at the hearing scheduled for August 5, 2010 and to focus the argument

on the issues raised in the accompanying memorandum.

Respectfully submitted,

Dated: July 19, 2010

  _/s/ Andrew T. Wise_____
Andrew T. Wise (D.C. Bar # 456865)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER& CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 626-5801

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 08-CR-274 (ESH) |
| | ) | |
| | ) | |
| KEVIN A. RING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**KEVIN A. RING'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF REVISED MOTION FOR JUDGMENT OF ACQUITTAL**

Dated: July 19, 2010

Andrew T. Wise (D.C. Bar #456865)
Timothy P. O'Toole (D.C. Bar #469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005-5701
*Attorneys for Kevin A. Ring*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

The Supreme Court's *Skilling* Decision....................................................................................1

    A.    The Court Should Grant The Motion For Judgment of Acquittal Because The Government's Proof At Trial Failed To Satisfy The Material Misrepresentation Element Of Honest Services Fraud As A Matter of Law....................................................................................................4

        1.    To Be Material Any Alleged Misrepresentation Or Act of Concealment Must Violate A Legal Duty To The Alleged Victim Of The Fraud...................................................................................5

        2.    To Be Material, Any Alleged Misrepresentation or Act of Concealment Must Violate A Legal Duty to the Public. ............................7

        3.    To Establish Criminal Responsibility for a Material Misrepresentation or Act of Concealment by Others, the Government Must Present Evidence That A Defendant Aided and Abetted That Conduct. ...............................................9

        4.    No Reasonable Juror Could Find Beyond A Reasonable Doubt That Mr. Ring Made Or Aided And Abetted Misrepresentations Or Concealments Of Material Fact...........................10

            a.    *The Government Presented No Evidence That Mr. Ring Made a Material Misrepresentation or Concealed a Material Fact from the Public.* ................................10

            b.    *There is no evidence from which a reasonable juror could find beyond a reasonable doubt that Mr. Ring aided and abetted a misrepresentation to, or concealment of fact from, the public.* .............................14

        5.    The Government's Waiver Arguments Lack Merit ...................................22

    B.    The Court Should Grant A Judgment Of Acquittal Because The Government's Trial Evidence Failed To Establish Bribery As Required Under *Skilling v. United States* .............................................24

CONCLUSION....................................................................................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*BMW of N. America v. Gore*, 517 U.S. 559 (1996) ..............................................................4

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................5

* *Chiarella v. United States*, 445 U.S. 222 (1980) ................................................8

*Durland v. United States*, 161 U.S. 306 (1896) ..............................................................4

*Fischer v. N.Y. Stock Exch.*, 408 F. Supp. 745 (S.D.N.Y. 1976) .....................................14

*Gravel v. United States*, 408 U.S. 606 (1972) .............................................................21

*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ...............................................4

*Kungys v. United States*, 485 U.S. 759 (1988).............................................................5

*Lawrence v. Chater*, 516 U.S. 163 (1996) ...................................................................26

*McCormick v. United States,*, 500 U.S. 1257 (1991)................................................27, 30

*McNally v. United States*, 483 U.S. 350 (1987)..........................................................28

* *Neder v. United States*, 527 U.S. 1 (1999).............................................................4

* *Skilling v. United States*, No. 08-1394,
    2010 U.S. LEXIS 5259 (June 24, 2010) ............................................................ *passim*

*Ullmann v. United States*, 350 U.S. 422 (1956)............................................................9

* *United States v. Chartock*,
    283 Fed. Appx. 948 (3d Cir. 2008)................................................................10, 15

* *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ...........................................8, 12

*United States v. Davis*, 989 F.2d 244 (7th Cir. 1993) ..................................................6

* *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) .......................................29, 30, 31

*United States v. Gaudin*, 515 U.S. 506 (1993)............................................................5

*United States v. Hively*, 437 F.3d 752 (8th Cir. 2006)...................................................6

*United States v. Johnson*, 383 U.S. 169 (1966) ....................................................................21

\* *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) ........................................29, 30, 31

*United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009) ..................................30

\* *United States v. Klein*, 476 F.3d 111 (2d Cir. 2007)...........................................................6

*United States v. McAuliffe*, 490 F.3d 526 (6th Cir. 2007) ...................................................6

*United States v. Orenuga*, 430 F.3d 1158 (D.C. Cir. 2005)................................................26

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ............................................................6

*United States v. Ring*, 628 F. Supp. 2d 195 (D.D.C. 2009) ................................................10

\* *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008)..................................................7

\* *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996)................................................28, 30

*United States v. Scrushy*, No. 09-167,
   2010 U.S. LEXIS 5528 (June 29, 2010) ......................................................................26

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) ...................................25, 28

*United States v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998)................................................9, 22

*Williams v. United States*, 458 U.S. 279 (1982) ..................................................................5

## DOCKETED CASES

*Hargrove v. United States*, No. 09-929 (June 29, 2010)......................................................26

*Harris v. United States*, No. 09-6516 (June 29, 2010) ........................................................26

*Hereimi v. United States*, No. 09-1035 (June 29, 2010 ......................................................26

*Redzic v. United States*, No. 09-7560 (June 29, 2010) ........................................................26

## FEDERAL STATUTES

U.S. Const. Art. I...................................................................................................................21

18 U.S.C. § 201(b) ................................................................................................................15

# MISCELLANEOUS

Ben Bergman, *Lobbying Rules Tough To Swallow for D.C. Eateries*, National
   Public Radio, (Feb. 16, 2007) ..............................................................................13, 27

Jeffrey H. Birnbaum & Thomas B. Edsall, *Hill Gift Limits Often Exceeded,*
   *Lobbyists' Records Show:  BellSouth Document Illustrates Gap Between the*
   *Rules and the Realities*, WASHINGTON POST, (Jan. 1, 2006) .................................13, 27

Juliet Eilperin, *Gift Rules Regularly Flouted on Hill, Insiders Say; House Ethics*
   *Chairman Acknowledges Enforcement Breakdown*, WASHINGTON POST, A27
   (Oct. 14, 2002) ...............................................................................................12

John Chipman Gray, THE NATURE AND SOURCES OF THE LAW 8-9 (2d ed. 1921) .............9

*Lobbying Reform: Proposals and Issues: Hearing Before the S. Comm. on*
   *Homeland Sec. & Governmental Affairs*,
   109th Cong. 5 (2006)……………………………...………………………..................27

Thomas Heath, *After Abramoff, Nats Fear It's Out With the Hill Crowd,*
   WASHINGTON POST, (Mar. 28, 2006)....................................................................13, 27

WEBSTER'S II NEW COLLEGE DICTIONARY 977 (3d ed. 2005) .........................................9

## **INTRODUCTION**

The Court has asked Mr. Ring to file a single, amended motion for judgment of acquittal, in which he fully briefs the most pressing arguments pending before this Court, in light of the Supreme Court's decision in *Skilling v. United States*, No. 08-1394, 2010 U.S. LEXIS 5259 (June 24, 2010).  Without waiving any of his other MJOA arguments, Mr. Ring focuses in this memorandum on two pending issues, which must now be assessed through *Skilling*'s lens: (1) Whether the government's evidence at trial of a "material misrepresentation" is insufficient as a matter of law; and (2) whether the government's trial evidence on the "quid pro quo" bribery element of honest services fraud was insufficient as a matter of law.[1]  Mr. Ring submits that, even viewing the evidence in the light most favorable to the government, that evidence is insufficient as a matter of law to support a prosecution under the honest services statute, as that statute has been limited by the *Skilling* decision.  The Court should accordingly dismiss all honest services fraud charges, and the portion of the conspiracy count whose object was allegedly honest services fraud.

### **The Supreme Court's *Skilling* Decision**

Throughout most of these proceedings, the government has argued that the "honest services fraud" law, 18 U.S.C. § 1346, is the ultimate in flexible prosecutorial weapons, permitting it to prosecute "bribery-esque" conduct without proving the quid pro quo agreement that would be required under the bribery statute. *E.g.,* Tr. 4/20/09 at 13:20 (government describes honest services fraud theory as "bribery-esque conduct"); 9/25/09 (p.m.) at 42:15 (same); Tr.

---

[1] Mr. Ring also demonstrates below why these issues are squarely and properly in front of the Court for resolution as a matter of law, and why the analysis of this issue is not altered in any way by the arguments over jury instructions or the jury instructions themselves given during the trial.

8/13/09 at 44:5 (government says it must prove only "this sort of bribery-esque conduct that the cases talk about"); 9/16/09 (p.m.) at 39:5 ("[b]ribery-esque"); Tr. 9/23/09 (a.m.) at 67:22 (same). Such assertions were recently put to rest by the Supreme Court's decision in *Skilling v. United States*, No. 08-1394, 2010 U.S. LEXIS 5259 (June 24, 2010), where all nine members of the Court expressed grave concerns over the expansive nature in which this facially vague statute had been applied by prosecutors over the past twenty years.  While three members of the Court would have addressed these concerns by striking the statute in its entirety on vagueness grounds, *see Skilling,* No. 08-1394, 2010 U.S. LEXIS 5259 at *108-128 (Scalia, J., dissenting), the Court's majority chose instead to preserve the statute by construing it as criminalizing "*only* the bribe-and-kickback core of the pre-*McNally* case law."  *Id.* at *97-98 (emphasis in original).  The majority suggested that application of the statute to conduct outside of this "core" is unconstitutional, and thus held that limitation of the statute to this "core" of cases was necessary to satisfy these concerns.  *Id.* at *96-97 ("[t]o preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribery-and-kickback core of the pre-*McNally* case law.")  The majority, in fact, cautioned Congress that crafting a statute to be applied outside of this "core" would be difficult, if not impossible.  *Id.* at *101-02 n. 45 (rejecting government's formulation and providing a non-exhaustive list of questions that formulation "leaves unanswered").

*Skilling*'s effect on this prosecution is clear:  The days in which the honest services fraud statute could be contorted to reach "bribery-esque," "bribery-lite" or any other arguably dishonest conduct are now over.   Instead, to prove honest services fraud, the government must plead and prove a discrete set of identifiable and non-negotiable elements that include, among

other things, bribery as defined in 18 U.S.C. § 201(b). [2]  *Skilling*, No. 08-1394, 2010 U.S. LEXIS

5259 at * 103-04 (remaining "core" of honest services law "draws content not only from the pre-

*McNally* case law, but also from federal statutes proscribing -- and defining -- similar crimes",

*citing* 18 U.S.C. § 201(b)).  *Skilling* forbids any other sort of honest services fraud prosecution.

      Contrary to the government's prior claims that honest services fraud was "bribery-lite,"

*Skilling* makes clear it is "bribery-plus" -- with the "plus" being an additional showing of the

elements of fraud.  As the government has rightly conceded, *Skilling* does not eliminate the other

essential elements of a mail and wire fraud prosecution.  Indeed, the *Skilling* Court carefully

tailored its analysis to the "scheme" element of an honest services fraud prosecution, *id.* at *22

("Congress intended at least to reach schemes to defraud involving bribes and kickbacks . . . .

§ 1346 covers only bribery and kickback schemes"); *88 (pre-*McNally* cases involved fraudulent

schemes to deprive another of honest services through bribes or kickbacks"); *102

("[i]nterpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally

vague").  Significantly, the Court rested its ultimate conclusion that Mr. Skilling could not be

convicted of honest services fraud on the government's failure to show that the alleged scheme

involving the receipt of bribes or kickbacks was made "in exchange for" Mr. Skilling's alleged

misrepresentations.  *Id.* at *105 ("the government did not, at any time, allege that Skilling

solicited or accepted side payments from a third party in exchange for making these

misrepresentations . . . It is therefore clear that, as we read § 1346, Skilling did not commit

honest-services fraud.")  In short, post-*Skilling*, in this case, the basic elements of an honest

services fraud prosecution can now be boiled down to (1) a material misrepresentation; (2) as an

---

[2] The government has conceded that this is not a kickbacks case. Tr. 4/09/09 at 40:3-4 ("The Court: There are no kickbacks here, right?  [The government]:  No, Your Honor . . .").

integral part of a bribery scheme; (3) a specific intent to defraud; and (4) use of the mail or interstate wires, as those terms are defined in the case law.   In this amended motion, Mr. Ring focuses on why the government's proof at trial failed to satisfy those first two elements as a matter of law.

> **A.      The Court Should Grant The Motion For Judgment of Acquittal Because The Government's Proof At Trial Failed To Satisfy The Material Misrepresentation Element Of Honest Services Fraud As A Matter of Law.**

After consulting with the Solicitor General's office about the elements of the offense, post-*Skilling*, the government acknowledged that a material misrepresentation was an essential element of honest services fraud.  That concession is well-taken.  The requirement of a material misrepresentation or active concealment has long been one of the essential elements of a "fraud." *BMW of N. Am. v. Gore*, 517 U.S. 559, 579 (1996) ("actionable fraud requires a material misrepresentation or omission").  In fact, over a century ago, the Supreme Court held that one essential element of statutory fraud was a false "representation[] as to the past or present, or suggestions and promises as to the future." *Durland v. United States*, 161 U.S. 306, 313 (1896). The Supreme Court reiterated this requirement after the passage of the current form of the mail and wire fraud statutes, explaining the words "to defraud" commonly refer to "wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  Thus, the Court held in *Neder v. United States*, 527 U.S. 1, 22 (1999) that "the well-settled meaning of 'fraud' require[s] a misrepresentation or concealment of material fact," and that that well-settled meaning is incorporated into the mail and wire fraud statutes as an element of the offense. *Id.* at 25 ("we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes").

Despite its concession that it was required during the first trial to show a *material* misrepresentation or concealment of a *material* fact, the government continues to argue that *any* misrepresentation or act of concealment, no matter its content or its audience, will suffice to meet this requirement.  But, as this Court has recognized, "material is not an element or word without meaning," Tr. 10/19/09 at 25:6-10.  Indeed, the Supreme Court has explicitly encouraged courts to be "careful not to set too low a standard of materiality," *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988), recognizing that to do otherwise would threaten to make a "surprisingly broad range of unremarkable conduct a violation of federal law." *Williams v. United States*, 458 U.S. 279, 286 (1982).

Materiality thus provides an objective criterion that requires a false representation to be one that a reasonable person would consider pertinent, relevant, germane to the transaction and which would have influenced him in his actions.  *Kungys v. United States*, 485 U.S. 759, 770 (1988) ("natural tendency to influence"); *see also United States v. Gaudin*, 515 U.S. 506, 509 (1993).  In particular, the controlling law governing materiality imposes real and enforceable limitations on (1) the person or entity to whom any material misrepresentation or act of concealment must have been directed, (2) whether any acts of concealment of misrepresentation must violate a legal duty to the public; and (3) whether and how a person can be held responsible for alleged misrepresentations and actions by others.  The government's honest services fraud case against Mr. Ring cannot withstand scrutiny when these requirements are applied to its trial evidence.

> **1.    To Be Material Any Alleged Misrepresentation Or Act of Concealment Must Violate A Legal Duty To The Alleged Victim Of The Fraud.**

The most basic requirement of materiality is that it is looked at from the perspective of the alleged victim:  "Conduct or speech that is immaterial -- irrelevant -- to a putative victim

cannot be fraud." *United States v. Klein*, 476 F.3d 111, 114 (2d Cir. 2007); *United States v. Davis*, 989 F.2d 244, 247 (7th Cir. 1993) (Posner, J.) (reversing federal bank fraud conviction because the government failed to prove that the defendant's misrepresentations in opening an account in the name of a mythical company was material to the bank's decision to allow him to deposit a wrongly obtained IRS refund check); *and see United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007) ("In *Neder*, the Supreme Court rejected the idea that a bank fraud conviction could stand 'so long as the defendant intended to deceive the victim, even if the particular means chosen turn out to be immaterial, *i.e.*, incapable of influencing the intended victim.'"); *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007) ("[t]he misrepresentation 'must have the purpose of inducing the victim of the fraud to part with the property or undertake some action that he would not otherwise do absent the misrepresentation or omission.'"); *United States v. Hively*, 437 F.3d 752, 764 (8th Cir. 2006) (pertinent question is whether misrepresentation is "capable of influencing the intended victim").

Here, the alleged victim of the purported scheme to defraud is the United States public. While the government made rumblings in a recent hearing about a theory of honest services fraud that supposedly involved misrepresentations by Mr. Ring to his former law firm through submission of vague expense reports, this is not a valid theory of "public" honest services fraud, which is the only type of honest services fraud alleged in the indictment.[3]  The cases involving "employers" as victims are so-called "private" honest services fraud cases, where the employee is alleged to have breached a fiduciary duty owed to the employer through the acceptance of bribes and kickbacks.  To the extent the Supreme Court has permitted a limited version of this

---

[3] Nor could it be a tenable theory given the extensive evidence that people throughout the law firm were aware of the lobbyists' (both within and outside of Jack Abramoff's "team") practices with regard to meals, entertainment and the use of sports tickets to promote lobbying efforts.

type of theory to survive *Skilling*, *see Skilling v. United States*, No. 08-1394, 2010 U.S. LEXIS

5259 at *94-95 n. 42, the honest services fraud charges in this case cannot and do not support

such a theory because the indictment here alleges that the public was defrauded as a result of

public servants who were supposedly concealing the fact that they were receiving a stream of

things of value from lobbyists and then supposedly agreeing to perform official acts in exchange

for these things of value.  Because the public was the alleged victim of this supposed fraud, the

government was required to prove that any misrepresentations or acts of concealment had a

natural tendency to be capable of deceiving the public.

> **2.      To Be Material, Any Alleged Misrepresentation or Act of
>          Concealment Must Violate A Legal Duty to the Public.**

The charges must not only involve a misrepresentation to the public -- they must involve,

in words of the United States, "deceptive *breaches of duty* that have a sufficient level of

importance to the conduct of the relevant victim's affairs."  Brief for the United States in *Black*

*v. United States*, No. 08-876 (September 2009) at 38, *citing*, *Neder*, 527 U.S. at 22-23 (emphasis

added).  In other words, any alleged misrepresentation or act of concealment must violate a *legal*

*duty* to the public.  The D.C. Circuit's decision in *Safavian* makes this specific point with regard

to "concealment."  As the Court of Appeals explained, "[c]oncealment cases in this circuit and

others have found a duty to disclose material facts on the basis of specific requirements for

disclosure of specific information."  *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir.

2008).  Thus, the government cannot rely on some abstract notion of "concealment" to make its

case, but must show the concealment involved violation of a specific legal duty to disclose

specific information to the victim.

The government has attempted to portray *Safavian* as an outlier case restricted to

prosecutions brought under 18 U.S.C. § 1001, Tr. 10/19/09 at 11:15-18, but it clearly is not.  As

the Supreme Court stated in *Chiarella v. United States*, 445 U.S. 222, 227-28 (1980), "[a]t common law . . . one who fails to disclose material information . . . commits fraud only when he is under a duty to do so."  Tellingly, the Supreme Court has cited *Chiarella* with approval as illustrative of the sort of fiduciary relationship that must exist in the honest services fraud context.  *Skilling v. United States*, No. 08-1394, 2010 U.S. 5259 at *94-95 n. 45.  Thus, where the claim is that Mr. Ring was concealing matters from the public, the government's proof must demonstrate that any act of concealment violated some disclosure duty owed to the public -- *i.e.*, to be material, the statements must have pertained to something the public had a right to know. *See United States v. D'Amato*, 39 F.3d 1249, 1258 (2d Cir. 1994) (rejecting contention that lawyer's inclusion of fake name on bills to avoid embarrassing publicity allegedly defrauded shareholders of client corporation because "[a]n inaccurate statement in documents that are not lawfully available for inspection by shareholders, and do not materially affect information that is available, can hardly be said, without more, to defraud, or to be intended to defraud, such shareholders.").

Such a conclusion flows directly from the statutory language itself.  After all, it is the "right" to "honest services" that the statute protects against "schemes to defraud."  *Skilling v. United States*, No. 08-1394, 2010 U.S. LEXIS 5259 at *88-89 (relying on Congress' specific reliance on use of definite article "the" in defining "right" to honest services).  The requirement that a "scheme to defraud" deprive the victim of its "right" to "honest services" thus strongly suggests that an independent, preexisting legal duty to disclose is an essential component of any material misrepresentation or active concealment.  *Id.* and *104-05 n. 45 (relying on fiduciary duty case law to define those scope of bribery-kickback schemes within the reach of the honest services law, and specifically relying on *Chiarella*).

In other words, the "public" can only be victims of fraud if it was deprived of a service to

which it has a "just or legal title or claim."  WEBSTER'S II NEW COLLEGE DICTIONARY 977 (3d

ed. 2005) (definition of "right").  Common sense would dictate that absent an unambiguous,

affirmative legal duty of Mr. Ring to disclose particular information to the public, it did not have

a "right" to the information.  *See Ullmann v. United States*, 350 U.S. 422, 428 (1956) ("rights

and duties are correlative") (quotation marks and citation omitted); John Chipman Gray, THE

NATURE AND SOURCES OF THE LAW 8-9 (2d ed. 1921) ("Right is a correlative to duty; where

there is no duty there can be no right.").

> **3.    To Establish Criminal Responsibility for a Material Misrepresentation or Act of Concealment by Others, the Government Must Present Evidence That A Defendant Aided and Abetted That Conduct.**

It is undisputed that Mr. Ring was a private-citizen lobbyist, who owed no legal duties to

the public.  Because Mr. Ring indisputably owed no legal duty to the public whatsoever with

respect to disclosure of gifts, the government has also sought to hold Mr. Ring responsible for

the alleged misrepresentations and acts of concealment by public officials in their financial

disclosure forms.  *See* Tr. 9/30/09 at 102:3-8, 104:25.[4]  But to impute responsibility for these acts

to Mr. Ring, the government must satisfy the elements of criminal aiding and abetting, meaning

the government must prove: "(1) the specific intent to facilitate the commission of a crime by

another; (2) guilty knowledge (3) that the other was committing an offense; and (4) assisting or

participating in the commission of the offense."  *United States v. Wilson*, 160 F.3d 732, 738

---

[4] As discussed more fully below, Mr. Ring is not arguing that a private citizen cannot be exposed to criminal liability in connection with a public honest services fraud scheme.  His argument is merely that because the linchpin of that scheme is the public official's deprivation of the public's "right" to honest services, however, any breach of these obligations must be founded on the public official's fiduciary duty and breach thereof, and attaches to the private citizen only upon a showing of active participation in that breach through the doctrine of aiding and abetting.

(D.C. Cir. 1998) (finding insufficient evidence of aiding and abetting as a matter of law in a

murder case).  Here, where the theory is that Mr. Ring aided and abetted in filing a false

disclosure form in an honest services fraud case, the government must prove that the defendant

"knew of [the public official's] disclosure requirement and assisted in the evasion of that

requirement."  *United States v. Chartock*, 283 Fed. Appx. 948, 956 (3d Cir. 2008).  Indeed, this

Court has already relied on *Chartock* as setting forth the proper standard for measuring the

government's proof on aiding and abetting a public official in evading disclosure requirements.

*United States v. Ring*, 628 F. Supp. 2d 195, 214 (D.D.C. 2009).

> **4.    No Reasonable Juror Could Find Beyond A Reasonable Doubt That
>          Mr. Ring Made Or Aided And Abetted Misrepresentations Or
>          Concealments Of Material Fact.**

The government's evidence fails to meet the standards described above.  For two reasons,

no reasonable juror could find beyond a reasonable doubt that Mr. Ring made or aided and

abetted misrepresentations or concealments of material fact.  *First*, there is no evidence from

which a reasonable juror could find beyond a reasonable doubt that Mr. Ring made any material

misrepresentation to the public or concealed any material fact from the public.  *Second*, there is

no evidence from which a reasonable juror could find beyond a reasonable doubt that Mr. Ring

knew of any public disclosure requirement and assisted in the public official's evasion of that

requirement.

> **a.    *The Government Presented No Evidence That Mr. Ring Made a
>          Material Misrepresentation or Concealed a Material Fact from
>          the Public.***

The first problem with the government's proof is the failure to present any evidence that

Mr. Ring made a material misrepresentation or concealed a material fact from the public.  The

government has proceeded under the theory that it can satisfy the material

misrepresentation/concealment of a material fact requirement by showing *any* falsehood,

intentional omission or act of concealment.  But, as the above discussion amply demonstrated, that is simply incorrect -- the actionable falsehood must be directed at the public, it must deprive the public of truthful information it otherwise had a legal right to know, and it must be capable of inducing reliance by the public.

The evidence relied on by the government to satisfy the element is defective as a matter of law.  For example, in its opposition to the motion for judgment of acquittal, the government relied heavily on the emails between Mr. Ring and Jennifer Farley, which allegedly omitted the term "tickets" and instead used the term "fruit."  DE 110 at 7.  But this evidence cannot satisfy the material misrepresentation/concealment element because (1) the emails were never directed at the public, (2) were not provided to the public pursuant to any legal duty, and (3) thus were incapable of influencing the public.[5]  Nor did they have any conceivable connection to the stand-alone honest services fraud counts, which involved Mr. Coughlin (Count 3), Mr. Albaugh (Counts 4-7) and Mr. Doolittle (Count 8).

The same analysis applies to Mr. Ring's alleged omissions in his internal billing records reflecting meals he purchased for public officials, which the government also relied extensively on in its opposition papers.  DE 110 at 7.  The most obvious failing with this evidence is, once again, the lack of any legal duty owed by Mr. Ring to the public.  As a private-citizen lobbyist, Mr. Ring had no public duty whatsoever to keep records of his meals.  Indeed, with respect to the meals, even the public officials themselves were under no obligation to report these local meals

---

[5] Moreover, the emails themselves show that Ms. Farley initiated use of the term "fruit," Mr. Ring often strayed from the term by using words such as "games" and "Wizards" and "Dave Matthews."  In addition, the only witness who testified about the emails, Mr. Volz, said he had no idea where the term "fruit" came from, and noted that Ms. Farley had not even received tickets to the main game referenced in the emails. Tr. 9/16/09 (a.m.) at 8-13.  Ms. Farley's lack of attendance at the game was gleaned from internal firm emails that included her name and title, and her attendance at a later concert was gleaned from the GT ticket grids, which included names and titles.  *Id.* at 12-13.

to the public.  *See generally* DE 100 (outlining specific disclosure obligations of public officials and showing that gifts of local meals are exempt from public disclosure); Tr. 9/18/09 (a.m.) at 19:18-20:18 (Albaugh acknowledging no disclosure requirements for local meals).  Under *Safavian* and the other cases discussed above, no omission in the internal receipts could be sufficient to establish concealment.  *See United States v. D'Amato*, 39 F.3d at 1258.

Lobbyists also had no legal duty to disclose gifts of tickets; and in any event, there was no hint of any omission, misrepresentation or concealment by Mr. Ring with respect to the records concerning the tickets.  The tickets were recorded on internal grids and the undisputed evidence was that those grids were maintained in the normal course of business and largely accurate.  No effort was ever made to alter them or to conceal who had gone to a game.  Tr. 9/25/09 (a.m.) at 13:11-14 (Boulanger testifies that GT kept grids showing who received tickets and no effort was made either to alter or shred grids or to conceal who had gone to a game).

The materiality question, moreover, does not turn on whether the public had knowledge of a "bribe" (*but see* Tr. 9/30/09 at 98:4-6) but on whether it was material for Mr. Ring to inform the public that he was paying for a public official's meal or tickets.  When the correct question is posed, the answer is plainly "no" because it was already public knowledge who was routinely picking up the tab at these events; any additional information simply could not have been material.[6]

---

[6] For example, a 2002 article in the Washington Post reported that Congressional officials were regularly "flouting" their own gift rules by accepting free meals and tickets from lobbyists.  *See* Juliet Eilperin, *Gift Rules Regularly Flouted on Hill, Insiders Say; House Ethics Chairman Acknowledges Enforcement Breakdown*, WASHINGTON POST, A27 (Oct. 14, 2002).  Indeed, this article was expressly referenced during the trial because it quoted the head of Greenberg Traurig's lobbying team, Ronald Platt, as saying that the gift rules do not apply to lobbyists, and also quoted the House Ethics Chairman acknowledging the widespread violation of the gift rules through meals and tickets being provided by lobbyists from all

(footnote continued on next page)

Indeed, it is indisputable that most of the events took place in plain public view; the officials were frequently accompanied by Mr. Ring or another Greenberg Traurig lobbyist at these events.  In those circumstances, the public could easily have *seen* Mr. Ring pay for meals in plain view, and would have *seen* Mr. Ring accompany public officials to suites in which Jack Abramoff's name was on a public plaque outside the door.  Any interested member of the public would have already known that the officials were interacting with Mr. Ring at these events. While many people might find this traditional practice distasteful, there was nothing deceptive or fraudulent about this conduct; it is how lobbying has been practiced for many years, and nothing presented at trial showed otherwise.  Indeed, the government cannot dispute that the public could have seen Mr. Ring with public officials at restaurants, bars and sporting events throughout Washington; it played for the jury a nationally-televised Wizards game in which Mr. Ring and Mr. Coughlin were seated together at the Verizon Center.

---

(footnote continued from previous page)
over Washington.  Tr. 9/15/09 (p.m.) at 60:16-64:15.The Washington Post, in fact, has reported that not only did the Washington Wizards and Capitals set ticket prices in luxury suites with gifts to public officials in mind, but that Washington sporting franchises were damaged when Congress changed the law in 2007 to make it a crime for lobbyists to provide these sorts of gifts.  Thomas Heath, *After Abramoff, Nats Fear It's Out With the Hill Crowd*, Washington Post, March 28, 2006 (March 28, 2006), available at http://www.washingtonpost.com/wp-dyn/content/article/2006/03/27/AR2006032702036.html.  Other articles also reported to the public the ready availability of meals and tickets provided by lobbyists to public officials prior to the HLOGA.  *E.g.*, Ben Bergman, *Lobbying Rules Tough To Swallow for D.C. Eateries*, National Public Radio, (Feb. 16, 2007), available at http://www.npr.org/templates/story/story.php?storyId=7445120; Jeffrey Birnbaum and Thomas B. Edsall, *Hill Gift Limits Often Exceeded, Lobbyists' Records Show*, Washington Post (Jan. 1, 2006), available at . http://www.washingtonpost.com/wp-dyn/content/article/2005/12/31/AR2005123100719.html;  These articles show that it was already a matter of common knowledge that lobbyists were paying for tickets and meals long before the Abramoff scandal broke.  The Court instructed the jury as much.  DE 113 at 29 (Instruction 28) ("Lobbyists often use hospitality to cultivate personal and political relationships with public officials.  There is nothing illegal about this practice."); Tr. 9/24/09 (p.m.) at 90:2-91:19 (Boulanger discussing widespread use of meals and tickets throughout Washington).

Any alleged failure by Mr. Ring to disclose to the public who was paying for the tickets (despite his lack of duty to do so) thus cannot be material at all.[7]   The Court should reject this untenable premise.  *See Fischer v. N.Y. Stock Exch.,* 408 F. Supp. 745, 754 (S.D.N.Y. 1976) ("there is a serious question of the materiality . . . Damaging information . . . may well become immaterial if the person alleging fraud subsequently becomes aware of even more negative facts and yet goes ahead with the transaction.")

> **b.**      ***There is no evidence from which a reasonable juror could find beyond a reasonable doubt that Mr. Ring aided and abetted a misrepresentation to, or concealment of fact from, the public.***

There is also no evidence from which a reasonable juror could find beyond a reasonable doubt that Mr. Ring aided and abetted a misrepresentation to, or concealment of material fact from, the public.  At the outset, Mr. Ring submits that *this* is the only theory that even makes any sense in an honest services fraud case involving the public.  Because *Skilling* restricts honest services fraud schemes to those in which a public official *accepts* a bribe or a kickback in violation of a fiduciary duty to the public, 2010 U.S. LEXIS 5259 at *93 (discussing fiduciary duty), * 102-03 (discussing scheme as "fraudulently depriving another of one's honest services by *accepting bribes or kickbacks"*) (emphasis added), the deception in such a scheme must consist of a material misrepresentation by the fiduciary to the public.  To the extent that the charges are leveled against someone who is not a fiduciary based on alleged involvement in the scheme, that

---

[7] Indeed, the public already knew far more relevant information on this same subject, since Mr. Ring and his law firm were required to and did disclose to the public that they had provided many of these same public officials with thousands of dollars in campaign contributions at the same time they were lobbying them on behalf of various clients.  Such information was readily available on the Federal Election Commission website and on the Congressional Ethics websites, where the public can still find lobbying disclosure forms pertaining to Mr. Ring and his clients and the general matters on which Mr. Ring was lobbying.  *See* FEC Campaign Finance Disclosure Page, http://www.fec.gov/finance/disclosure/norindsea.shtml; United States House of Representatives, Office of the Clerk, http://lobbyingdisclosure.house.gov/; United States Senate, Office of Public Disclosure, http://www.senate.gov/pagelayout/legislative/g_three_sections_with_teasers/lobbyingdisc.htm.

individual must have knowingly aided and abetted the material misrepresentation.  The government may complain that this requirement might hinder honest services fraud prosecutions involving bribery -- but there is a simple solution:  Charge bribery.[8]  Since the government has chosen to move forward with this prosecution as a fraud case, it cannot complain about the supposed difficulties involved in proving fraud.

The question for the Court is accordingly whether the government presented any evidence during trial from which a reasonable juror could infer that Mr. Ring knowingly aided and abetted a material misrepresentation by a public official.  On this point, the government has pointed to what it claims are allegedly false disclosure forms submitted by Mr. Coughlin, Mr. Doolittle, Mr. Lopez and Mr. Albaugh.  But with respect to each of these individuals, there has been no showing that Mr. Ring aided and abetted any false disclosures; in other words, there is no evidence that Mr. Ring "knew of [the public official's] disclosure requirement and assisted in the evasion of that requirement."  *United States v. Chartock*, 283 Fed. Appx. 948, 956 (3d Cir. 2008).

At the outset, there was no evidence that Mr. Ring knew of the disclosure requirements that applied to various public officials.  While the government called Mr. Schuelke to talk about Mr. Ring's knowledge about Congressional and Executive Branch *gift* rules, Tr. 9/14/09 (a.m.) at 27:9-22, Mr. Schuelke said nothing about Mr. Ring's knowledge of *any* disclosure requirements.  No other witness did either, and the topic was not covered by any of the law firm manuals.  Nor can such knowledge be inferred from Mr. Ring's service on Capitol Hill, since there was no showing that Mr. Ring ever had any disclosure obligations.

---

[8] The government indicted this case under the honest services fraud statute to avoid having to prove what its evidence does not establish -- a quid pro quo agreement that is the core requirement of bribery under 18 U.S.C. § 201(b).  *See Section II.*

Nor was any evidence presented to show that Mr. Ring knew of disclosure obligations involving a particular individual and assisted that individual in evading disclosure requirements.[9] Indeed, the evidence at trial not only failed to show Mr. Ring's lack of knowledge, it affirmatively showed that he did *nothing* to assist anyone in evading disclosure requirements.

The government presented only a single public official at trial subject to financial disclosure requirements -- John Albaugh.  The allegedly fraudulent deprivation of the public's right to Mr. Albaugh's "honest services" formed the basis of Counts 4 through 7.  But as to Mr. Albaugh, the evidence affirmatively shows that Mr. Ring did not misrepresent or conceal anything from the public -- material or otherwise.  Thus, although Mr. Albaugh admitted filing "false" disclosure forms that did not include "various tickets and meals" that would have exceeded the disclosure threshold, Tr. 9/17/09 (a.m.) at 60, it is unclear whether this testimony even established a knowing and intentional falsehood by Mr. Albaugh.  As Mr. Albaugh's testimony showed, local meals were exempt from disclosure, Tr. 9/18/09 (a.m.) at 19:18-20:18, and he did not hide from Congressman Istook that he was receiving tickets from Mr. Ring, thus suggesting he was not attempting to conceal anything.  *Id.* at 19:5-7.

Whatever Mr. Albaugh did or did not do with respect to the disclosure forms, however, his testimony was entirely exculpatory as to Mr. Ring.  For example, Mr. Albaugh admitted that he never discussed his disclosure forms with Mr. Ring, and that Mr. Ring never told

---

[9]If the Court is wondering what aiding and abetting a false disclosure form would look like, the testimony of Mr. Volz provided a perfect example.  On cross-examination, Mr. Volz admitted that he had aided and abetted Mr. Ney in filling out a false disclosure form in connection with their Scotland trip, explaining that he had given Mr. Ney false numbers to enter onto the disclosure form that would have the "appearance of being justifiable."  Tr. 9/16/09 (a.m.) at 14:15-15:3.  But Mr. Volz admitted that Mr. Ring had no knowledge of that trip, no role with regard to Mr. Ney's false disclosure form, and other than that incident Mr. Volz did not know of any other examples of aiding and abetting a public official in filling out a false disclosure form.  *Id* at 15:4-10.

Mr. Albaugh to keep things off his expense reports.  Tr. 9/18/09 (a.m.) at 18:21-19:1.  In fact, Mr. Albaugh affirmatively stated that he didn't leave the tickets off his disclosure form because he was trying to hide his relationship with Mr. Ring, he just didn't think of including them. Tr. 9/18/09 (a.m.) at 19:8-14.  As a matter of law, Mr. Ring cannot be found to have aided and abetted any material misrepresentation or concealment of a material fact with respect to the counts related to Mr. Albaugh.  This Court must dismiss Courts 4 through 7 of the indictment on the basis of this undisputed testimony by Mr. Albaugh.

As to Count 3, which relates to Mr. Coughlin, there is no evidence that Mr. Ring knew of the executive branch disclosure requirements that governed Mr. Coughlin's political position in the Department of Justice, much less that Mr. Ring assisted Mr. Coughlin's evasion of that requirement.  Indeed, because the government declined to call Mr. Coughlin as a witness, its proof at trial did not even show that Mr. Coughlin *evaded* any disclosure requirements.  The government's *Brady* disclosure of September 4, 2009 suggested, in fact, that Mr. Coughlin believed, based on the advice from a DOJ Ethics Official, that any gifts from Mr. Ring did not violate DOJ rules.  *See* Exhibit A.  Thus, at most, the government's evidence showed that Mr. Coughlin received tickets and did not disclose them on his disclosure forms for reasons that may well have related to a mistaken but good faith belief that they did not need to be disclosed. Because no evidence was presented with respect to whether Mr. Coughlin's omission was intentional, and absolutely nothing was presented with regard to Mr. Ring's alleged knowledge or assistance in evading Mr. Coughlin's disclosure requirements, the evidence is insufficient even to show an act of material misrepresentation or concealment by Mr. Coughlin, and it is woefully insufficient to show that Mr. Ring aided and abetted Mr. Coughlin in evading disclosure requirements.

Finally, as to Count 8, there was no showing of any material misrepresentation or act of concealment with respect to Julie Doolittle's job; rather, the evidence showed that Mr. Doolittle had prepared truthful disclosure forms with respect to Mrs. Doolittle's jobs in the past, GX 428, and the government chose not to present Mr. Doolittle's disclosure forms for 2002-04, which would have shown truthful disclosures in those years as well.  *See* GX 429-32 (admitted before trial but withdrawn at close of evidence) and Tr. 10/5/09 at 108:23-109:4 (noting failure of proof).  Moreover, the government's own evidence included a publicly distributed flyer in which Mrs. Doolittle is listed as the director of community relations for Mr. Abramoff's charity.  *See* GX 449 and Tr. 10/5/09 at 107:8-17.  In other words, there was no material misrepresentation or active concealment, and there was even disclosure to the public in the absence of any legal duty to do so.  There was also no showing that Mr. Ring knew of any disclosure requirements with respect to spouses or assisted in the evasion of that requirement with respect to Julie Doolittle or in any other way related to Congressman Doolittle.

Nor were there any other material misrepresentations or acts of concealment related to the conspiracy counts.  The only officials with disclosure requirements pertaining to those counts were Mr. Albaugh, Mr. Doolittle, Mr. Lopez and Mr. Coughlin.  As noted, Mr. Albaugh affirmatively exculpated Mr. Ring from any role in the disclosure process.  As to Mr. Doolittle, Mr. Lopez and Mr. Coughlin there was never any showing that these individuals *evaded* any disclosure requirements, much less was there any evidence that Mr. Ring knew of their disclosure requirements or took any action to assist them in evading those requirements.  In fact, the evidence showed that Mr. Lopez had reported that "Greenberg, Traurig" had paid for his trip to Puerto Rico, GX 356, even when such sponsorship was not permitted by House rules.  *See* House Gift Rule XXV.   Relevant to this case, there is no evidence that Mr. Ring ever protested

or took any action to cause Mr. Lopez to amend or retract this disclosure form.  Moreover, although the government has claimed that Mr. Lopez falsely described one of the purposes of the trip -- his disclosure said it was part personal and part "fact-finding" -- the government chose to present no evidence at all about what Mr. Lopez did on the trip despite having provided Mr. Lopez with an immunity agreement.  As a result, there is no evidence that the description in the disclosure form was inaccurate, much less any evidence that Mr. Ring intentionally aided and abetted Mr. Lopez in evading disclosure requirements.

With respect to the conspiracy count, the government has also referenced an email in which Greg Orlando, a Legislative assistant to Mr. Doolittle, asked for a ticket to a Knicks game, but requested that Mr. Ring keep the gift "covert" as "I['] ll get fired."  GX 399A.  But this evidence does nothing to satisfy the government's burden either.  It is telling on this point that the government, which later tried to assert this email as prime evidence of concealment, presented absolutely no evidence about this incident other than introducing the email itself, and declined to call Mr. Orlando to testify despite naming him as a witness.  Thus, no evidence was presented to show that Mr. Ring agreed to keep any tickets "covert" or that Mr. Ring or Mr. Orlando did *anything* to keep any gift of tickets "covert" by making any misrepresentation or affirmatively concealing the gift.  The government presented no evidence, moreover, that Mr. Orlando had any duty to disclose the tickets or that Mr. Ring aided or abetted him in evading a disclosure obligation.  Indeed, the government presented no evidence to show either that Mr. Ring even provided tickets or that Mr. Orlando attended the game in question.  The email says nothing about concealment or misrepresentations, which is presumably why the government said nothing about it during trial, including during closing argument.

In this same vein, the government has relied on an email from Mr. Ring to David Mielke (another lawyer-lobbyist representing a New Mexico tribe) about discussions with respect to the 2003 Transportation Appropriations bill, in which Mr. Ring noted that he had suggested a reduction for one part of the project being pushed by the New Mexico representative, and then stated "[m]aybe you should delete this email after reading it."  DE 146 at 8-9.  But suggesting that a private lobbyist take actions to preserve the confidentiality of communications by deleting a politically sensitive, private email that neither was under any legal duty to preserve cannot serve as a material act of concealment from the public.[10]

The same is true with respect to the government's claim that a material act of concealment occurred when Mr. Ring allegedly suggested that Mr. Boulanger ask hypothetical questions of the Senate Ethics office without providing names of officials who were the subject of the request.  DE 146 at 10.  Making anonymous requests for ethics advice concerning a possible trip is neither improper nor reasonably cast as an effort to "conceal."[11]  More importantly, a private inquiry to the Senate Ethics officials creates no duty of public disclosure and cannot serve as the requisite concealment of material information needed for a material misrepresentation to the public.

---

[10] Apart from the fact that this email is legally insufficient evidence of concealment, its content also undercuts the government's suggestion of a quid pro quo agreement – central to the government's case – between Mr. Ring and John Albaugh.  The government chose mid-trial to drop Mr. Mielke as a witness and now suggests incriminating conclusions a jury could draw from an email between two lobbyists introduced wholly without context.  DE 146 at 9.  What it ignores is that in that very email, Mr. Ring writes "I just got a note from Istook's CoS asking for the description of [the] I-25 tramway project. I hope that is a good sign."  GX 147A.  Nowhere in the email (or in any other) does Mr. Ring suggest Mr. Albaugh has made explicit promises or even implicit hints about pending official actions to be taken in exchange for a supposed "stream" of tickets and meals.

[11] Of course, the evidence also showed that neither Mr. Ring nor the officials he considered bringing on the trip attended.

Finally, the government has argued that actions by lobbyists to help public officials provide a politically acceptable explanation for their conduct should suffice to meet the material misrepresentation or active concealment requirement.  DE 110 at 6 ("Team Abramoff provided 'public' reasons that public officials could use for supporting a position that contrasted sharply with the 'private reasons' that were the real motivations").  But this is nothing like the sort of *factual* misrepresentation necessary to satisfy the materiality element under *Neder*, and having courts adjudicate whether a material misrepresentation or act of concealment occurs when an elected public official's stated justification for official action is different from their "real" motivation comes uncomfortably close to inviting "questioning" of Members of Congress for their official acts, in violation of the Speech or Debate Clause of Article I, Section VI of the Constitution.[12]  It would likewise result in criminalizing practices that are both widespread and never before thought to be criminal.  If a politician's "public" justification for his or her official acts can be characterized as a misrepresentation any time it is different from the politician's "real" motivation for the official act -- in other words, any time a politician seeks to put a more favorable spin on what he or she is doing -- there is no limit to the sorts of prosecutions that can be brought under this statute despite the Supreme Court's efforts to provide strict limitations in *Skilling*.

---

[12] The *Speech or Debate Clause* provides that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1. The privilege embodied in the *Speech or Debate Clause* was "recognized as an important protection of the independence and integrity of the legislature." *United States v. Johnson,* 383 U.S. 169, 178 (1966); *and see Gravel v. United States,* 408 U.S. 606, 616 (1972) ("[t]he *Speech or Debate Clause* was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch.").

### 5.   The Government's Waiver Arguments Lack Merit

Apart from raising objections on the merits, the government has also earlier sought to argue that Mr. Ring waived or narrowed some these arguments during the jury instructions hearing.  According to the government, Mr. Ring agreed during jury instructions to a concept of materiality that was broader than the one in his moving papers (because it included a misrepresentation directed to a public official's employer), and he is therefore bound by that concept in his MJOA motion.  DE 146 at 6-7.  The Court can give such arguments short shrift.

In the first place, the question in a motion for judgment of acquittal is whether the evidence is sufficient "as a matter of law"[13] -- not whether the evidence met the jury instructions crafted on the fly after the government changed its theory of the case after the close of evidence. In the second place, the Court itself has already noted the confusion during jury instructions on the materiality concept and the need for additional briefing to ensure reasoned consideration of this issue.[14]  Third, Mr. Ring's position in his moving papers is precisely the same as it was

---

[13] In reviewing the denial of a motion for judgment of acquittal, "our review is de novo, considering the evidence in the light most favorable to the government and determining whether any rational trier of fact could find all of the essential elements of the crime beyond a reasonable doubt . . . . As this court has observed, however, this review, although deferential, is not servile: We do not fulfill our duty through rote incantation of these principles followed by summary affirmance. **We must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law.**  A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation."  *United States v. Wilson*, 160 F.3d 732, 737 (D.C. Cir. 1998) (emphasis added and internal citations omitted); *and see* Tr. 10/19/09 at 28-29 (the Court suggests that the government is attempting to expand its evidence of materiality without having argued it in closing, and Mr. Edmonds responds that sufficiency analysis simply looks at whether the evidence was sufficient as a matter of law without regard to what was argued to the jury).

[14] Tr. 10/19/09 at 6:23-25 (THE COURT:  "And I don't understand the [materiality] element particularly well: that's why we're having [this] problem."); at 9:6-9; (THE COURT:  "Mr. Wise has asked for the opportunity to brief it a little more, and I'm not going to obviously deny that opportunity.  It was raised in their motion for judgment."); at 11:10-14 (THE COURT:  "[T]hat's the question I've never addressed, of whether you would have superimposed the way the circuit has discussed in *Safavian*, or whether it is just enough to have the trappings of . . . secrecy"); at 14:22-25 (THE COURT: responding to government argument that materiality should be relaxed in bribery cases, "[y]ou can always charge bribery . . . Don't

(footnote continued on next page)

when materiality was discussed during jury instructions.  Indeed, after the government's eleventh

hour conversion on the materiality element, and after defense counsel stated his initial

impression that the instruction on materiality drafted and tendered by the government that

morning was generally acceptable, the Court asked for more specific objections, specifically

inquiring of Mr. Ring's counsel "what would you do to define materiality?" Tr. 9/30/09 at

101:23-24.  Defense counsel responded:

> [O]ur belief, I guess, is twofold.  One is the duty ought to be to the public since
> this is a public honest services fraud case.  And the second thing is that, and I
> know we'll get to it in a second, but really what we're dealing with on the
> disclosure form is aiding and abetting.  And so you would need some sort of
> instruction about Mr. Ring having specific intent, the same specific intent that
> whoever did the concealment on the disclosure form had.

Tr. 9/30/09 at 101:25-102:8.  This passage -- not cited by the government in its earlier pleadings-

- amply rebuts any "waiver" arguments, as Mr. Ring's position on this issue has been consistent

throughout.[15]  But in any event, the entire issue is a red-herring, as Mr. Ring is not on appeal

complaining about the jury instructions; he is seeking a judgment of acquittal based on a claim

that the government failed as a matter of law to present sufficient evidence of a material

---

(footnote continued from previous page)
forget.  I mean, there is always an easy way to pre[v]ent this . . . ."); at 21:24-22:3 ("I want to focus on
this legal issue . . . it seems to me that I have to decide this and I don't know whether anybody has really
discussed it"); at 22:23-25 (materiality "was not an element that anybody ever focused on.  So that,
whether or not you satisfied that, I do think we have to have briefing.")

[15] Mr. Ring had also raised a similar argument in his initial motion for judgment of acquittal.  *See* DE 108
at 14 (The giving of "gifts that private lobbyists were under no obligation to document cannot be evidence
of deceit, particularly when the gifts were widely known throughout Washington."); at 15 ("Deception
cannot be shown by the failure to create affirmative evidence an individual is under no obligation to
create. . . Moreover, an intent to prevent embarrassment to oneself or one's clients, or to public officials,
or an intent to prevent other lobbyists or political rivals from learning of their competitor's activities, or
even an intent not to create evidence that Congressional officials are violating their administrative gift
rules, is not an intent to deceive or cheat the public by willfully concealing information it had a right to
know.")  The government also fails to mention these earlier arguments when it suggests that Mr. Ring has
waived the right to argue that materiality requires a showing of the violation of legal duty of disclosure to
the public.

misrepresentation.  Whether he is correct is measured by the controlling law on material

misrepresentations, and the government cannot evade those legal standards by pointing to what

did or did not happen during jury instructions.

    **B.**    **The Court Should Grant A Judgment Of Acquittal Because The Government's Trial Evidence Failed To Establish Bribery As Required Under *Skilling v. United States***

The government's trial evidence was also deficient with respect to the proof of bribery --

in particular its failure to show that a public official participated in a bribery scheme by

accepting bribes in exchange for a commitment or promise to provide official acts.  The Court

should accordingly grant a judgment of acquittal on all of the honest services fraud counts for

this reason as well.

The government spent the first trial disclaiming any obligation to prove bribery, and

specifically disclaimed any obligation to prove any promise or commitment by the public official

as part of its honest services fraud case. Tr. 9/30/09 at 65-66 (objecting to any requirement that

the government prove any conduct on the part of the public official; rejecting Court's suggestion

that proof of a "quid pro quo" is required because jurors supposedly "just need to worry about

what Mr. Ring was thinking"); Tr. 9/11/09 at 7-8 ("gifts given to influence.  That is honest

services fraud."); Tr. 8/13/09 at 44 (discussing need to admit evidence relating to campaign

contributions to prove "bribery-esque" conduct).  But the Supreme Court has now made clear  in

*Skilling*  that the government's honest services fraud must include evidence of, among other

things, bribery as defined in 18 U.S.C. § 201(b).  *Skilling*, No. 08-1394, 2010 U.S. LEXIS 5259

at * 103-04 (remaining "core" of honest services law "draws content not only from the pre-

*McNally* case law, but also from federal statutes proscribing -- and defining -- similar crimes",

*citing* 18 U.S.C. 201(b)).[16]  It is clear, moreover, that when the Supreme Court described this requirement, it specified that the government needed to show active participation in the scheme by the public official.  *Skilling*, No. 08-1394, 2010 U.S. LEXIS 5259 at * 94 (core of pre-McNally cases "involved *offenders* who, in violation of fiduciary duty, participated in bribery or kickback schemes.") (emphasis added).  Likewise, in another part of the opinion, the Court made clear that any post-*Skilling* honest services scheme must include proof beyond a reasonable doubt of "acceptance" of a bribe or a kickback by a public official.  Id. at * 102-03 ("A prohibition on fraudulently depriving another of one's honest services by *accepting bribes or kickbacks* does not present a problem on either score.")  (Emphasis added).

To be clear, the Court's decision does *not* mean that a private individual is necessarily off-the-hook for a public honest services fraud scheme -- but it does require that such a scheme include an actual fiduciary breach of the public trust through the acceptance of bribes or kickbacks.  *Skilling*'s focus on the two-sided nature of the exchange -- and the particular importance of the fiduciary's role in the scheme -- was not an aberration; it is black letter law that the essence of bribery is a quid pro quo exchange; the crime is consummated when a "quid" is given "in exchange for (pro)" a "quo." *United States v. Sun-Diamond Growers*, 526 U.S. at 404-05 ("for bribery there must be a *quid pro quo* -- a specific intent to give or receive something of value in exchange for an official act.").  While the official act itself need not be fully completed, there must be a mutually-agreed-upon exchange, the essence of which is

---

[16] Because it was limiting honest services fraud to its "core" of bribery and kickback schemes, the Court in *Skilling* specifically addressed whether its ruling would "render § 1346 superfluous" in light of 18 U.S.C. § 201(b).  *Skilling*, No. 08-1394, 2010 U.S. LEXIS 5259 at * 104-05 n. 46.  The Court responded that it was not superfluous because Section 201 "applies only to federal public officials" and therefore § 1346 was necessary to reach conduct by state and local officials or "private-sector fraud . . . that might otherwise go unpunished.  *Id.*  This case, however, does involve federal public officials, and *Skilling* thus makes clear that the bribery allegations must satisfy the requirements of § 201(b).

*agreement or promise* to exchange a thing of value for an official act.  *United States v. Orenuga*,

430 F.3d 1158, 1166 (D.C. Cir. 2005) (in a bribery case, "the illegal conduct is *taking or*

*agreeing to take money for a promise to act in a certain way."*).

    *Skilling* thus forces the government to prove the essential elements of bribery in all

honest services fraud cases.  The Supreme Court's post-*Skilling* grants of certiorari, vacatur of

the judgment and remand for reconsideration (GVR) in light of *Skilling* in a number of cases,

including *United States v. Scrushy,* No. 09-167, 2010 U.S. LEXIS 5528 (June 29, 2010),

*vacating, United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009), suggests that the Court is

keenly interested in ensuring that the quid pro quo element is vibrant enough to ensure that

*Skilling*'s limitation of the honest services fraud statute cannot be easily evaded.[17]

    For example, the question presented in *Scrushy/Siegelman* was whether the government's

evidence of campaign contributions provided in exchange for official acts constituted sufficient

evidence of a *quid pro quo* to support an honest services fraud conviction.  The Supreme Court's

GVR suggests that the low quid pro quo standard applied by the Eleventh Circuit has been

undermined by *Skilling*, and that a more rigorous showing of a quid pro quo should have been

applied.  *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (GVRs are appropriate only where

"intervening developments . . . reveal a reasonable probability that the decision below rests upon

a premise that the lower court would reject if given the opportunity for further consideration, and

---

[17] On the same day it GVR'd *Scrushy/Siegelman*, the Court also GVR'd four other honest services fraud cases for reconsideration in light of *Skilling*.  *See Hargrove v. United States*, No. 09-929 (GVR entered June 29, 2010), *vacating,* 579 F.3d 752 (7th Cir. 2009); *Hereimi v. United States*, No. 09-1035 (GVR entered June 29, 2010), *vacating, Hereimi v. United States*, __ F.3d __ (9th Cir. 2009); *Harris  v. United States*, No. 09-6516 (GVR entered June 29, 2010), *vacating, Harris v. United States*, 313 Fed. Appx. 969, 2009 U.S. App. LEXIS 4913 (9th Cir. 2009); *Redzic v. United States*, No. 09-7560 (GVR entered June 29, 2010), *vacating, United States v. Redzic*, 569 F.3d 841 (8th Cir. 2009).

where it appears that such a redetermination may determine the ultimate outcome of the litigation.")[18]

Those same concerns would exist here if a judgment of acquittal is not granted; the government's proof of "bribery" in Mr. Ring's trial ignored the need to prove a *promise or agreement* by the public official, instead focusing on unilateral conduct -- gifts of meals and tickets -- that has long been viewed as part of traditional lobbying. *Lobbying Reform: Proposals and Issues: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 109th Cong. 5 (2006) (testimony of Fred Wertheimer, President, Democracy 21) (urging Congress to change the law because the role of campaign contributions and entertainment in Mr. Abramoff's lobbying practice "were not unique to Abramoff; they are common tools of the Washington lobbying trade"). A lobbyist's job is to influence public officials to take official acts that favor their clients. When a lobbyist provides gifts as part of that process, which the testimony at trial showed that many lobbyists did,[19] it will be inevitable that the lobbyist will hope those gifts will influence public officials through the building of relationships that "might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 405 (1999) (describing legal lobbying). Because that sort of generalized

[18] As noted in the motion *in limine* filed today, it is the defense position that, post-*Skilling* and *Siegelman*, an honest services fraud charge against a lobbyist for use of traditional lobbying tools require a showing of an explicit quid pro quo as set forth in *McCormick v. United States*, 500 U.S. 257 (1991), which can not be based simply on a close-in-time proximity between hospitality and official acts.

[19] Not only was the testimony uniform on this issue, the ready availability of meals and tickets prior to the HLOGA has been widely reported. E.g., Ben Bergman, Lobbying Rules Tough To Swallow for D.C. Eateries, National Public Radio, (Feb. 16, 2007), available at http://www.npr.org/templates/story/story.php?storyId=7445120; Jeffrey Birnbaum and Thomas B. Edsall, Hill Gift Limits Often Exceeded, Lobbyists' Records Show, Washington Post (Jan. 1, 2006), available at . http://www.washingtonpost.com/wp-dyn/content/article/2005/12/31/AR2005123100719.html; Thomas Heath, After Abramoff, Nats Fear It's Out With the Hill Crowd, Washington Post, March 28, 2006 (March 28, 2006), available at http://www.washingtonpost.com/wp-dyn/content/article/2006/03/27/AR2006032702036.html.

hope of influence is perfectly legal, there is a tremendous risk of unjust convictions in sending cases like this to the jury, solely on the basis of this sort of traditional lobbying behavior.

This is especially so in light of *Skilling*'s focus on the need for notice, prior to the Supreme Court's decision in *McNally v. United States,* 483 U.S. 350 (1987), that the honest services law criminalized the conduct on which the current charges are based. The majority in *Skilling* held that § 1346 criminalizes *only* the bribery-and-kickback core of the pre-*McNally* case law, and suggested that application of the statute to conduct outside of this "core" is unconstitutional. *Skilling,* No. 08-1394, 2010 U.S. LEXIS 5259 at *97-98. In another part of the opinion, the Court limits the honest services fraud statute to "*paradigmatic* cases of bribes and kickbacks." *Id.* at *101 (emphasis added).

*Skilling* thus prohibits the government from shoehorning outlier facts into the "bribery" mold -- the case must consist of a "paradigmatic" application of the proscriptions against bribery and kickbacks as evidenced by the pre-*McNally* case law. *Skilling*, No. 08-1394, 2010 U.S. LEXIS 5259 at * 103-04 ("as to arbitrary prosecutions, we perceive no significant risk that the honest-services statute, as we interpret it today, will be stretched out of shape.") This case does not fit that mold. Indeed, it is telling that there are *no* instances of the application of the honest services fraud statute, prior to *McNally*, under a theory like the one here -- where the government is arguing that a lobbyist who provides a "stream" of traditional lobbying gifts (meals and tickets), combined with evidence that the lobbyist attempted to influence public officials during the same time frame, gives rise to an inference of an honest services bribery scheme. Moreover, in the only post-*McNally* case to address similar conduct, *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996), the First Circuit repeatedly stressed the unprecedented nature of the prosecution theory, and expressed concern about applying the statute to such facts. *See* Tr. 9/28/09 (p.m.) at

51:12-16) (court notes that *Sawyer* is only honest services prosecution involving lobbying, and that Mr. Ring's case was even more difficult because of his friendship with public officials he was lobbying).  Given the lack of any sort of pre-*McNally* analogue for this sort of prosecution, combined with the longstanding history of this sort of lobbyist-public-official interaction in Washington, to permit such a theory to move forward in the absence of something to distinguish it from the sort of case that could have been leveled against hundreds of Washington lobbyists, gives rise to precisely the same sorts of vagueness and fair-notice concerns that lay at the heart of the Supreme Court's *Skilling* decision.

Only a vigorously applied quid pro quo element -- in which the government proves that a public official participated in the scheme by accepting bribes or kickbacks in exchange for a *commitment or promise* to undertake official acts -- can fairly separate legal lobbying from illegal bribery.  As a result, each of the leading "bribery" cases involving honest services has stressed this requirement and sought to use it as a way of weeding out cases involving legal lobbying.  *E.g.*, *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) ("requiring a jury to find a quid pro quo, as governing law does, ensures that a particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future"); *id.* at 142 ("we . . . hold that the requisite quid pro quo for the crimes at issue may be satisfied upon a showing that government official received a benefit *in exchange for his promise* to perform official acts . . . ."); *United States v. Kemp*, 500 F.3d 257, 281-82 (3d Cir. 2007) ("[t]he key to whether a gift constitutes a bribe is whether *the parties intended* for the benefit to be made in exchange for some official action").  Moreover, other honest-services-fraud-by-bribery prosecutions have involved typical allegations of explicit or implicit exchanges of things of value that are so obviously outside-the-norm (cash, clothing, preferential loans, contracts for

companies in which the defendant had a concealed interest) that their receipt must take place outside of public view and their disclosure might conceivably be inherently capable of influencing the public.  *See, e.g.*, *United States v. Kincaid-Chauncey*, 556 F.3d 923, 942-43 (9th Cir. 2009) (cash), *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (cash and clothing); *United States v. Kemp*, 500 F.3d 257, 281-82 (3d Cir. 2007) (cash, preferential loans, government contracts for company in which defendant had a secret interest).[20]

The common-place nature of the gifts provided in this case take this case well outside the paradigm of *Ganim* and *Kemp*, and make it especially important to vigorously enforce the quid pro quo requirement here.  Indeed, the same considerations that gave rise to the Supreme Court's decision in *McCormick v. United States*, 500 U.S. 257 (1991) -- namely, the danger of applying the anti-corruption laws to innocent, constitutionally-protected conduct -- suggest that the same rigorous quid pro quo requirement should apply, and that proximity in time between gifts and official acts should not be sufficient to get to the jury on this issue.  *McCormick*, 500 U.S. at 272 ("to hold that legislators commit [a] federal crime . . . when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have [intended]").

---

[20] Mr. Ring is not arguing that only a cash payment can form the necessary predicate for an honest services charge.  He is arguing only that there is a substantial difference between providing an obviously illegal thing of value like cash, suits, an undisclosed interest in a business, and using the traditional tools of the lobbying trade, doing things that registered, bona fide lobbyists do in public every day.  There is a reason no lobbyist has ever been on trial before for this sort of conduct in the context of honest services fraud.  Such a common and widespread practice is incompatible with the notion of "fraud."  Indeed, the only other reported case in the country that accused a registered lobbyist of honest services fraud, *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996), not only was brought long after *McNally* but also included proof of a tangible deceit of the public by the lobbyist himself, and did not involve the complicating issue of a lobbyist who was entertaining public officials who were also pre-existing friends.

And yet, the government's proof on this element falls well short of what is required under *McCormick*, and far below what was shown in other honest services bribery cases.  For example, in *United States v. Ganim*, 510 F.3d at 138, the government presented proof of two conversations between Mr. Ganim and private individuals in which he agreed to steer city contracts to them, and in return, they agreed that "a portion of th[e] money [from the agreement] would be to take care of [Ganim].  If he needed cash, we would take care of him.  If he needed suits, we would take care of him . . . ."  Similarly, in *United States v. Kemp*, 500 F.3d at 286, the government presented a taped phone call in which the private individual waived a substantial loan origination fee, and the public official responded that the private individual could always speak to him directly because "you are my f--king guy . . . So you get special treatment."  *Kemp* also noted that the public official did not just say that "special treatment" would be provided, but went on to rig a government bidding process in favor of the private individuals; and the Court then also referred to later conversations in which both the public official and the private individuals had discussed their specific quid pro quo agreements with others.  *Id.*

In short, the "paradigmatic" honest-services-by-bribery cases involved a series of conversations from which a bribery agreement could fairly be inferred, and did not involve drawing inferences of "bribery" from commonplace conduct, participated in every day by public officials and lobbyists who were not engaging in criminal conduct at all.  In such cases, it is particularly important to ensure that the government presents at least some evidence from which a reasonable jury could infer beyond a reasonable doubt that a mutual understanding to "exchange" things of value for a "commitment" or "promise" to provide official acts occurred.

There simply is no such evidence here.  The dearth of evidence on the "pro" -- that is, exchange -- element is particularly telling with Mr. Doolittle and his office.  The government

called no witnesses from that office, and introduced no evidence of any conversations with that

office even approaching a quid pro quo level.  Mr. Ring's contact with that office, moreover, was

largely directly with Mr. Doolittle, and it is clear that the Congressman participated personally in

all of the official acts taken by that office.  Thus, the pertinent question is whether there is any

evidence of any communications between Mr. Ring and Mr. Doolittle from which a quid pro quo

could be inferred.  There is not a scintilla.  Indeed, the government's own witness, Todd

Boulanger, testified that the trust between Mr. Doolittle and Mr. Ring was such that Mr. Ring

didn't have to give Mr. Doolittle a dime to get him to take legislative actions on behalf of

Mr. Ring's clients.  Tr. 9/24/09 (p.m.) at 95:15-96:1.  So the government's own evidence not

only failed to establish a quid pro quo between Mr. Ring and Mr. Doolittle -- it affirmatively

refuted the existence of a quid pro quo.  The Court should accordingly dismiss Count VIII on this

ground alone.

 The government did not introduce testimony about agreements or promises or

commitments even from the few percipient witnesses it did call.  Ms. Copland certainly said

nothing from which it could be inferred that she committed to take official acts in exchange for

tickets and meals.  Nor did Mr. Albaugh, who did not describe a single communication with

Mr. Ring from which it could be inferred that he committed to take official acts in exchange for

meals and tickets.  To be sure, Mr. Albaugh said that he felt at least partially influenced by the

tickets to take official acts, and claimed he did things for Mr. Ring that he did not do for any

other lobbyist.  Even this evidence, however, was insufficient on its face to establish a

commitment on his part beyond a reasonable doubt, since Mr. Albaugh did not refer to any sort

of communication like the ones that were present in *Gamin* or *Kemp*, and since by his own

testimony any purported "special treatment" of Mr. Ring was inextricably intertwined with

undisputedly legal campaign contributions, and was never communicated in any form to Mr. Ring himself.

Under such circumstances, where this is far from a "paradigmatic" pre-*McNally* case of bribery or kickbacks, and where there is a great danger that traditional lobbying conduct and/or campaign contributions were part of any equation, Mr. Ring submits that *Skilling*, combined with the GVR in *Siegelman*, require this Court to rigorously ensure that the government's evidence would suffice to permit a reasonable juror to find that Mr. Ring provided things of value in exchange for a commitment from a public official to provide official acts.  Wherever the Court sets the bar, however, it is clear that the government's proof does not meet it on this issue.

## CONCLUSION

For the reasons set forth above, and for all the other reasons set forth in his oral Rule 29 motion and in his revised motion for Judgment of Acquittal, Mr. Ring respectfully requests that this motion be granted and that the Court enter a judgment of acquittal as to each of the eight counts of the indictment.

Respectfully submitted,

Dated:  July 19, 2010

_/s/ Andrew T. Wise_____
Andrew T. Wise (D.C. Bar # 456865)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 626-5801