**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) ) | |
| v. | ) ) ) | No. 08-CR-274 (ESH) |
| **KEVIN A. RING** | ) ) | |

**KEVIN A RING'S NOTICE OF RULE 806 EVIDENCE**

Kevin A. Ring, through undersigned counsel, hereby provides notice that he intends to present impeachment evidence at trial pursuant to Rule 806 of the Federal Rules of Evidence. The particular items of evidence he seeks to present are discussed more fully below.

A.  **Federal Rule of Evidence 806**

In pertinent part, Fed. R. Evid. 806 provides:

When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

The principle underlying Rule 806 -- that where one side attempts to prove its case with hearsay the other side can respond with hearsay -- is particularly important in conspiracy cases. As this trial has shown, Fed. R. Evid. 801(d)(2)(E) can be used to present to present jurors with a case largely based on statements of those who never see the inside of the Courtroom.  To prevent leaving the fact-finder with a distorted picture from a one-sided hearsay presentation, appellate courts have required district courts to be sensitive to these concerns -- particularly when criminal defendants attempt to present hearsay to respond to Rule 801(d)(2)(e) evidence.

For example, in *United States v. Grant*, 256 F.3d 1146 (11th Cir. 2001), the government presented the testimony of an FBI agent, who testified extensively about statements by alleged co-conspirator Wilson during the course of the conspiracy while the agent was undercover. Those statements involved: (1) Wilson's plans to import marijuana into the United States; (2) Wilson's claims that he had a partner in Jamaica who was his neighbor; (3) Wilson's comments that he had buyers who would assist him in distributing marijuana and cocaine; and (4) Wilson's intent, after purchasing one kilogram of cocaine from the undercover agent, to take the cocaine to his partner for testing and evaluation.  In his direct testimony, the agent's statements had not discussed directly Wilson's relationship with Grant.

In response, the defense sought to present as Rule 806 evidence a declaration Mr. Grant's lawyer had secured from Wilson stating:  (1) Grant had no knowledge of Wilson's actions in consummating the drug deal with the agents; (2) Wilson had falsely told the undercover agents he had a partner because Wilson did not want them to think he was acting alone; (3) Wilson had asked Grant to meet him in Tampa to loan him money; (4) that none of the $ 50,000 in cash Wilson possessed came from Grant; and (5) that Wilson had lied to the undercover agents about Grant not wanting to meet with anyone because Wilson was carrying a large amount of cash and wanted the undercover agents (whom he believed to be criminals) to think he had a partner.  The affidavit was executed after the conspiracy ended and following Wilson's deportation to that country.  The district court refused to admit any of Wilson's affidavit statements, however, finding that they were not specifically inconsistent, as required by *Rule 806*, with the statements of Wilson admitted through the Agent's testimony.

The Eleventh Circuit reversed::

> The government's principal argument mirrors the district court's reasoning that none of the statements in Wilson's affidavit are inconsistent with or contradictory

> to Wilson's conspiracy statements which were admitted through Mozas' testimony. The government points out that none of Wilson's conspiracy statements which were admitted at trial specifically identify Grant as Wilson's partner or as the source of any money used in the transaction . . .
>
> The government's conception of inconsistency is too narrow. Although Grant was specifically identified by Mozas only during cross-examination, his testimony in its entirety did circumstantially link Grant to the conspiracy. At the very least, it indicated that Wilson had a co-conspirator. The government attempted to avoid *Rule 806* by carefully ensuring that Mozas, in testifying about Wilson's statements during the conspiracy, never specifically identified Grant as Wilson's co-conspirator, at least on direct examination, and then presenting other evidence indicating that Grant was Wilson's co-conspirator. [4] Wilson's statements in the proffered affidavit, however, indicate that he had no co-conspirator and, further, that Grant had no involvement in Wilson's drug transactions.
>
> The *Rule 806* test is not whether the inconsistent statements relate to the identity of co-conspirators; that's not what the Rule says. Instead, it says that "any" evidence is admissible "which would be admissible ... if [the] declarant had testified as a witness" from the stand. *Fed.R.Evid. 806*. If Wilson had been called as a witness and testified, for example, that he was taking the cocaine he was buying to his partner to test and evaluate it, his affidavit statements indicating that he had lied to the agents when he told them he had a partner would surely be admissible. Likewise, if Wilson had testified and during cross-examination had said that Grant did not want to meet with anyone, his affidavit statement that he had lied about that would be admissible to impeach him. The test is whether the out-of-court statements would have been admissible for impeachment purposes had the co-conspirator statements been delivered from the witness stand by the co-conspirator himself, not as hearsay about what he said during the conspiracy but as contemporaneous in-court statements.

*Grant*, 256 F.3d at 1153-54; *accord United States v. Wali,* 860 F.2d 588, 591 (3d Cir.1988) (reversing conspiracy and explaining: "We find unpersuasive, however, the government's argument that the statements at issue in this case were not inconsistent. Even though Esser never stated that Wali was the "Hadji" who supplied him with narcotics, the government used his co-conspirator statements to show that they were made in furtherance of a conspiracy to import drugs, thereby inculpating Wali. Thus, Esser's statements to Dutch authorities that exculpated Wali were inconsistent.").

3

As the Court will see below, some of the statements offered by Mr. Ring into evidence are sufficient even to meet the narrowest definition of impeachment evidence. Other proffered impeachment, however, looks much like the declaration at issue in *Grant* -- while not explicitly responsive to the narrow language of the hearsay statements placed into evidence by the government, the impeachment statements being proffered by Mr. Ring clearly rebuts any suggestion of a conspiracy -- which is the entire basis on which the government offered the statements in the first place.

The party who offered the hearsay evidence, of course, has some right to offer statements in what is essentially the hearsay version of "redirect." But that right is limited by other evidentiary principles. Thus, in *United States v. Uvino*, 590 F. Supp. 2d 372 (S.D.N.Y. 2008) (per Weinstein), the district court made clear that the principles of *Crawford v. Washington,* 541 U.S. 36 (2004), supersede those of Rule 806, where the two are in conflict. But where the Defendant introduces hearsay statements from 302 Reports, other portions of same witness statement may become admissible to provide context. Such a ruling is hardly unusual; the Court of Appeals in this Circuit has likewise held that the provisions of Rule 806 are not unbounded but are instead limited by other legal principles as well. *United States v. White*, 116 F.3d 903 (D.C. Cir. 1997). (Rule 806 limited by more specific federal rule governing impeachment by specific examples of misconduct).

B.   **The Proffered Rule 806 Evidence**

With these principles in mind, the defense proffers the following statements for admission pursuant to Federal Rule of Evidence 806.[1] Once the Court determines the

---

[1] Copies of the proposed Rule 806 evidence are attached. In some instances, the defense has offered evidence under Rule 806 that it believes is substantively admissible. At the appropriate time, the defense
(footnote continued on next page)

admissibility of these statements, the defense will formulate a procedure for putting the information before the jury, just as occurred in the previous trial.  *See United States v. Uvino*, 590 F. Supp. 2d at 375 (discussing procedure for use of 302 evidence).

| Witness | Statement(s) | Rule 806 Impeachment |
|---|---|---|
| John Albaugh | GX 4 & 162:  Hearsay statements of Mr. Albaugh to support allegation that tickets and meal received in November 2003 were bribes or gratuities. | Tr. 9/17/09 am at 97:4-98:20 (did not perceive anything about lunch at which tickets were discussed as a reward for official acts). |
| John Albaugh | Hearsay statements of Mr. Albaugh presented by government in support of allegation that Mr. Ring provided things of value in exchange for official act. These include GX 110, GX 129 ("Don't worry about it, just make sure I have the information"); GX 136 ("Aren't you lucky I'm around"); GX 141 ("please send Chinese food"); GX 145 ("Thanks for lunch, and the package"); GX 154 ("So how are we batting for you"); GX 155 ("Judy Istook is going to call you and Jack about the Congressional Spouses club"); GX 158 ("yes, it is helping your projects out"); GX 161 ("Can you go [to lunch] today?"); GX 162 ("Do you have tickets to the Patriot center? I'm looking for 4 tickets for the Lipizzaner Stallion Show?"); GX 163; | **Brady letter of September 28, 2010**<br>Mr. Albaugh stated in sum and substance that he considered the campaign contributions, meals and tickets to be all part of the "things of value," but that he would not have taken the official actions for Mr. Ring if the campaign contributions were not provided. Mr. Albaugh stated in sum and substance that he continued to take actions for Mr. Ring even after he stopped receiving meals and tickets. |

---

(footnote continued from previous page)
reserves the right to offer such materials into evidence for reasons independent of Rule 806, and nothing in this notice should be read to suggest otherwise.

5

|  | GX 164; 165. |  |
| --- | --- | --- |
| John Albaugh | GX 176 (Disclosure form) | Tr. 9/18/09 am at 18:21-19:14. |
| Robert Coughlin | GX 359 (Email government introduced during Mr. Boulanger's testimony to suggest lack of genuine friendship between Mr. Ring and Mr. Coughlin) | DX 17 (showing gifting by Mr. Coughlin to Mr. Ring and using language reflective of personal friendship); DX 27 (email exchange before August 29, 2005); DX 28 (lunch that same day) DX 29 (email less than one-month later from Coughlin recusing himself from investigation because KR an "old friend" and "long-time personal friend") <br><br> These emails are also non-hearsay admissible to show Mr. Ring and Mr. Coughlin engaged in conversations of the sort from which friendship can be inferred, and are also admissible to show state of mind under 803(3). <br><br> Government letter to defense counsel of September 4, 2009: <br><br> "Mr. Coughlin does not believe that his friendship with Mr. Ring changed when Mr. Coughlin began working at the U.S. Attorney's Office for the Eastern District of Virginia. If the two spent less time together, it was because Mr. Coughlin no longer worked in downtown Washington and was busier, and because of Mr. Ring's family responsibilities." |
| Robert Coughlin | Hearsay statements of Mr. Coughlin in GX 300, GX 335, GX 336, GX 337, GX 338, GX 339, 340, GX 341 used by | Same stipulation as given at trial from **MOI 3/7/2007** <br> The parties agree to the following stipulation: |

6

| | | |
|---|---|---|
| | government to support allegation that Coughlin received tickets to Wizards Game as a gratuity. | Coughlin said he did not perceive the tickets as a reward.  Coughlin said he would have asked Ring for the tickets anyway - independent of Ring's request for assistance.  Mr. Coughlin's attorney asked him if this was given to him as a friend.  Coughlin replied, "Absolutely."  Coughlin said there was no connection to the Eshkol/SEVIS matter. |
| Robert Coughlin | Hearsay statements of Mr. Coughlin offered by government to support allegation that Mr. Coughlin exchanged official acts for things of value.  These include GX 300, GX 335, GX 336, GX 337, GX 338, GX 339, 340, GX 341. | September 4, 2009 Letter from Government to Mr. Ring's counsel: At the time of his actions, Mr. Coughlin did not believe that he acted other than in the government's best interests. The things of value Mr. Ring gave him did not influence Mr. Coughlin's official actions. At the time of his actions, Mr. Coughlin did not believe he was treating Mr. Ring preferentially. |
| Robert Coughlin | Hearsay statements in GX 569 offered to suggest that Mr. Coughlin discussed offer of a job and/or proposed a starting salary. | **September 4, 2009 letter from government to defense counsel**: Though he admitted discussing with Mr. Ring the prospect of working at Greenberg Traurig LLP (GT), Mr. Coughlin was never interviewed by GT, has never been to GT, and did not send his resume to or discuss a starting salary with anyone at GT. |
| Robert Coughlin | GX 315 & 317, statements of | DX 17:  February 2002 email |

7

| | | |
|---|---|---|
| | Mr. Coughlin presented to support government allegation that he knew significant and confidential details about the Choctaw jail funding in the Winter of 2002, and provided those details to Mr. Ring. | from Coughlin to Mr. Ring: "I am dying for details about the Choctaw Jail $" Also admissible to show state of mind under 803(3) and as noted above as non-hearsay demonstrating that Mr. Ring and Mr. Coughlin had conversations reflecting close personal friendship. |
| Ann Copland | Statements of Ms. Copland presented by the government in support of allegation that she provided official acts in exchange for things of value. These include GX 502, 503, 505, 506, 507, 509, 510, 515, 516, 519, 520, 521, 522, 524, 525, 526, 529, 530, 531, 532 | From Copland's 2/28/07 302 at 4:<br><br>COPLAND worked with BOULANGER, SHAWN VASELL, and KEVIN RING, in that order, on CHOCTAW issues. Without being asked by the interviewing SAs, COPLAND, advised that she was never asked to do anything legislatively by BOULANGER, VASELL, or RING that she was not already working on for the CHOCTAW. COPLAND emphasized that she never did anything legislatively as a result of receiving tickets or other gifts. |
| Peter Evich | Statements of Mr. Evich offered by government to support allegation that he performed official acts in exchange for things of value. These include GX 214, GX 258, 259, and GX 208A. | 08/29/2007 302 at 13:<br><br>Lunches with lobbyists were common. He does not know if these lobbyists also made contributions, or provided meals and tickets. EVICH explained that RING was a close friend before he started lobbying. EVICH did not deal directly with ABRMOFF much at all. EVICH dealt with RING on many issues. EVICH and RING had a reciprocal gift giving relationship. |

8

| | | |
|---|---|---|
| | | EVICH never accepted a gift or gratuity from RING with the feeling that he needed to return a legislative favor, and he is pretty sure RING never had that in mind. <br><br> EVICH was shown a copy of an e-mail marked with Bates stamp PGE-SR0035187, dated 09/12/00, with a subject line of "skins tix." EVICH did not believe that there was a quid pro quo here; RING did not have to bribe me. RING had direct access to DOOLITTLE, so why would he need EVICH . . . EVICH insisted that he did not take a ticket for any official act. |
| Jack Abramoff | Statement of Mr. Abramoff offered by the government to support its allegation that Ms. Doolittle received a little-work job. GX 242: "I want her to help, but not be overburdened with work." GX 243: "I don't want her to have to do too much, though, since she has responsibilities at home as a mother and as a wife." Offered to show Jack Abramoff intended for Julie to do "little work." Also needed to complete GX 247 & 248. | DX 340: "I'd like to get her to do something for the restaurants. She is a real hustler and gets things done on the Hill. Can she help us here?" Entire chain should be admissible under Rule 803(3), Rule 807, and under *Reyes v. United States*, 577 F.3d 1069 (9th Cir. 2009). |
| Tracy Henke[2] | GX 318 ("If you haven't contacted the tribe yet, hold off. I want to attempt one | Tracy Henke Grand Jury Testimony of November 14, 2007 at pp. 68:16-70:6 |

---

[2] The defense has not attached Ms. Henke's Grand Jury testimony excerpts, but will provide a copy for the Court at the hearing tomorrow.

| | |
|---|---|
| | more appeal"); GX 319 (Tracy Henke called); GX 320 ("my one last ditch attempt regarding the Choctaw was unsuccessful") | (discussing how she made decision to award $16.3 million). |

                        Respectfully submitted,

                        _____/s/ Timothy P. O'Toole_____
                        Andrew T. Wise (D.C. Bar # 456865)
                        Timothy P. O'Toole (D.C. Bar # 469800)
                        MILLER & CHEVALIER CHARTERED
                        655 Fifteenth Street, N.W., Suite 900
                        Washington, DC  20005-5701
                        Tel. (202) 626-5800
                        Fax. (202) 626-5801

Dated:  October 31, 2010